**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 16-cv-00230-CMA-SKC (consolidated for all purposes with
Civil Action No. 16-cv-01215-CMA-SKC and Civil Action No. 16-cv-03162-CMA-SKC)

JOAN OBESLO,
JAMES DIMAGGIO,
ANNE HALL,
CAROL A. REYNON-LONGORIA,
CYNTHIA BERNAL,
TINA GORRELL-DEYERLE, on behalf of Great West Funds, Inc.,

    Plaintiffs,

v.

GREAT-WEST CAPITAL MANAGEMENT, LLC,

    Defendant.

---

DUPLASS, ZWAIN, BOURGEOIS, PFISTER & WEINSTOCK APLC 401 (K) PLAN,

    Plaintiff,

v.

GREAT-WEST CAPITAL MANAGEMENT, LLC,

    Defendant.

---

JOAN OBESLO,
JAMES DIMAGGIO,
ANNE HALL,
CAROL A. REYNON-LONGORIA,
CYNTHIA BERNAL, and
TINA GORRELL-DEYERLE, on behalf of Great-West Funds, Inc.,

    Plaintiffs,

v.

GREAT-WEST LIVE & ANNUITY INSURANCE CO, and
GREAT-WEST CAPITAL MANAGEMENT, LLC,

    Defendants.

**ORDER DENYING DEFENDANTS' MOTIONS TO STRIKE
PLAINTIFFS' EXPERT WITNESSES**

This matter is before the Court on Defendants Great-West Capital Management, LLC and Great-West Life & Annuity Insurance Company, LLC's Motion to Strike Plaintiffs' Proffered Expert Brian Henderson (Doc. # 287) and Motion to Strike Plaintiffs' Proffered Expert J. Chris Meyer (Doc. # 288). Both Motions have been fully briefed.[1] (Doc. ## 294, 296, 299, 301.) For the reasons that follow, the Court denies both Motions.

## I.    BACKGROUND

The Court detailed the factual background of this case at the September 27, 2018 hearing at which the Court denied Defendants' Motion for Summary Judgment. (Doc. # 272.) That order is incorporated by reference, and the facts explained therein need not be repeated. The Court recounts only the facts necessary to address Defendants' Motions to Strike.

Great-West Funds, Inc. is an entity composed of over 60 mutual funds. (Doc. # 248 at 10.) The mutual funds include actively managed funds, index funds, and asset allocation funds. (*Id.* at 10–11.) Defendant Great-West Capital Management, LLC

---

[1] Neither party requested oral argument on these Motions, and the Court does not find that a hearing is necessary under the circumstances.

(GWCM) provides investment advisory services for Great-West Funds for all series of its shares. (Doc. # 252-1 at 13.) Great-West Funds compensates GWCM based on a percentage of the total value of assets under management for each fund. (*Id.*) Defendant Great-West Life & Annuity Insurance Co. (GWLA) provides administrative services for various Great-West Funds plans. (*Id.* at 12.) Great-West Funds compensates GWLA through an administrative services fee of 0.35% (35 "basis points" or "bps") for certain share classes of the Great-West Funds. (*Id.*)

Plaintiffs are shareholders in the mutual funds managed by Defendants. (Doc. # 230-1 at 2.) Plaintiffs filed this suit on behalf of themselves individually as well as all other shareholders of Great-West Funds, alleging that Defendants violated § 36(b) of the Investment Company Act of 1940 (the "ICA"). (*Id.*) Plaintiffs argue Defendants charged excessive fees, and, therefore, violated the ICA's "fiduciary duty [on investment advisers] with respect to the receipt of compensation for services." 15 U.S.C. § 80a-35(b).

In support of their arguments, Plaintiffs intend to call J. Chris Meyer and Brian Henderson as expert witnesses. Mr. Meyer has "24 years of experience working for advisers to four different mutual fund families[,] and [he] was involved in the processes by which those advisers satisfied their statutory fiduciary duties under . . . the [ICA] in informing and obtaining approval from mutual fund boards of their compensation." (Doc. # 294 at 1.) Mr. Meyer's proffered opinions relate to "the lack of care and conscientiousness of Great-West Funds' Board of Directors . . . in connection with its

3

approval of fees paid by Great-West Funds to GWCM and GWLA . . . and how disproportionate those fees were to the services actually rendered." (Doc. # 288-1 at 5.)

Plaintiffs intend to call Dr. Henderson as a rebuttal witness to opine on the testimony of Dr. Glenn Hubbard, who is one of Defendants' expert witnesses. Defendants "retained Dr. Hubbard to assess, from an economic and comparative perspective, the fees Defendants charged the Great-West mutual funds." (Doc. # 282 at 45.) Defendants expect that Dr. Hubbard "will offer expert testimony that the fees of the Great-West mutual funds are consistent with the fees of their respective peer funds." (*Id.*) Plaintiffs expect that Dr. Henderson—a professor of Finance—will identify analytical and methodological errors in Dr. Hubbard's analysis. (Doc. # 296 at 1.) Additionally, Plaintiffs anticipate that Dr. Henderson will adjust Dr. Hubbard's methodology "with more prudent assumptions" which will show that the fees at issue are comparatively higher than Dr. Hubbard suggests. (Doc. # 287-1 at 6.)

Defendants filed the instant Motions to Strike Dr. Henderson's and Mr. Meyer's testimony on February 11, 2019. (Doc. ## 287–88.) Plaintiffs filed Responses on March 4, 2019 (Doc. ## 294, 296), and Defendants filed Replies on March 18, 2019 (Doc. ## 299, 301).

## II.     LEGAL STANDARD

Under *Daubert*, the trial court acts as a "gatekeeper" by reviewing a proffered expert opinion for relevance pursuant to Federal Rule of Evidence 401, and reliability pursuant to Federal Rule of Evidence 702. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589–95 (1993); *see also Goebel v. Denver & Rio Grande W. R.R. Co.*,

215 F.3d 1083, 1087 (10th Cir. 2000). The proponent of the expert must demonstrate by a preponderance of the evidence that the expert's testimony and opinion are admissible. *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009); *United States v. Crabbe*, F. Supp. 2d 1217, 1220–21 (D. Colo. 2008); F.R.E. 702 advisory comm. notes. This Court has discretion to evaluate whether an expert is helpful, qualified, and reliable under Rule 702. *See Goebel*, 214 F.3d at 1087; *United States v. Velarde*, 214 F.3d 1204, 1208–09 (10th Cir. 2000).

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Rule 702 provides that a witness who is qualified as an expert by "knowledge, skill, experience, training, or education" may testify if:

    (a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
    (b)    the testimony is based on sufficient facts or data;
    (c)    the testimony is the product of reliable principles and methods; and
    (d)    the expert has reliably applied the principles and methods to the facts of the case.

F.R.E. 702.

In deciding whether expert testimony is admissible, the Court must make multiple determinations. First, it must first determine whether the expert is qualified "by knowledge, skill, experience, training, or education" to render an opinion. *Nacchio*, 555 F.3d at 1241. Second, if the expert is sufficiently qualified, the Court must determine whether the proposed testimony is sufficiently "relevant to the task at hand," such that it "logically advances a material aspect of the case." *Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 884, 884 n.2 (10th Cir. 2005). "Doubts about whether an expert's

5

testimony will be useful should generally be resolved in favor of admissibility unless there are strong factors such as time or surprise favoring exclusions." *Robinson v. Mo. Pac. R.R. Co.*, 16 F.3d 1083, 1090 (10th Cir. 1994) (quotation omitted).

Third, the Court examines whether the expert's opinion "has 'a reliable basis in the knowledge and experience of his [or her] discipline.'" *Norris*, 397 F.3d at 884, 884 n.2 (quoting *Daubert*, 509 U.S. at 592). In determining reliability, a district court must decide "whether the reasoning or methodology underlying the testimony is scientifically valid." *Id.* (quoting *Daubert*, 509 U.S. at 592–93). In making this determination, a court may consider: "(1) whether a theory has been or can be tested or falsified, (2) whether the theory or technique has been subject to peer review and publication, (3) whether there are known or potential rates of error with regard to specific techniques, and (4) whether the theory or approach has general acceptance." *Norris*, 397 F.3d at 884 (citing *Daubert*, 509 U.S. at 593–94).

The Supreme Court has made clear that this list is neither definitive nor exhaustive. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999). In short, "[p]roposed testimony must be supported by appropriate validation—i.e., 'good grounds,' based on what is known." *Daubert*, 509 U.S. at 590.

The requirement that testimony must be reliable does **not** mean that the party offering such testimony must prove "that the expert is indisputably correct." *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1233 (10th Cir. 2004) (quoting *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 781 (10th Cir. 1999)). Rather, the party need only prove that "the method employed by the expert in reaching the conclusion is scientifically sound and that the

opinion is based on facts which sufficiently satisfy Rule 702's reliability requirements." *Id.* Guided by these principles, this Court has "broad discretion" to evaluate whether an expert is helpful, qualified, and reliable under the "flexible" standard of F.R.E. 702. *Velarde*, 214 F.3d at 1208–09; *Daubert*, 509 U.S. at 594.

### III.   ANALYSIS

Defendants argue that Brian Henderson and J. Chris Meyer should be precluded from offering expert opinions because both purported experts lack sufficient qualifications and employed unreliable methods in their analysis. Additionally, Defendants argue that Mr. Meyer's opinions should be precluded on the basis of relevance. (Doc. # 288 at 3.)

**A.   WHETHER PLAINTIFFS' EXPERTS ARE SUFFICIENTLY QUALIFIED**

Rule 702 sets a "liberal standard" for qualifying a witness as an expert. *United States v. Gomez*, 67 F.3d 1515, 1525-26 (10th Cir. 1995); 4 Jack B. Weinstein et al., *Weinstein's Federal Evidence* § 702.04[1][a], at 702–50 (supp. 2019). "Rule 702 only requires that an expert possess 'knowledge, skill, experience, training, or education' sufficient to 'assist' the trier of fact, which is 'satisfied where expert testimony advances the trier of fact's understanding **to any degree**.'" *Robinson v. Geico Gen. Ins. Co.*, 447 F.3d 1096, 1100 (8th Cir. 2006) (emphasis added) (internal quotation marks omitted). "[O]nly a relatively modest degree of specialized knowledge" is necessary*.* 29 Charles Alan Wright & Victor James Gold, *Federal Practice and Procedure* § 6265 (1997 & Supp. 2012).

It is an abuse of discretion to exclude a witness as an expert if the witness is "generally qualified." 4 Weinstein et al., *supra*, § 702.04[1][a], at 702–52 n.6. A witness who "lacks expertise in specialized areas that are directly pertinent to the issues in question" is qualified "if the witness has educational and experiential qualifications in a general field related to the subject matter of the issue in question." *Id.* § 702.04[1][a], at 702–51; *see In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994) ("We have eschewed imposing overly rigorous requirements of expertise and have been satisfied with more generalized qualifications.").

"It is not required that experts be 'blue-ribbon practitioners' with optimal qualifications." *Id.* (quoting *United States v. Mahone*, 453 F.3d 68, 71 (1st Cir. 2006)). To be qualified as an expert, a witness need not have the particular degree or training which the court believes would be the most appropriate. *Id.* § 702.04[1][a], at 702–51; *In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829, 855 (3d Cir. 1990) (finding trial court abused its discretion by excluding testimony regarding the cause of a plaintiff's physical and emotional injuries on the ground that the witness lacked a degree in medicine or chemistry—the witness was adequately qualified by extensive research in toxicology). However, a witness "'should have achieved a meaningful threshold of expertise' in the given area." *Levin v. Dalva Bros., Inc.*, 459 F.3d 68, 78 (1st Cir. 2006) (quoting *Prado Alvarez v. R.J. Reynolds Tobacco Co.*, 405 F.3d 36, 40 (1st Cir. 2005)).

As indicated by the use of the disjunctive "or" in Rule 702, any one of the five bases listed in the Rule may be sufficient to qualify a witness as an expert: "knowledge, skill, experience, training, or education." *Lavespere v. Niagara Mach. & Tool Works,*

*Inc.*, 910 F.2d 167, 176 (5th Cir. 1990), *abrogated on other grounds by Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 n.14 (5th Cir. 1994); 4 Weinstein et al., *supra*, § 702.04[1][c], at 702-57; 29 Wright & Gold, *supra*, § 6265. None of the bases is essential, and none is ranked more highly than another. *United States v. Anderson*, 446 F.3d 870, 875 (8th Cir. 2006). Thus, a lack of practical experience does not prevent a witness from qualifying as an expert. The focus is on whether the witness has sufficient expertise to assist the finder of fact. 4 Weinstein et al., *supra*, § 702.04[1][d].

Accordingly, "[g]aps in an expert witness's qualifications or knowledge generally go to the weight of the witness's testimony, not its admissibility." *Robinson*, 447 F.3d at 1100 (internal quotation marks omitted).

1. Dr. Henderson

Plaintiffs have designated Dr. Henderson as a rebuttal witness. Specifically, Plaintiffs retained Dr. Henderson to "replicate and evaluate the methodology and assumptions used by Dr. Glenn Hubbard in his analysis of Great-West mutual fund fees relative to peer groups." (Doc. # 287-1 at 6.) Defendants argue that Dr. Henderson's opinions should be excluded because Dr. Henderson is not sufficiently qualified to offer an expert opinion. (Doc. # 287 at 3–4.) Specifically, Defendants assert that Dr. Henderson: does not have experience analyzing peer group methodologies; has not done academic research with regard to mutual funds in particular; and did not review data related to mutual fund peer group construction before reaching his opinion. (*Id.* at 9–10.)

9

However, although Dr. Henderson has not specialized in mutual fund peer group construction in particular, he has substantial training and experience in the related field of finance and investment. Specifically, Dr. Henderson holds multiple degrees in Finance and Quantitative Finance. (Doc. # 287-1 at 5.) Additionally, he has had professional experience working for investment management firms, where his duties have included, *inter alia*, "quantitative [investment] model development, enhancement, and deployment," which indicates that he has significant familiarity with constructing and analyzing financial models. (*Id.* at 4.)

Currently, Dr. Henderson is employed as a Professor of Finance at the George Washington University School of Business in Washington D.C., where his "primary areas of research include investment performance measurement and evaluation . . . ." (*Id.* at 4.) Relevant here, Dr. Henderson's "research is empirical in nature, requiring [him] to work with large datasets of financial market data." (*Id.*) Therefore, Dr. Henderson has the requisite training, education, and experience to offer an opinion about "the methodology and assumptions used by Dr. Glenn Hubbard in his analysis of Great-West mutual fund fees relative to peer groups" (*Id.* at 6) because that inquiry is directly related to Dr. Henderson's research in, and experience with, investment performance measurement and evaluation.

Moreover, any weaknesses in an Dr. Henderson's testimony from not having worked exclusively in a certain field go to the weight of his testimony, not its admissibility. As long as an expert stays within the "reasonable confines of his subject area," "a lack of specialization does not affect the admissibility of [the expert opinion],

but only its weight." *Compton v. Subaru of Am., Inc.*, 82 F.3d 1513, 1520 (10th Cir. 1996), *overruled on other grounds*, *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999); *see also Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 (10th Cir. 2001).

    2.    <u>Mr. Meyer</u>

Plaintiffs retained Mr. Meyer to provide expert opinions regarding the investment management fees and the administrative services fees at issue in this case. (Doc. # 288-1 at 5.) Specifically, Mr. Meyer's opinions address "the lack of care and conscientiousness of Great-West Funds' Board of Directors . . . in connection with its approval of fees paid by Great-West Funds to [Defendants] . . . and how disproportionate those fees are to the services actually rendered." (*Id.*)

Mr. Meyer received his Bachelor of Business Administration from the University of Iowa, where studied Financial Management and Financial Economics. (*Id.* at 104.) Professionally, Mr. Meyer began his career in finance and ultimately specialized in the mutual fund industry. (*Id.* at 5, 104.) After working for four firms as a Senior Vice President over the course of twenty years, Mr. Meyer gained experience in the following areas related to mutual funds:

- Fund design, development, and management;
- Investment performance analysis and monitoring;
- Sales and marketing;
- Market share analysis and monitoring;
- Board relationships;
- Annual contract renewal;
- Expense analysis;
- Sub-advisory management and oversight; and
- Retirement plan marketing and operations.

(*Id.* at 6.) Currently, Mr. Meyer is semi-retired, and he provides consulting services to "investment management [firms] related to product and distribution issues." (*Id.* at 103.) Relevant here, Mr. Meyer recently worked on the development of a database used to measure the value of investment products and firms. (*Id.*)

The text of F.R.E. 702 "expressly contemplates that an expert may be qualified on the basis of experience," and "[i]n certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony." F.R.E. 702 advisory comm. notes (2000). Mr. Meyer's education in financial management and his experience working in the mutual fund industry provide the requisite credentials for Mr. Meyer to be qualified as an expert with regard to mutual fund products and services related to mutual funds. Mr. Meyer's experience led to the conclusions he reached because the duties he performed in the industry were related to the duties of the board of directors at issue. Additionally, Mr. Meyer's educational background in financial economics provides sufficient foundation for him to opine on related matters such as economies of scale, profitability, fall-out benefits, and damages.

As with Dr. Henderson, "to the extent there are any gaps or other flaws in the relevant qualifications of these witnesses, those gaps go to the weight and credibility to be accorded to their opinions and not to the admissibility of those opinions." *Nicastle v. Adams Cty. Sheriff's Office*, No. 10-cv-00816-REB-KMT, 2011 WL 1655547, at *5 (D. Colo. Apr. 29, 2011).

## B. RELIABILITY AND RELEVANCE OF THE EXPERTS' OPINIONS

Once an expert is deemed sufficiently qualified, then "the court must determine whether the expert's opinion is reliable by assessing the underlying reasoning and methodology." *United States v. MacKay*, 715 F.3d 807, 834 (10th Cir. 2013) (quoting *United States v. Avita-Guillen*, 680 F.3d 1253, 1256 (10th Cir. 2012)). Additionally, courts must determine whether the expert's opinion is relevant. *York v. BNSF Ry. Co.*, No. 17-cv-1088-RM-STV, 2019 WL 764574, at *6 (D. Colo. Feb. 21, 2019).

The goal of a trial court's assessment of an expert's opinion is to make a preliminary assessment whether (1) the reasoning or methodology underlying the witness's testimony is valid, and (2) the reasoning or methodology can be properly applied to the evidence or facts at issue. 4 Weinstein et al., *supra*, §§ 702.05[2][a] (citing *Daubert*, 509 U.S. at 592–93). "Generally, the district court should focus on an expert's methodology rather than the conclusions it generates." *Crew Tile Distrib., Inc. v. Porcelanosa Los Angeles, Inc.*, No. 18-1029, 2019 WL 852293, at *7 (10th Cir. Feb. 21, 2019) (quoting *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003)). Accordingly,

> the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination. **Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the [trier of fact] must such testimony be excluded**.

*First Union Nat. Bank v. Benham*, 423 F.3d 855, 862 (8th Cir. 2005) (emphasis added) (quoting *Bonner v. ISP Tech., Inc.*, 259 F.3d 924, 929–30 (8th Cir. 2001)).

Ultimately, courts are required to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152.

1. Dr. Henderson

In assessing the opinion of Defendants' expert—Dr. Hubbard—Dr. Henderson sought to recreate Dr. Hubbard's methods and then evaluate them by making alterations to Dr. Hubbard's approach. According to his report, Dr. Henderson was "able to replicate very closely Dr. Hubbard's analysis based on the computer programs and the descriptions in [Dr. Hubbard's] report." (Doc. # 287-1 at 6.) After reproducing Dr. Hubbard's methodology, Dr. Henderson analyzed the results and determined that Dr. Hubbard had included "funds that are not economically similar" to the funds at issue. (*Id.* at 10.)

Dr. Henderson then made adjustments for such irregularities and concluded that some of Dr. Hubbard's "assumptions bias the peer group construction and comparison in favor of Great-West mutual funds." (*Id.* at 18.) Additionally, Dr. Henderson found that "after adjusting the methodology with more neutral assumptions, Great-West fees rank worse among peer funds." (*Id.*)

Dr. Henderson's methodology is valid because he recreates and evaluates another expert's opinion based on an informed assessment of the strengths and weaknesses of the other expert's approach. Additionally, Dr. Henderson's analysis can be properly applied to the facts at issue because the altered assumptions upon which

14

Dr. Henderson bases his conclusions are founded on Dr. Henderson's knowledge and experience in investment performance measurement and evaluation. Moreover, Dr. Henderson provides reasons and explanations in support of each of his conclusions. *E.g.*, (*Id.* at 10) (explaining why some funds Dr. Hubbard considered are "not economically similar" to the funds at issue). Finally, Dr. Henderson's opinion is relevant: if Dr. Hubbard's analysis is flawed and the Great-West fees actually rank less favorably among peer funds, it is more likely that those fees are excessive, which is the ultimate issue in this case. *Norris*, 397 F.3d at 884, 884 n.2.

    2.    <u>Mr. Meyer</u>

The method that Mr. Meyer employed in his analysis was to consider information relevant to the fees at issue and then reach an opinion about whether those fees were excessive in light of the applicable standard, his education, and his experience. *See generally* (Doc. # 288-1) (Meyer Report). Accordingly, Mr. Meyer opined on each of the factors set forth in *Gartenberg v. Merrill Lynch Asset Management, Inc.*, 694 F.2d 923 (2d Cir. 1982) as well as the issue of damages. For factors such as whether the Great-West Board of Directors was fully informed, Mr. Meyer based his opinion on his experience "informing and obtaining approval from mutual fund boards" with respect to issues related to the ICA. *See* (Doc. # 294 at 1). For factors such as the profitability of the funds, Mr. Meyer based his opinion on his educational background as well as his prior work experience as a chief financial officer. *See* (Doc. # 288-2 at 13–14).

Defendants argue that "Meyer's opinions on the *Gartenberg* factors . . . fail to satisfy the requirements of relevance and reliability . . . [and] [t]he same is true for his

15

opinions on damages, which are based on models that have been rejected by courts and are inconsistent with his own deposition testimony." (Doc. # 288.) However, Defendants arguments largely focus on Mr. Meyer's qualifications, his credibility, and the ultimate conclusions that he reached. The Court has already determined that Mr. Meyer is sufficiently qualified. *See supra* Section III(A)(2). Further, Mr. Meyer's credibility is a proper subject for cross examination, and "the district court should focus on an expert's methodology rather than the conclusions it generates." *Crew Tile Distrib.*, 2019 WL 852293, at *7 (quoting *Dodge*, 328 F.3d at 1222 (10th Cir. 2003)).

Additionally, many of Defendants' arguments regarding the reliability of Mr. Meyer's opinions relate to the conclusions that Mr. Meyer reached, and those arguments are based on authority that is not binding on this Court. For instance, Defendants assert that Mr. Meyer's opinion regarding economies of scale is unreliable because "[i]n order to show that a change in costs resulted from economies of scale and not other factors, a plaintiff **must** 'create a detailed analysis of each element of a transaction surrounding [the fund], over an extended period of time, over different levels of activity[.]'" (Doc. # 288 at 8) (emphasis added) (quoting *Krinsk v. Fund Asset Mgmt., Inc.*, 715 F. Supp. 472, 498 (S.D.N.Y. 1988)). However, in *Krinsk*, the Southern District of New York's holding was more limited than Defendants contend.

In fact, the court simply found "that merely because the ratio of fee based expenses to fee based revenues declined at a time when the Fund size grew, that fact does not establish that such a decline was necessarily due to economies of scale." *Krinsk*, 715 F.3d at 498. As a preliminary matter, it is not clear that Mr. Meyer's opinion

16

is analogous to the facts in *Krinsk*. *See* (Doc. # 288-1 at 71–77) (considering profitability rather than revenue alone, fixed costs, expenses, etc.). Therefore, although the non-binding precedent established in *Krinsk* may suggest that Mr. Meyer's conclusion is inaccurate, the case does not establish that his methods are inherently unreliable.

Similarly, Defendants argue that "[e]stablishing a fall-out benefit requires the satisfaction of a strict 'but for' test," and Meyer's analysis is unreliable because he "makes no effort to apply this test." (Doc. # 288 at 13) (citing *Krinsk*, 715 F.3d at 498). Although the "but for" standard the Southern District applied in *Krinsk* may ultimately prove to be persuasive[2] in determining the legal standard applicable to fall-out benefits, the Court is unconvinced that this non-binding precedent renders Mr. Meyer's opinion on the matter unreliable.

In sum, considering Mr. Meyer's background and experience, the methods that he employed are sufficiently reliable for him to offer his opinions at trial. Mr. Meyer's opinions are not "so fundamentally unsupported that [they] can offer no assistance to the [trier of fact] . . . ." *First Union*, 423 F.3d at 862. Additionally, Mr. Meyer's opinions are relevant because they relate to whether the fees at issue are excessive as well as the applicable amount of damages. *Norris*, 397 F.3d at 884, 884 n.2.

### IV. **CONCLUSION**

Based on the foregoing reasons, the Court ORDERS that Defendants' Motion to Strike Plaintiffs' Proffered Expert Brian Henderson (Doc. # 287) is DENIED. It is

---

[2] The Court cautions the parties not to overstate the effect of non-binding legal authority in their briefing or at trial.

FURTHER ORDERED that Defendants' Motion to Strike Plaintiffs' Proffered Expert J. Chris Meyer (Doc. # 288) is DENIED.

DATED: April 17, 2019

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge