IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.:  1:16-cv-00230-CMA-SKC (Consolidated for
all purposes with Civil Action Nos. 1:16-cv-01215-CMA-SKC
and 1:16-cv-03162-CMA-SKC)

JOAN OBESLO, et al.,
Plaintiffs,
v.
GREAT-WEST CAPITAL MANAGEMENT, LLC,
Defendant.
_____

DUPLASS, ZWAIN, BOURGEOIS, PFISTER & WEINSTOCK APLC 401(K)
PLAN,
Plaintiffs,
v.
GREAT-WEST CAPITAL MANAGEMENT, LLC,
Defendant.
_____

JOAN OBESLO, et al.,
Plaintiffs,
v.
GREAT-WEST LIFE & ANNUITY INSURANCE CO., et al.,
Defendants.
_____

REPORTER'S TRANSCRIPT
(Trial to the Court - Day 10)
_____

        Proceedings before the HONORABLE CHRISTINE M.
ARGUELLO, Judge, United States District Court, for the
District of Colorado, commencing at 8:28 a.m. on the 27th
day of January, 2020, Alfred A. Arraj United States
Courthouse, Denver, Colorado.

# A P P E A R A N C E S

**FOR THE PLAINTIFFS:**
MICHAEL A.  WOLFF and KURT C. STRUCKHOFF, Schlichter
Bogard and Denton, LLP, 100 S. 4th St., Suite 1200, St.
Louis, MO 63102

MARK T. JOHNSON, Schneider Wallace Cottrell Konecky
Wotkyns LLP, 2000 Powell St., Suite 1400, Emeryville, CA
94608

LYDIA M. FLOYD, Peiffer Rosca Wolf Abdullah Carr & Kane,
1422 Euclid Ave., Hanna Building, Suite 1610, Cleveland,
OH 44115

**FOR THE DEFENDANTS:**
SEAN M. MURPHY and James D. Whooley, Milbank Tweed Hadley
& McCloy LLP, 28 Liberty St., 47th Floor, New York, NY
10005-1413

ROBERT LIUBICIC, Milbank Tweed Hadley & McCloy LLP,
2029 Century Park E., 33rd Floor, Los Angeles, CA
90067-3019

EDWARD C. STEWART, Wheeler Trigg O'Donnell, LLP, 370 17th
St., Suite 4500 Denver, CO 80202-5647

ROBERT M. LITTLE, Great-West Life & Annuity Insurance
Company, 8515 E. Orchard Rd., Tower II, 5th Floor,
Greenwood Village, CO 80111

# I N D E X

**WITNESSES:**                                                          **PAGE**

### MARY MAIERS

CROSS-EXAMINATION BY MR. WOLFF                                          1819
REDIRECT EXAMINATION BY MR. MURPHY                                      1846

### DR. ROBERT G. HUBBARD

DIRECT EXAMINATION BY MR. MURPHY                                        1853
CROSS-EXAMINATION BY MR. WOLFF                                          1904
REDIRECT EXAMINATION BY MR. MURPHY                                      1954

### ARTHUR LABY

DIRECT EXAMINATION BY MR. MURPHY                                        1960


# E X H I B I T S

**NO.**                                                            **ADMITTED**

|    7 | 1850 |
|   30 | 1853 |
|  250 | 1835 |
| 1298 | 1910 |
| 1300 | 1992 |
| 1313 | 1997 |
| 1351 | 2009 |
| 1354 | 1992 |
| 1568 | 1985 |
| 1569 | 1984 |
| 1583 | 1889 |
| 1596 | 1874 |
| 1597 | 1877 |
| 1602 | 1910 |
| 1607 | 1887 |

1              **JANUARY 27, 2020**

2              (Proceedings commence at 8:28 a.m.)

3              THE COURT:  Good morning.  You may be seated.

4              All right.  We are back on the record for day 10 in

5    16-cv-00230, Obeslo, et al., v. Great-West Capital

6    Management.  Counsel is present.

7              Are we ready to proceed?

8              MR. WOLFF:  Yes, Your Honor.

9              MR. MURPHY:  Yes, Your Honor.

10             THE COURT:  Mr. Wolff, you may proceed.

11             MR. WOLFF:  Thank you, Your Honor.

12                          **MARY MAIERS**

13   having been previously duly sworn, testified as follows:

14                       **CROSS-EXAMINATION**

15   **BY MR. WOLFF:**

16   Q.   Good morning, Ms. Maiers.  I don't believe I took

17   your deposition, but I am the attorney for the plaintiffs,

18   as I am sure you know.

19             You finished your testimony on Friday afternoon,

20   and you were under a sequestration order from the Court.

21   Did you talk to anybody about your testimony after you

22   were off the stand on Friday?

23   A.   No.

24   Q.   And did you talk to anybody about potential

25   cross-examination today?

1   A.   Let me clarify.  I have talked to my counsel.

2   Q.   "Anybody" means anybody.

3        MR. MURPHY:  Your Honor, so, I didn't believe -- I

4   think once cross-examination starts, I believe you are not

5   allowed to talk to the witness.  Certainly prior to her

6   direct examination, I am allowed to prep her for her

7   examination.

8        I think it is fair game to ask if she was

9   sequestered and did she talk to anybody about her

10  testimony or did I provide her information about anybody's

11  testimony.  But I am certainly allowed to meet with my

12  witness until she is on cross-examination.  That is my

13  understanding of the rules.

14       THE COURT:  That is my understanding, as well.

15       MR. WOLFF:  My understanding of the rules is once

16  the witness takes the stand, the witness cannot be

17  communicated with, even by counsel.

18       THE COURT:  No.  She can always communicate with

19  counsel.

20  Q.   (BY MR. WOLFF)  Ms. Maiers, other than Great-West,

21  you have never worked for another mutual fund adviser?

22  A.   No.

23  Q.   It is true that you haven't worked for any other

24  mutual fund sub-adviser than Great-West Capital

25  Management; right?  Have you worked for any mutual fund

1    adviser other than Great-West Capital Management?

2    A.   I was just trying to think if I had any roles in

3    other investment advisers within the Great-West structure.

4    But, no, I don't think I ever had any official roles with

5    them, like Great-West has other investment advisers.

6    Q.   So, to the extent you did any work for other mutual

7    fund advisers, it would have been potentially one of the

8    other Great-West affiliates, such as Irish Life or Putnam?

9    A.   And we have an adviser, AAG.  But, no.  I am thinking

10   I have never had any official role with any other

11   investment adviser.

12   Q.   Do you have any basis -- you testified about a lot of

13   the work that you do in the operations department

14   regarding the Great-West mutual funds.  Do you have any

15   understanding that the work that you described is

16   different from work that other mutual fund advisers

17   perform for their mutual fund companies?

18   A.   I would say that we do have in-house fund

19   administration, and that is different from some investment

20   advisers.  Many investment advisers would outsource out,

21   and we do all of that work in-house.

22   Q.   Apart from whether it is in-house or out-house, the

23   same work is being done whether it is the in-house group

24   or the subcontracted group?

25   A.   Generally, yes.  There could be minor differences

1  depending on asset types, and maybe -- sometimes that work

2  isn't even -- is so minor it wouldn't be significant.

3  Q.   All right.  You do not recall informing the

4  Great-West Funds, Inc., Board that you or your department

5  do things for the Great-West mutual funds that is not

6  performed by other mutual fund advisers?

7  A.   Our board knows that we have in-house fund

8  administration, is that what you are asking?

9  Q.   No.  What I was just asking is whether you inform the

10  board that here are things we do that nobody else does?

11  A.   I don't know if we would have described it that way.

12  Q.   And at least as of 2016, only about half of your time

13  was spent on Great-West Funds; is that right?

14  A.   Yes.

15  Q.   And was that generally true in 2015?

16  A.   Most likely, yes.

17  Q.   And also 2017?

18  A.   Most likely.

19  Q.   Now, you mentioned on Friday programming robots, in

20  terms of inputting information from trade files into your

21  accounting system.  I'd just like to clarify what you mean

22  by that.  Your trade files aren't, like, physical files,

23  like paper; right?

24  A.   No.

25  Q.   It is all electronic; right?

1   A.   Yes.

2   Q.   Your accounting system isn't in big green ledger

3   books, it is all electronic; right?

4   A.   Yes.

5   Q.   So you don't actually have robots going around the

6   office building, physical robots; right?

7   A.   No.

8   Q.   What you have is you've developed the software

9   program to take the electronic files -- the information

10  from the electronic trade files and automatically input it

11  into the accounting system?

12  A.   Yes.

13  Q.   It's just a software program that was done?

14  A.   Yes, that is a software program.  And then where the

15  manual work comes in is if all of the securities in the

16  trade file aren't already in the accounting system, and so

17  then, you know, like the trade file will break, and then

18  we have to manually set up the securities within the

19  accounting system.

20  Q.   And the "we have to manually," that is where human

21  beings come in and take over?

22  A.   Yes.

23  Q.   Not robots?

24  A.   Right.

25  Q.   And that automation system was implemented in 2020?

1   A.   The robots?

2   Q.   The programming, this automated entry of trade file

3   data into the accounting system?

4   A.   No.  We have been doing that -- we started doing

5   that, I think, in 2018.  Probably went into full

6   production probably in 2020, but I think we had been

7   working on it for quite a while.

8   Q.   Started the programming work in 2018?

9   A.   Uh-huh.  I think so.

10  Q.   Now, the cost for all of the operations work that you

11  described on Friday, that is included in the Net Income by

12  Fund Charts under the category Operations Expenses; is

13  that right?

14  A.   Say that question again?

15  Q.   Yes.  The operations work that you described on

16  Friday, the cost for providing that work is included in

17  the Net Income by Fund Charts that you provided to the

18  board; right?

19  A.   Yes.

20  Q.   And that is under the category "Operations Expenses"?

21  A.   Yes.

22       MR. WOLFF:  So, if we can have Exhibit 1047,

23  please, page 175.  And if we can just expand that whole

24  part there, just to see it a little more clearly.

25  Q.   (BY MR. WOLFF)  "Operations expenses," is this column

1825

1   E?

2   A.   Yes.

3   Q.   And that is showing operations expenses as a

4   percentage of assets?

5   A.   Yes, it is in basis points.

6   Q.   It is in percentages, but to convert it to base

7   points, for example, for the S&P 500 Index Fund, it is 1.6

8   basis points --

9   A.   Yes.

10   Q.   -- of the average annual net assets of the S&P 500

11   Index Fund?

12   A.   Right.

13   Q.   Now, up here at the top, there is this key that helps

14   one interpret this document to show that the operating

15   margin is taking the net adviser fee minus portfolio

16   management expense, operations expense, et cetera.  Net

17   income is taking the operating margin, taking out

18   corporate overhead.  So, the net income is 22 basis points

19   for the S&P 500 Index Fund out of a starting point of 25

20   basis points.

21        The first time that was put on the Net Income by

22   Fund Chart was in the report provided to the board in

23   2017?

24   A.   That what was put on there?  We have used this chart

25   for many years.

1826

1   Q.   The key to understanding these columns?

2   A.   The key, yeah.  One of the directors actually asked

3   if we would add that key to this chart so they could

4   understand -- I think it was for their discussions,

5   actually, so they could use it for their discussion

6   purposes.

7        So, before that, we would have to put notes down at

8   the bottom.  In the previous years you would have seen

9   like a little subscript, like number one or something next

10  to these headings.  And then this year we branched out, at

11  the board's request, to add those letters at the top.

12       MR. WOLFF:  If we can go to Exhibit 1023, the 2016

13  15(c) materials, page 173.  And if we could expand the

14  same section for that Income by Fund Chart.

15  Q.   (BY MR. WOLFF)  This is how that information had been

16  presented for all previous years?

17  A.   Yeah, except for -- if you are asking, like, at the

18  bottom end of this report, there would have been footnotes

19  that described what each of the columns represented.  You

20  can see, like, the little subscript numbers.

21  Q.   Yeah, kind of.

22  A.   Or superscript.

23       MR. WOLFF:  If you can close this window.

24  Q.   (BY MR. WOLFF)  So, not down at the bottom of the

25  page, but at the end of the Net Income by Fund Chart.

1827

1        Now, if we can go back to 1047, and to page 175.

2    In addition to putting the key to understanding this chart

3    with those letters and formulas at the top, you also

4    provided 10 pages of explanation of those charts, starting

5    on page 164.  If we can go there.  And go to the next

6    page.  Next page.  Next page.  Next page.

7        Here is a page explaining the parent profitability

8    analysis.  That is all of the profits that GWL&A makes

9    from both the 35 basis point fee and the profits it

10   receives from Capital Management; is that right?

11   A.   Yes.

12   Q.   Next page.  More explanation of the parent

13   profitability analysis.  Next page.  Explaining the

14   estimated profitability under the new advisory agreement.

15   And that continues on to page 173.  But those pages of

16   explanations of the Net Income by Fund Chart, that was

17   provided for the first time to the board in 2017?

18   A.   And so if you would -- if you go back and look, all

19   of those previous pages, those explanations would have

20   been in those footnotes.  And so the reason we added the

21   profitability guide was because we were adding this

22   modeling under this new advisory agreement.  And so we

23   wanted to make sure that we were clear as to what we had

24   prepared for them, so they could understand our approach

25   to the modeling.

1828

```
1            So we added that.  And then, I think, since we knew
2    we had to explain that further, we just pulled it all out.
3    And it is a cleaner presentation.
4    Q.   Now, the 2015 Net Income by Fund Chart that was
5    provided to the board in 2016, which we just looked at in
6    Exhibit 1023, that had to be corrected at the board's
7    meeting in June; correct?
8    A.   Well, we corrected it before that, yes, before the
9    meeting.
10   Q.   The correction was presented to the board in June;
11   correct?
12   A.   Yes.
13   Q.   Exhibit 30.  So, do you recognize this as the
14   document in which those corrections were being provided?
15   A.   No.  This is Jonathan Kreider's discussion guide.
16   Q.   All right.  Well, if we can go to the next page of
17   Exhibit 30.  It's the start of Mr. Kreider's discussion
18   guide.  Then if we can go to page 37, it's the end of his
19   discussion guide.  And then page 38 -- see how it says
20   page 38 at the bottom?
21   A.   Yes.
22   Q.   This is the beginning of the explanation of the
23   mistakes in the 2015 Net Income by Fund Chart that was
24   provided to the board in March and April; correct?
25   A.   Yes.
```

1    Q.   Then the next page is providing the updated

2    information.  Next page is more updated charts.  Next

3    page, more updated information.  Next page, a sheet with

4    footnotes on it.  Next page is showing the difference

5    between the revised profitability and the original

6    profitability; right?

7    A.   Yes.

8    Q.   Going on to page 52, the end of the presentation on

9    the profitability revisions on pages 38 to 52 of Exhibit

10   30; correct?

11   A.   Yes.

12   Q.   You talked about the work you had to do on some form

13   called N-PORT; is that right?

14   A.   Yes.

15   Q.   That regulation went into effect last year?

16   A.   Yes.  I think it was effective -- I think the first

17   time we had to file was in the spring of 2019.

18   Q.   Okay.  So that had nothing to do with expenses in

19   2017 and before?

20   A.   We would have been starting to prepare for that

21   regulation, because the regulation came out in 2016.  But

22   I am not a hundred -- I don't know if we would have

23   started charging the funds until it was effective.  I

24   don't know.

25   Q.   And, in any case, if you did charge the funds for

1    preparing for that, that would be in the operations

2    expense category on the Net Income by Fund Charts?

3    A.   Yes.  But I'm not sure, like, if we would have

4    started paying, like, the licensing and stuff yet.

5    Q.   You provided the treasurer's report -- the quarterly

6    treasurer's report to the board at the quarterly meetings;

7    is that right?

8    A.   Yes.

9        MR. WOLFF:  And if we can have Exhibit 1077,

10   please.  This is the June 23, 2016 minutes.  If we could

11   go to page 18.  And if we could expand these two

12   paragraphs, please.

13   Q.   (BY MR. WOLFF)  So, this is the portion of the

14   meeting at which you made your presentation that refers to

15   your treasurer's report, in the first paragraph.  Then

16   also reviewing the report on 12b-1 fees paid by the funds,

17   noting that 12b-1 funds are paid to GWFS Equities, Inc.,

18   which then pays GWL&A for distribution-related services,

19   including payments to unaffiliated financial

20   intermediaries.

21        So, you remember presenting -- so, the treasurer's

22   report and the 12b-1 fees report in your presentation to

23   the board, was that part of a single document?

24   A.   They might be in separate sections, but the 12b-1

25   report is generally right after the treasurer's report.

1    So, at that time, they could have been together.  I don't

2    know.

3    Q.    Okay.  If we can have Exhibit 10, please.  So, this

4    is an example of the cover of your treasurer's report; is

5    that right?

6    A.    Yes.

7    Q.    If we can go to the second page.

8          MR. MURPHY:  Your Honor, just an objection that

9    this is outside of the scope of my direct.  I certainly

10   didn't ask her anything about a treasurer's report.

11   Ms. Maiers was on their will-call list, and they decided

12   not to call her.  And I feel like I am getting a little

13   bit of their examination had they called her, instead of

14   responding to my cross.  And I just ask for a standing

15   objection.

16         THE COURT:  All right.  How is this within the

17   scope of the direct?

18         MR. WOLFF:  Because she testified about all of the

19   work she provides in the operations department.  Part of

20   the work is tracking the 12b-1 fees.  And so I want to get

21   into what that work involved.

22         THE COURT:  All right.  The objection is overruled.

23   Q.    (BY MR. WOLFF)  So, this is an example of a page --

24   the second page of your treasurer's report.  Essentially

25   it is the same format every quarter?

1    A.   Generally, yes.

2    Q.   I just want to go to page 16.  So, as part of your

3    treasurer's report, this is the section on 12b-1 fees?

4    A.   Correct.

5    Q.   All right.  Page 17.  This is showing what was

6    collected by GWFS.  It was all paid to GWL&A.

7            MR. WOLFF:  And then if we can expand this box.

8    Q.   (BY MR. WOLFF)  The footnote here shows GWL&A paid

9    levelized compensation to unaffiliated broker/dealers and

10   other financial intermediaries, et cetera.  So, this is

11   describing the distribution-related services that are

12   being paid for by GWL&A?

13   A.   Yes.

14   Q.   This is something that you track as part of your

15   operations work?

16   A.   I don't track their payments.  I track that top part

17   of how much is paid out of the funds.  And then we ask our

18   intermediary -- we are describing to the board what our

19   intermediaries are doing with those fees.

20   Q.   This information, though, is reported to you as part

21   of the accounting system?

22   A.   How much is paid out of the funds, the 12b-1 fees?

23   Q.   The information on page 17.

24   A.   Well, that is what I am trying to clarify.  Okay, so

25   that first number, that top number where it says "amounts

1833

1   of the funds paid," that is out of our fund accounting

2   system and confirmed with our transfer agent.  And then

3   this part about fees paid to GWL&A, that would have come

4   out of GWFS Equities' records.

5   Q.   All right.  But that is reported to your department

6   so you can include it in your report?

7   A.   Correct.

8        MR. WOLFF:  If we can go to page 18.  And if we can

9   expand that chart so it is a little easier to see.

10  Q.   (BY MR. WOLFF)  So, this is a list of the top 10

11  broker/dealers to whom the 12b-1 payments were made?

12  A.   Uh-huh, yes.

13  Q.   And these aren't GWL&A employees; right?

14  A.   No.  These are unaffiliated broker/dealers.  It says

15  they are unaffiliated.

16  Q.   All right.  And the information that is on here is

17  part of a longer list of a report from Investment

18  Administration of payments under 12b-1 in the

19  administrative services agreements?

20  A.   You are kind of mixing terminology, so I just want to

21  be clear.  There is a longer list -- this is the top 10.

22  And there is a longer list of who GWL&A paid levelized

23  comp to.  Is that what you are asking?  Yes, it is a

24  subset of that list.

25  Q.   You are familiar with the longer list?

1    A.   I have seen it before.  And we get that list from

2    Great-West.  So, I'm not -- it isn't part of something

3    that I work on.  I am not very familiar with it.

4    Q.   Do you know who Securities America, Inc., is?

5    A.   No.

6    Q.   Do you know if they are one of the entities on this

7    list?

8    A.   No.

9    Q.   Would it refresh your recollection to see that list?

10   A.   Yes.  If you show me, I can see if they are on there.

11        MR. WOLFF:  Okay.  We have physical copies of this,

12   Your Honor.  But I would like to display document

13   GWCM-03871134, a 43-page document that ends in

14   GWCM-03871176.

15   Q.   (BY MR. WOLFF)  Do you recognize this as the long

16   list of that information?

17   A.   Yes.

18   Q.   If you can go to page 3.

19   A.   Okay.  Yes, I see Securities America, Inc.

20   Q.   As one of the revenue dealers not in the top 10;

21   correct?

22   A.   Correct.

23   Q.   If we could go to Exhibit 250, please.  Part of the

24   work that you describe as part of operations, that include

25   providing budgets?

1835

1   A.   Yes.

2        MR. WOLFF:  All right.  And so if we can just

3   expand that to make it a little more easy to see.

4   Q.   (BY MR. WOLFF)  This is an email with you -- and

5   Kelly New is somebody in your department?

6   A.   She is the assistant treasurer for the funds.

7   Q.   All right.  John Clouthier, C-L-O-U-T-H-I-E-R.  What

8   is his position?

9   A.   He is also an assistant treasurer for the funds.

10  Q.   So, as part of your work in doing the budgeting,

11  somebody warned you that the GW Fund directors asked for

12  another increase for 2017?

13  A.   Yes.  They were asking us to budget that increase.

14       MR. WOLFF:  Move to admit Exhibit 250, a stipulated

15  exhibit.

16       THE COURT:  250 is admitted.

17       (Exhibit No. 250 is admitted.)

18  Q.   (BY MR. WOLFF)  I would like to pull up Exhibit 1555.

19  Now, you kind of blazed through this on Friday, so I want

20  to get a little clarification on this.  You were telling

21  the Court, Judge Arguello, that this is the profit margin

22  on Great-West Capital Management's 25 basis point

23  investment advisory fee in 2015?

24  A.   I think this chart is GWCM and GWL&A profitability.

25  Q.   So, it's showing the profitability of both Great-West

1    Capital Management on a 25 basis point fee and GWL&A's

2    profitability on its own 35 basis points fee?

3    A.    Correct.

4    Q.    So, you are not representing that this is the profit

5    margin on the 25 basis point advisory fee that Capital

6    Management got in the S&P 500 Index Fund in 2015?

7    A.    No.  I don't have that number in front of me.  But I

8    don't think that that is what this was trying to present.

9    Q.    Okay.  It was a little unclear to me when I saw it on

10   Friday, so thank you for clearing that up.

11        So, even just as -- well, let's take a look at the

12   Net Income by Fund Chart, and understand where the 71.64

13   percent combined profit margin comes up.  Let's have

14   Exhibit 1030, and go to page 6.

15        So, this is, again, a different version of the

16   exhibit we saw earlier, but this is now in color, showing

17   the revised 2015 net income by fund?

18   A.    Yes.

19        MR. WOLFF:  If we can just highlight the index fund

20   section and the headers.

21   Q.    (BY MR. WOLFF)  So, focusing on S&P 500 index funds,

22   the profit margin you are showing the Court in Exhibit

23   1555 is in this column (indicating)?

24   A.    Yes.  We would have weighted these profit margins by

25   the assets under management, and it would have been the

1    average assets under management, to come up with a fund

2    level profitability, because this presentation is by share

3    class.

4    Q.   Okay.  So, if I understand what you mean by that, so

5    these three numbers are the ones you are averaging; 66.41,

6    87, and 59.72?

7    A.   Well, and we may have actually just averaged the

8    dollar profit and loss when we did it.  I would have to go

9    back and check.  I don't recall.

10   Q.   When you say "averaged the dollar profit and loss,"

11   that is in the far right column that has the exponent 11

12   on it?

13   A.   Yeah.  I am not recalling exactly that formula.  But

14   it is -- you weight these formulas by the average net

15   assets in each of the classes of shares.  And that is not

16   on this page, but it is on the previous page, I think, or

17   one of the earlier ones, and you can see that, like, some

18   of the share classes, like the Class L share class is much

19   smaller than the other two.

20   Q.   And how did you do the weighting?  Did you use the

21   percentages or the numbers?

22   A.   Yeah, I am sorry, I don't recall.

23   Q.   But, that Exhibit 1555 was done under your

24   supervision, you said?

25   A.   It was.  It just wasn't done -- you know, it wasn't

1    yesterday.  So, no, I don't recall.

2    Q.   Do you know who did do that math?

3    A.   It would have been somebody on my team that prepared

4    it.  I know I have checked it, I just can't recall the

5    math.

6    Q.   You don't know who that was?

7    A.   Not for certain.

8    Q.   The institutional shares of the Great-West S&P 500

9    Index Fund is just the 25 basis point fee; right?

10   A.   Yes.

11   Q.   And the profit margin for that is 87 percent, whether

12   you look at it from just Great-West Capital Management or

13   if you look at it combined; GWCM and parent profitability

14   ratio; right?

15   A.   Right, yes.

16   Q.   That number is calculated by taking the GWCM net

17   income number, which is the 25 basis point advisory fee,

18   minus the portfolio management fee, minus the operations

19   expenses, and dividing that by 25; correct?

20   A.   And overhead.

21   Q.   And overhead, okay.  Overhead for the S&P 500 Index

22   Fund is probably less than a basis point; right?

23   A.   I don't know off the top of my head.

24   Q.   So 25 minus the sub-advisory expense, which is .75,

25   minus operations expense, minus overhead, whatever those

1839

 1   numbers are, is the net income number; right?

 2   A.   That sounds right.

 3   Q.   You take that net income number and divide it by 25

 4   to get the profit margin?

 5   A.   Yeah.

 6   Q.   That is what gives us 87 percent as Capital

 7   Management's profit margin on its advisory fee in 2015;

 8   right?

 9   A.   Uh-huh.  Yes.

10   Q.   But that is not what you put in your Exhibit 1555;

11   right?

12   A.   I am sorry, I don't have Exhibit 1555.  Is that that

13   summary?

14   Q.   If we can go back to Exhibit 1555.

15   A.   So, no.  This was a -- this is a summary of all three

16   share classes, and it is weighted.  So, yeah.  And --

17   yeah.  I guess I don't understand what you are asking.

18   Q.   What does Exhibit 1555 have to do with judging the

19   appropriateness of Capital Management's 25 basis point

20   fee?

21   A.   I mean, it is a summation -- it is a summary of the

22   profitability on that fund from GWCM and the Great-West

23   perspective.  It's a view.

24   Q.   Just a view.

25        Exhibit 1556.  So, all of the numbers on here, this

1840

1    is the combined profit margin of Capital Management on its

2    advisory fee and on GWL&A on its 35 basis point fees,

3    taking into account all share classes of these funds?

4    A.    Correct.

5    Q.    Do you know how those various share classes were

6    averaged?

7    A.    Again, it would have been a weighted average based on

8    the number of shares or dollars in each share class.

9    Q.    Right.  But how was that done?  Was it done with the

10   profit margin number?  Was it done by just adding up the

11   dollars and then dividing it by the average net assets?

12   A.    Yeah, I don't recall.  If I would have remembered, it

13   would have been the same formula we used on the 2015

14   version.

15   Q.    Right.  Which you don't recall.

16         MR. WOLFF:  If we can go to Exhibit 1047, page 175.

17   And if we can expand the "index fund" section.

18   Q.    (BY MR. WOLFF)  So, the profit margin on Capital

19   Management's investment advisory fee is 87.92 percent; is

20   that right?

21   A.    Yes.

22   Q.    But that, in 2017, when you were reporting the 2016

23   numbers, you are only providing a combined mix; right?

24   A.    Would you repeat the question?  In 2017?

25   Q.    2017 is when you presented this to the board, which

1    is the 2016 --

2    A.   Oh, okay.

3    Q.   -- net income by fund --

4    A.   I see what you are saying, yes.

5    Q.   -- is that right?

6         Ms. Maiers, this is probably your first time

7    testifying, so if you can make sure I get my question out

8    before you give your answer --

9    A.   Okay.

10   Q.   -- it will be easier for the court reporter to take

11   it down.

12   A.   Okay.

13   Q.   So, this is the information that was provided to the

14   board in 2017; right?

15   A.   Yes.

16   Q.   In 2017, all of the share classes of the S&P 500

17   Index Fund are being combined together?

18   A.   Correct.

19   Q.   So, unlike in 2015, we can't look at just the

20   institutional shares to see what the profit margin was on

21   the 25 basis point investment advisory fee for the funds

22   where that is the only fee being charged; right?

23   A.   Correct.

24   Q.   If we look just at those numbers, the GWCM

25   profitability ratio, just its advisory fee, would be

1    higher than 87.92 percent?

2    A.   You are saying if we broke them out?

3    Q.   Look just at the institutional shares.

4    A.   I don't know.

5    Q.   Well, given what we looked at in 2015, doesn't it

6    appear that that would be the case?

7    A.   Well, I wouldn't know without looking at the official

8    details, so I am not going to speculate.

9    Q.   And the board, in looking at this, wouldn't know that

10   either; right?

11   A.   The board is required to approve the investment

12   advisory contract for the fund.  And so we are showing

13   them legally what they need to see to do that.

14   Q.   And here is the 69.25 percent figure that you have in

15   your Exhibit 1556; is that right?

16   A.   Yes.

17        MR. WOLFF:  And if you'd go back to Exhibit 1030,

18   at 6.  So, just focusing on the revised profitability

19   ratio table, if we can highlight the S&P 500 Index Fund

20   portion.

21   Q.   (BY MR. WOLFF)  This shows that, if you look just at

22   the institutional share class, which has just the 25 basis

23   point advisory fee, the profit margin is 87 percent;

24   right?

25   A.   Yes.

1843

1    Q.   If you include the initial share class, which has the

2    35 basis point administrative services fee being paid to

3    GWL&A, that drops down to 51.21 percent; right?

4    A.   Yes.

5    Q.   If you add to that the 12b-1 fees that go to the

6    broker/dealers that is included in the L shares, that goes

7    down to 49.37 percent; right?

8    A.   Yes.  And there are other expenses that are by share

9    class.  So, sometimes, like, a transfer agent fee or

10   registration fees and stuff also vary.  So that isn't a

11   clear view.  But, yes, those are probably the larger

12   differences.

13   Q.   So, by whatever math you are doing it, if you average

14   these numbers, the average is going to be less than 87

15   percent?

16   A.   Right.

17   Q.   Do you recall that the SEC criticized Capital

18   Management in reporting the profitability on its advisory

19   fund of including as a cost the 35 basis point fee?

20   A.   I don't remember that they criticized us on that.

21   They asked us to show the parent profitability in a

22   different manner on our profitability.  I don't remember

23   them criticizing us at all on having it as you've

24   described.

25   Q.   If we can go to Exhibit 1005, going to the 15(c)

1844

1    materials, page 144, the SEC letter describing

2    deficiencies and weaknesses in 2013.  Do you remember

3    seeing that?

4    A.    Yes.

5            MR. WOLFF:  If we can go to page 146 of Exhibit

6    1005, and expand this paragraph.

7    Q.    (BY MR. WOLFF)  "The staff reviewed GWCM'S

8    profitability analysis titled 'Investment Company

9    Administration Net Income by Fund."  Those are the charts

10   we have been looking at?

11   A.    Uh-huh.  Yes.

12   Q.    The examiner points out, "For recordkeeping and

13   administrative services, Capital Management agreed to pay

14   GWL&A 35 basis points on the GW Funds' assets under

15   management, excluding the Money Market and the external

16   underlying fund investments," et cetera.  The 15(c)

17   materials, Capital Management indicated that it cost 18.2

18   basis points, resulting in 16.2 basis points of profit for

19   GWL&A.

20           "The profitability analysis shows that 35 basis

21   points, not 18.2 basis points, is deducted from the

22   advisory fee revenue received by Capital Management,"

23   right?  So the profitability analysis is the net income by

24   fund?

25   A.    Yes.

1845

1    Q.   And back before May 1, 2015, Capital Management's

2    advisory fee was 60 basis points for the S&P 500 Index

3    Fund, representing its 25 basis point advisory fee and

4    GWL&A's 35 basis point fee?

5    A.   Yes.

6    Q.   The SEC points out that putting in 35 basis points at

7    the beginning, and then taking out 35 basis points as a

8    cost, "appears to understate GWCM's profitability because

9    the profitability analysis" -- net income by fund -- "does

10   not reflect the net cost to that the administrative

11   services agreement between GWCM and GWL&A has on GWCM's

12   profitability."  Do you remember reading that?

13   A.   I do.  And so my interpretation --

14   Q.   The question is just whether you remember seeing

15   that.

16   A.   Yep.  Yes, I do.

17   Q.   If we can go to the next page, which is an example

18   showing how profit adding, including the administrative

19   services expense of 35 basis points, tends to make the

20   profit margin look smaller than it actually is.  That is

21   what that example is showing?

22   A.   Yes.

23   Q.   And that has the effect of understating

24   profitability?

25   A.   That is what they are saying.  It says by not

1    reflecting that, they felt like we needed to have all of

2    that on one page so it is clearer to the board.  We were

3    disclosing that in a different manner.  But they felt like

4    it all just needed to be on one page, which is how, then,

5    we started presenting it after that.

6    Q.   And in your Exhibits 1555 and 1556, the profit

7    margins that you are showing, those are profit margins

8    that are including that same 35 basis point fee; right?

9    A.   So, for -- yes.  Yes, it would be.

10         MR. WOLFF:  No further questions, Your Honor.

11         THE COURT:  Mr. Murphy?

12         MR. MURPHY:  Thank you, Your Honor.

13         If we could pull back up 1005, please.  Then what

14   page was that, do you know?

15         MR. WOLFF:  146.

16         MR. MURPHY:  Page 146, please.

17                     **REDIRECT EXAMINATION**

18   **BY MR. MURPHY:**

19   Q.   Ms. Maiers, can you generally describe what you

20   understand to be the issue the SEC was raising?

21   A.   Yeah.  Previous to 2011 -- so, they would have looked

22   at 2011.  I can't remember by the time the exam got done

23   when we actually changed our presentation.  But, previous

24   reports that we would have prepared, we would have

25   presented the 35 basis points and the profitability on

1    that in a different manner to the directors.

2         And I believe they fully understood exactly the

3    level of profit that we were receiving on that.  And then

4    when the SEC came in and they saw how we were -- because

5    the 35 basis points was entirely in the management fee at

6    the time, they just felt a cleaner presentation for the

7    board would be to show it all on one page.

8         And so that is what we did.  And, you know, I think

9    their language, they say "this appears to understate,"

10   well, because they aren't saying specifically this does

11   understate, like, they knew we were showing it.  They just

12   said it is a cleaner presentation.

13   Q.   So, the information about GWL&A's profitability was

14   elsewhere in the materials?

15   A.   Yes.

16   Q.   And they wanted it all presented in one chart?

17   A.   Yes.

18   Q.   And they wanted the GWL&A profitability presented

19   with GWCM's profitability?

20   A.   They did.

21   Q.   And this issue, I think you said, related to 2011 and

22   carried on through 2013?

23   A.   I don't know if it was through 20- -- I can't

24   remember.  Like, because the exam went for a while, and

25   then the results.  So, I don't know.  Obviously they

1   looked at 2011.  I am sure 2012 was presented that way.

2   And then with 2013, is when we first combined it all

3   together.  I can't remember.

4   Q.   Well, during the periods relevant to this litigation,

5   2014 to 2017, did you present profitability the way the

6   SEC had suggested?

7   A.   Oh, yes.

8   Q.   Mr. Wolff asked you if the 35 basis point fee was in

9   fund profitability.  Do you recall that?

10  A.   In that exhibit?

11  Q.   Yes.

12  A.   Yes.

13  Q.   But, so, that is reported as revenue?

14  A.   Yes.

15  Q.   And when you get to the costs of providing those

16  services, you provide the actual cost of providing those

17  services?

18  A.   Right.

19  Q.   If we can see Exhibit 7.  Does this appear to be a

20  response to the SEC?

21  A.   Yes.  It looks like this was the version that we were

22  taking to the board of directors to discuss this with

23  them.

24  Q.   Okay.  And just so I am clear, this issue has -- your

25  understanding of what the SEC was requesting, you have

1   done since 2013?

2   A.   Yes.  And so actually at this meeting, I think we

3   took the 2012 profitability restated in that format to

4   show the board what it would look like going forward and

5   what it had looked like for 2012.

6   Q.   Are you aware of whether Great-West turned over the

7   board materials to the SEC in 2016 in connection with the

8   non-public inquiry?

9   A.   Yes.  But -- yes.

10  Q.   Are you aware of any criticisms they raised in

11  connection with the fund profitability information

12  provided to the board?

13  A.   No.

14  Q.   If we can go to Exhibit 1047, please, at 175.  And I

15  believe Mr. Wolff asked you about the operations expense

16  on the S&P 500 fund.  If we can look at the Templeton

17  Global Bond Fund, what are the operations expense for the

18  Templeton Global Bond Fund?

19  A.   Those would be the same types of expenses, but

20  they're probably on -- like, there would be more related

21  to, like, foreign custody.

22  Q.   I just meant what was the amount.

23  A.   I see.  It's the -- that would be, I think, 19.1

24  basis points.

25  Q.   And that would include many of the expenses covered

1   by the unitary fee?

2   A.   In 2016, yes, it would have been covered under the

3   unified fee.

4        MR. MURPHY:  Your Honor, I believe I didn't move

5   Exhibit 7 into evidence.  I would offer its admission now.

6        THE COURT:  7 is stipulated.  It is admitted.

7        (Exhibit No. 7 is admitted.)

8        MR. MURPHY:  If we can get Exhibit 10, page 17.

9   And if we can highlight that middle box, the one with the

10  amount of fees paid.

11  Q.   (BY MR. MURPHY)  Mr. Wolff showed you the footnote,

12  "GWL&A pays compensation."  And it goes on to say, "in

13  connection with the distribution, sales support, servicing

14  of selection.  It mentioned "servicing."  Do you have an

15  understanding of whether 12b-1 fees covers services?

16       MR. WOLFF:  Objection, foundation.

17       MR. MURPHY:  Your Honor, he asked her about this

18  document, and that footnote specifically.

19       THE COURT:  All right.  Overruled.

20       MR. WOLFF:  I would like to add for the record, she

21  did state that this is information which she receives from

22  a different department.  She doesn't compile the

23  information herself.

24       THE COURT:  Well, if she can answer it, she will.

25  Q.   (BY MR. MURPHY)  Ms. Maiers, do you have an

1851

```
 1    understanding that 12b-1 fees can be used to cover

 2    shareholder services?

 3    A.   Yes, they can.

 4    Q.   If we go to Exhibit 250.  At the top there, Mr. Wolff

 5    showed you this email.  Did you understand the directors

 6    were -- I think you said they were asking you to put their

 7    compensation increase in the budget?

 8    A.   Yes.

 9    Q.   Who sets the directors' compensation?

10    A.   The directors set their own compensation.

11    Q.   Do you have any role at all in setting their

12    compensation?

13    A.   No.

14    Q.   This also mentions considering hiring an independent

15    consultant.  Do you recall what that was about?

16    A.   The directors were considering hiring an independent

17    consultant to help them review and sort through some of

18    the 15(c) information.  And I actually do not recall -- I

19    didn't get involved in hiring, so, yeah.

20    Q.   Did you ever make a recommendation in connection with

21    this email?

22    A.   I did not.  And I don't think any of our officers

23    did.  My recollection of this was that after we left that

24    meeting, the independent directors worked with their

25    independent counsel to sort out how they wanted to address
```

1    the 15(c).

2    Q.   Did you find out that they hired JDL after the fact?

3    A.   If they hired JDL as a result of this, yes.  I would

4    have found out after the fact.

5    Q.   If we can go to exhibit -- well, without looking at

6    the exhibit, do you recall Mr. Wolff showed you that at

7    some point, I believe in 2017, you stopped reporting

8    profitability at the share class level?

9    A.   Yes.

10   Q.   And why did you do that, do you recall?

11   A.   Yes.  Independent counsel to the independent

12   directors noted to us that her other clients were not

13   reporting profitability at the share class level, and she

14   said that that wasn't required.  And she asked us to

15   combine that going forward.

16          MR. MURPHY:  No further questions, Your Honor.

17          THE COURT:  All right.  May this witness be

18   excused?

19          MR. WOLFF:  Yes, Your Honor.

20          Just so -- on Exhibit 30 that I went through with

21   the witness, I didn't move to admit it.  I do move to

22   admit it now.

23          THE COURT:  All right.  Any objection to 30?

24          MR. MURPHY:  No objection, Your Honor.

25          THE COURT:  30 is admitted.

1          (Exhibit No. 30 is admitted.)

2          THE COURT:  Thank you very much, Ms. Maiers, you

3   are excused.

4          Defendants may call their next witness.

5          MR. MURPHY:  Defendants call Glenn Hubbard.

6          COURTROOM DEPUTY:  May I have everyone's attention,

7   please.

8          Raise your right hand.

9                    **DR. ROBERT G. HUBBARD**

10   having been first duly sworn, testified as follows:

11          THE WITNESS:  I do.

12          COURTROOM DEPUTY:  Please be seated, sir.

13          Please state your name, and spell your first and

14   last names for the record.

15          THE WITNESS:  Robert, R-O-B-E-R-T, Glenn,

16   H-U-B-B-A-R-D.

17                    **DIRECT EXAMINATION**

18   **BY MR. MURPHY:**

19   Q.   What is your current occupation?

20   A.   I am a professor of economics and finance.

21   Q.   And where are you a professor of economics and

22   finance?

23   A.   At Columbia University, I am a professor of finance

24   and economics at the Business School, where I just stepped

25   down as dean.  And then I am also a professor in our

1854

1    faculty of arts and science.

2    Q.   Broadly speaking, what are your responsibilities as

3    the Dean of the Columbia Business School?

4    A.   Fortunately, since June 30th, I don't have those

5    responsibilities.  But, when I had them, it was being the

6    chief administrative and academic officer of the

7    institution.

8         So, we have a very large global footprint, a very

9    large staff and faculty.  So faculty management, fund

10   raising, budgets, and university administrative work.

11   Q.   And you are still currently a professor at Columbia?

12   A.   Yes.  I just moved back upstairs to the faculty life.

13   Q.   And you have been a professor at Columbia for how

14   long?

15   A.   I came to Columbia in 1988.  And other than being in

16   the government a couple of times, I have been at Columbia

17   for 30-plus years.

18   Q.   And I would like to show you Exhibit 1298.

19        MR. MURPHY:  And, Your Honor, can I hand the

20   witness or have the witness handed a hard copy of the

21   exhibit, as well?

22        THE COURT:  You may.

23   Q.   (BY MR. MURPHY)  Do you recognize this document?

24   A.   Yes, I do.  A copy of my CV.

25   Q.   And it was -- can you tell that it was current as of

1855

1    what date?

2    A.   This, if it is the one from the report, it would have

3    been January -- end of January 2018.

4    Q.   If you look to -- maybe flip to page 2, in the upper

5    right-hand corner.

6    A.   Okay.  Got it.

7    Q.   Is that January 2018?

8    A.   Yes.

9    Q.   And does this accurately reflect your publications

10   and professional experience as of that time?

11   A.   As of that time, yes.

12   Q.   Can you please describe your educational history.

13   A.   Sure.  I did my undergraduate training in economics

14   at the University of Central Florida.  I have a BA and a

15   BS degree.  Both -- one in sort of arts and science, the

16   other engineering bent.  Then I got my master's in

17   economics and a Ph.D. in economics from Harvard

18   University.

19   Q.   Can you describe your academic employment after

20   getting your doctorate in 1983?

21   A.   Sure.  My first job was at Northwestern University,

22   in Evanston, where I was professor in the economics

23   department and in public policy.  I moved from

24   Northwestern to Columbia when I was awarded a

25   professorship there in 1988.  And, as I said, since that

1856

1   time, other than public service, I have been at Columbia.

2   Q.   And all of your teaching positions, were those all in

3   the field of economics?

4   A.   Yes.  Either economics directly or finance, which I

5   consider part of my discipline, or public policy courses

6   related to economics.

7   Q.   And, broadly speaking, what have you done as an

8   academic in the field of economics?

9   A.   Well, I love economics.  So, I have written in many

10  of its areas.  Most of my work is in what is called public

11  economics, economics of public sector; taxation and

12  budgets.  Financial economics and corporate finance.

13  Energy economics.  Public policy and antitrust.  So, a

14  wide variety of areas in microeconomics and in

15  macroeconomics.

16  Q.   And if we can turn to page 5, or if you want to look

17  at it, Mr. Hubbard, page 5 of your CV, at the bottom there

18  is publication and papers?

19  A.   Yes.

20  Q.   I think it goes on for four or five pages or so.

21  Again, broadly speaking, what have you published in the

22  field of economics?

23  A.   Well, I have published a number of books in a variety

24  of areas in finance, in taxation.  I have also published

25  about 100 or so refereed articles -- peer-reviewed

1    articles, and dozens and dozens of public policy related

2    articles, generally spanning topics in taxation, finance,

3    monetary policy, macroeconomics.

4    Q.   And have you authored any textbooks?

5    A.   I have.  My *Principles of Economics* textbook is one

6    of the most popular in the country, for which I am

7    grateful.  And then I have also written a textbook in

8    money and banking and intermediate macroeconomics.

9    Q.   Have you, in terms of the publications listed in your

10   CV, have any of those publications been on the subject of

11   mutual funds?

12   A.   Yes.  Going backwards in time, about 20 years ago, I

13   wrote a paper, I think one of the first, on what

14   institutional ownership might mean for corporate

15   governance, now a very hot topic with passive funds being

16   so important.  I also wrote a Law Review paper with a

17   colleague, John Coats, on competition issues in mutual

18   funds and investment advisers.

19        Then I wrote a technical book with some co-authors

20   on estimating sensitivity of fund flows to a performance,

21   to fees, and attributes of fund complexes and how to

22   measure economies of scale.

23   Q.   And what is the title of that book?

24   A.   It is something like *Competition in the Mutual Fund

25   Industry, Growth and Welfare*.  I can't get it exactly

1    right, it is a decade old, but something like that.

2    Q.   At a high level, what does that book cover?

3    A.   Well, to me it is interesting.  I think to most

4    readers it would be highly technical.  It really is about

5    how sensitive fund flows are to fees and to performance.

6    It was written with an idea of asking, what is the market

7    structure of mutual funds?  Does the market system

8    actually constrain prices?  What do we know about evidence

9    there?  And how would you go about measuring economies of

10   scale for a mutual fund or for a mutual fund complex.  And

11   it has a little history in it, as well.

12   Q.   And do you believe, based on your studies on that

13   book, that there are constraints on an adviser's ability

14   to set prices?

15   A.   Yes.  There are thousands of providers and abundant

16   market forces that would offer those constraints.

17   Q.   Have you been involved in government service?

18   A.   I have, on multiple occasions.

19   Q.   And in what capacity?

20   A.   In the early 1990s, I worked for President George

21   H.W. Bush, in the Treasury Department.  I was the deputy

22   assistant secretary for tax policy at the Treasury.  So

23   that is really the administrations, revenue estimates, tax

24   proposals analyses.

25        In President George W. Bush's administration, I was

1    the chairman of the council of economic advisors, a White

2    House economic advisor.  And I was also, at his behest,

3    chairman of the economic policy committee, the OECD, which

4    is a group of industrial countries.

5    Q.   And did any of those positions require you to be

6    confirmed by the United States Senate?

7    A.   Yes.  To be chairman of the council of the economic

8    advisors.  Those were gentler days in Senate life.

9    Q.   What about the deputy assistant secretary, was that a

10   Senate confirmation?

11   A.   No, that is not.

12   Q.   What were your -- well, in terms of your role as

13   chairman of the President's council of economic advisors,

14   who did you report to in that role?

15   A.   The President.

16   Q.   Which was George Bush?

17   A.   At the time, it was George W. Bush.

18   Q.   And what were your responsibilities in that position?

19   A.   It is really like being a consultant with one client.

20   So, really, whatever he wanted.  And, in my day, it was

21   all of the budget matters for the President.  The economic

22   policies following the September 11th terrorist attacks.

23   There were a number of corporate accounting scandals and

24   reforms that led to Sarbanes-Oxley.  I certainly handled

25   that for the President.  He also asked me to work

1860

```
 1    especially on our relationship with Japan and also an
 2    Argentine debt crisis.  So really at his service.
 3    Q.   Have you served, Mr. Hubbard, as a consultant to any
 4    governmental agencies?
 5    A.   Yes.  Many governmental agencies.
 6    Q.   Can you give us some of those?
 7    A.   The Treasury Department, the IRS, the Defense
 8    Department, State Department, Congressional Budget Office,
 9    Federal Reserve Board, the Reserve Bank of New York, among
10    others.
11    Q.   Have you -- I guess, going back to page 1 of your
12    CV -- if we can go to page 3, please.  At the top there,
13    there is a directorship.  What is reflected there?
14    A.   Those would be corporate board positions and the
15    years of service.
16    Q.   And so you have served on the board of MetLife?
17    A.   Yes.  I am currently on the board of MetLIfe and on
18    ADP.
19    Q.   And you are the lead independent director on the
20    MetLife Board?
21    A.   I am actually now the chairman of the board.  I was
22    lead independent director at the time.
23    Q.   And ADP is in 2004 to the present?
24    A.   Correct.
25    Q.   And then I think there is a semicolon, BlackRock
```

1    Closed-End Funds.  What is that?

2    A.   BlackRock Closed-End Funds is what it says.  It is a

3    closed-end funds complex of BlackRock.  I was a director

4    of that complex until very recently.  I am still a

5    director, but we changed the name.  It is now called

6    fixed-income funds.  There has been a re-organization at

7    BlackRock.  But this was the name in January of 2018.

8    Q.   So you are an independent director on the BlackRock

9    Mutual Fund Board?

10   A.   Yes.

11   Q.   And is that one of the largest mutual fund complexes

12   in the United States?

13   A.   Yes.

14   Q.   And you have had that position since 2004?

15   A.   That's correct.

16   Q.   In your role as an independent director, have you

17   analyzed fee peer groups, for example?

18   A.   Well, of course, as part of the 15(c) process every

19   year.

20   Q.   Does BlackRock use a service for fee comparisons?

21   A.   We do.  We use Lipper.

22        MR. WOLFF:  Object to inquiries on this.  It is

23   outside the scope of his expert report.  He does not

24   mention in his expert report anything about what the board

25   considered.

```
 1          THE COURT:  Overruled.

 2   Q.   (BY MR. MURPHY)  Further down on that page 3 of your

 3   CV, Mr. Hubbard, there is a post in non-profit

 4   organizations?

 5   A.   Yes.

 6   Q.   And the first one is co-chair Committee on Capital

 7   Markets Regulation.  What is that?

 8   A.   It is a bipartisan committee that's designed on an ad

 9   hoc basis to look at trends in capital market

10   organization.  Its origin was when Hank Paulson was

11   Treasury Secretary, he asked John Thornton and myself to

12   set up a committee with academics and industry people to

13   just comment and advise on regulations.  So we have been

14   doing so since that time, and the committee reports are

15   available on the website.

16          MR. MURPHY:  Your Honor, at this time I would move

17   to qualify Dr. Hubbard as an expert in financial analysis,

18   mutual fund fee analysis, and economies of scale.  I would

19   submit that he is qualified to testify as an expert in

20   these areas by reason of his experience and training as

21   reflected in his CV and his testimony here today.

22          THE COURT:  Any objection?

23          MR. WOLFF:  Yes.  He has not demonstrated his

24   qualifications; hasn't worked for an adviser, has no

25   experience as an adviser.  Whatever experience he has was
```

1    with BlackRock, and is limited to fixed-income funds.  He

2    doesn't describe the board process in his expert report,

3    so that is outside the bounds of his permissible

4    testimony.

5         THE COURT:  All right.  The objection is overruled.

6    He is accepted as an expert in those areas.

7    Q.   (BY MR. MURPHY)  Mr. Hubbard, do you understand that

8    Great-West funds are sold primarily in the retirement

9    market?

10   A.   Yes.  That is my understanding.

11   Q.   What is your understanding of who selects the funds

12   that are offered as investment options to retirement plan

13   participants?

14   A.   The actual decision, of course, would be a plan

15   sponsor.  Almost all plan sponsors would also avail

16   themselves of outside advice, as well.  But it is the plan

17   sponsor who makes that decision.

18   Q.   And do you believe there is competition among mutual

19   funds to be included as options on the fund plans?

20        MR. WOLFF:  Objection, foundation.

21        THE COURT:  Overruled.

22        THE WITNESS:  There is certainly abundant

23   competition among mutual funds.

24   Q.   (BY MR. MURPHY)  And does that act as a constraint on

25   pricing, in your opinion?

1864

1    A.   Yes, along with, of course, the fiduciary

2    responsibility the plan sponsor, itself, has.

3    Q.   Are you familiar with the sub-advised structure that

4    Great-West uses on some funds?

5    A.   Yes.

6    Q.   And how do you understand that to work?

7    A.   In any business organization, you can decide whether

8    you want to do things internally or subcontract some parts

9    of your activity.  Sub-advising is simply an example of

10   that.  The fact that we see it continue at such scale in

11   the economy tells us there are real benefits from it.

12   Q.   Did you examine the prevalence of the sub-advised

13   structure as part of your engagement in this case?

14   A.   I did.  In my report, I noted that just under a

15   quarter of the funds were sub-advised.

16   Q.   And, from an economic perspective, what does it tell

17   you that just under a quarter of mutual funds use the

18   sub-advised structure?

19   A.   Again, from an organizational perspective, you always

20   have competition among organizational types to see what is

21   the best way to do business.  The fact that you see both

22   categories competing at the same time tells you there are

23   real business purposes for it.

24   Q.   Do you believe GWCM faces risks in the management of

25   the funds?

1    A.    Well, of course.

2    Q.    And do you believe GWL&A faces risk in the

3    administration of retirement plan assets?

4    A.    Of course.  There are a number of risk categories

5    that either or both would face having to do with just

6    entrepreneurial risk of flows coming in and out.  There

7    are operational risks, that I know the Court has heard

8    some testimony about.  Litigation, the reason we are here.

9    Reputational risks.  There are a number of risks that

10   would be quite significant for an adviser.

11   Q.    Plaintiffs' expert has testified that in the mutual

12   fund industry, those risks are minimal.  Do you agree with

13   that?

14   A.    I do not.

15   Q.    Why not?

16   A.    Well, again, the size of those risks can be quite

17   large.  Reputational error, an operational error can be

18   very significant for a complex, as well as funds going in

19   and out, depending on the success of the complex.

20   Q.    What is a total expense ratio?

21   A.    A total expense ratio is just the all-in cost of

22   buying an integrated bundle called a mutual fund.  Think

23   of it as the closest things to a "price."

24   Q.    What are the components that make up a total expense

25   ratio?

 1    A.    Well, going into the total expense ratio, as I am
 2    sure the Court has heard, would be the management or
 3    advisory fees, the administrative fees, 12b-1 fees.   The
 4    total expense ratio is the sum of all of those, usually
 5    expressed as a ratio as a percentage of assets.
 6    Q.    When a fund pays some fees directly, as opposed to
 7    covering it by the management fee, are those reflected in
 8    a total expense ratio?
 9    A.    The total expense ratio captures everything.
10    Q.    And as part of your case -- your analysis in this
11    case, did you analyze the fees of the Great-West Funds?
12    A.    I did.
13    Q.    And what fees did you focus on?
14    A.    I focused on the total expense ratio for two reasons.
15    One, it is the all-in price.   The SEC, itself, gives
16    guidance that that's the notion of the price to look at.
17    And, second, it is the easiest to compare apples to
18    apples, as opposed to fee components.
19    Q.    Did you look at fee components, as well?
20    A.    I did.   I also looked at management fees, and I
21    looked at the total expense ratio less intermediary fees.
22    Q.    Is a mutual fund a bundled product?
23    A.    It is.   You buy the mutual fund with all of its
24    attributes.   As investors, you can't buy a piece of it.
25    Q.    So, for example, Mr. Hubbard, if I wanted to get

1    advisory from GWCM but I want administrative services from

2    Fidelity, could I do that?

3    A.   In a regular mutual fund context, no.

4    Q.   What is a unitary fee, in your understanding?

5    A.   A unitary fee is simply a fee that includes some

6    multiple components; meaning that it wouldn't be all the

7    way to the total expense ratio nor would it be limited to

8    the management or advisory fee.

9    Q.   Did the Great-West core funds have a unitary fee for

10    some period relevant to this?

11    A.   My understanding is before May 1, if I am remembering

12    correctly, 2017 -- the answer to that is yes.  Before May

13    2015, that unitary fee would have included admin --

14    administrative fees.  Between 2015 and 2017, also certain

15    operational expenses.  The reason that is of some

16    relevance is that it means it would be difficult to

17    compare the unitary fee with a management fee of another

18    complex.

19    Q.   And just so I am clear, you are talking about the

20    core funds.  The lifetime funds have had unitary fees

21    throughout?

22    A.   Yes.

23    Q.   How unusual is a unitary fee structure in the fund

24    industry, in your experience?

25    A.   In my experience, very unusual.

1    Q.   I believe you said that -- maybe I can ask you again.

2    In terms of the unitary fee, how difficult does that make

3    management fee comparisons?

4    A.   What makes them difficult in a sense is that if a

5    unitary fee, let's say, also includes the administrative

6    fee, you wouldn't want to compare that number to a peer

7    management fee of someone else; it is like comparing an

8    apple to an orange, which is one reason most economists

9    focus on total expense ratios to begin with.

10   Q.   And even after the core funds cease having a unitary

11   fee, do you think management fee comparisons are apples to

12   apples?

13   A.   They are not.  They are better, but it is still an

14   apple to a kind of orange, in the sense that different

15   fund families can define different things as being part of

16   a management fee.  So it is never strictly apples to

17   apples, although the problem did become smaller.

18   Q.   So, do you know if, for example, Great-West continues

19   to provide fund accounting services to Great-West Funds?

20   A.   I believe it does.

21   Q.   And, in fact, many other funds in the industry do

22   not?

23   A.   Yes.  I think that was testified to this morning.

24   Q.   In terms of the Great-West Funds' Board in this case,

25   do you know if they were given fee comparisons that

1   compared the fees on the Great-West funds to other funds

2   in the industry?

3   A.   Yes.  They were given information as part of a 15(c)

4   process from Lipper about constructive peer groups.  For

5   the Court's benefit, think of it as a benchmark for

6   comparison.

7   Q.   And as part of your work in this case, did you review

8   those peer groups?

9   A.   I did.

10   Q.   And who is Lipper, in your experience?

11   A.   Lipper is a third-party advisory service that

12   collects and provides data.  One typical use of Lipper is,

13   in these proceedings, is to construct peer groups to

14   assist boards in evaluating whether performance or fees

15   are reasonable.

16   Q.   Are they, in your experience, are they generally

17   regarded as reliable in the industry?

18          MR. WOLFF:  Objection, outside the scope of his

19   expert report.

20          THE COURT:  Response?

21          MR. MURPHY:  I don't believe so.  I don't have his

22   report in front of me, but I think he testified about the

23   use of Lipper widely, and I can also ask about his

24   experience in that regard.

25          THE COURT:  Are you not asking for any opinions,

1870

1    you are asking for his understanding?

2        MR. MURPHY:  I am asking for his understanding of

3    their reputation in the industry.

4        THE COURT:  I will overrule the objection.

5        THE WITNESS:  They are widely used by advisers.

6    Q.   (BY MR. MURPHY)  Do you use Lipper in some of your

7    mutual fund research, personally?

8    A.   I do.

9    Q.   I would like to show you what has been marked as

10   Exhibit 1596.  Do you recognize this document,

11   Mr. Hubbard?

12   A.   Yes.  I presented this in my report.  It really comes

13   from the presentations given to the board of peer groups

14   versus a particular Great-West fund.  This exhibit that

15   you have on the screen now is for the index and actively

16   managed fund versus their peer group.

17   Q.   Was this prepared under your direction?

18   A.   It was, as part of the report.

19   Q.   Is it an accurate summary of the underlying source

20   materials listed in the notes?

21   A.   It is.

22   Q.   And can you just broadly describe for the Court how

23   you prepared this?

24   A.   Well, sure.  These are my understanding of the

25   at-issue funds.  And so at-issue fund fee is the

1    institutional share class of total expense ratio.  The

2    peer mean is simply what it says, it is the average of the

3    Lipper peers, as constructed by Lipper.  So Lipper used a

4    number of filters to ask which are the funds that are most

5    comparable to the fund at issue.

6    Q.   Go ahead.

7    A.   The third column just does the math.  What is the

8    difference between the Great-West Fund and its peer mean.

9    Q.   Does this just show how each at-issue fund ranks

10   compared to its Lipper peer group?

11   A.   Yes.

12        MR. MURPHY:  Your Honor, I move Exhibit 1596 into

13   evidence.

14        THE COURT:  Any objection?

15        MR. WOLFF:  Yes, I do object.  Can you identify

16   where this is in the report, because I didn't see that.

17   We don't have any of the appendix numbers and the like

18   that were included in the report to allow me to identify.

19        THE COURT:  Where is it in the report?

20        MR. MURPHY:  I am sorry?

21        THE COURT:  He wants to know where it is in the

22   report.

23        MR. MURPHY:  Perhaps it might be -- Your Honor, can

24   I hand up Mr. Hubbard his report and see if he can find

25   it?

1872

1        THE COURT:  You may.

2        MR. WOLFF:  All of the charts have exhibit numbers;

3   right?  What exhibit number is it?

4        MR. MURPHY:  We are trying to find it.  I think

5   these numbers come right out of his appendix.  The only

6   thing we have done, Your Honor, is pull out the funds that

7   are at issue, since those have changed over time.  But I

8   don't think there is any great surprise that these numbers

9   come right out of his report.

10       THE WITNESS:  They come really from describing the

11   Lipper presentations to the board that I opined on in the

12   report.

13       MR. WOLFF:  If this chart was not included in the

14   report, I object to the use of the chart in evidence here.

15   In addition, it is also irrelevant.

16   Q.   (BY MR. MURPHY)  Mr. Hubbard, maybe to cut through

17   this, what is your understanding of whether this analysis

18   is in your --

19       MR. WOLFF:  Your Honor, I have a pending objection.

20       THE COURT:  Well, it may not come in as an exhibit,

21   but it is certainly -- his testimony is he has taken these

22   from the report, narrowing them down to the mutual funds

23   at issue here.  He can testify to that, and I will decide

24   whether or not I will admit the exhibit after I hear the

25   testimony.  So the objection is overruled.

1873

1     MR. WOLFF:  All right.  And, just to be clear, this

2  chart, in any form, no matter how many funds were included

3  on it, was not in the report.

4     THE COURT:  But the information contained in it is

5  in the report; correct?

6     THE WITNESS:  That is the way I would describe it,

7  Your Honor.  The underlying 15(c) documents that are cited

8  here are the ones on which I am opining in the report.

9  And my recollection, from reading the testimony during the

10  trial, is Mr. Kreider already put this chart in anyway.

11     MR. WOLFF:  Right.  So, there are thousands of

12  pages of documents and information, a lot of them cited in

13  the report.  To put that all together in a chart, that I

14  am seeing for first time in trial, is the basis of my

15  objection to it.

16  Q.   (BY MR. MURPHY)  Mr. Hubbard, if you can turn to

17  Appendix I?

18  A.   Okay.

19  Q.   Does this -- what does this reflect?

20  A.   This is the underlying fund level information.

21  Q.   And does it have the total expense ratio for each

22  fund versus their Lipper peer group?

23  A.   Yes.  Appendix I.1 would be the analog to this chart.

24  Q.   Again, all you have done is take the at-issue funds

25  and show their ranking for each of the two years?

1874

1    A.    That's correct.

2          MR. MURPHY:  Your Honor, I would move again -- I

3    don't know where we landed on Exhibit 1596.  I didn't

4    think this was controversial.  This is just a convenient

5    summary for the Court of the Lipper material.

6          THE WITNESS:  If it might help the Court, if you

7    look at Appendix I.1 --

8          THE COURT:  I am looking at it.

9          THE WITNESS:  -- you can see that first Great-West

10   International Index Fund peer mean .36 percent, what you

11   see in the middle panel, that is the Lipper expense mean.

12   These are just taken from here to here.

13         THE COURT:  All right.  Well, I am going to

14   overrule the objection, because I think 1596 actually is

15   much more comprehensible to me than I.1.  And my

16   understanding is that the information contained in 1596 is

17   merely just a summary of what is contained in I.1.  So

18   that has been available.  1596 is admitted.

19         (Exhibit No. 1596 is admitted.)

20   Q.    (BY MR. MURPHY)  Mr. Hubbard, what is the

21   significance of the green shading in Exhibit 1596?

22   A.    Those are just the funds for which the at-issue fund

23   fee is less than the peer mean.

24   Q.    And it looks like some of the funds on the total

25   expense ratio basis are above average; they are not green?

1    A.   That's true.

2    Q.   And if we can just look at the S&P 500 fund.

3    A.   So, for the Lipper calculation, the S&P 500 Index

4    Fund, the at-issue fee is 25 basis points for

5    institutional.  Peer mean is 22 basis points.  So it would

6    be 3 basis points higher.

7    Q.   And 3 basis points higher than the average?

8    A.   From the Lipper average, yes.

9    Q.   And you consider that to be in the range, in your

10   analysis?

11   A.   It is definitely in the range.  And, as of the next

12   year, it is actually dead even.

13   Q.   And then the Templeton Global Bond Fund, that one

14   looks like it is the most above average?

15   A.   Yes.  The Templeton Global Bond Fund, as of December

16   31, 2015, was 95 basis points versus 78 basis points

17   Lipper peer mean.  That is a 17 basis points difference.

18   I note that there was a lot of discussion at the board

19   level about what kind of fund that was, maybe more like a

20   global macro hedge fund, certainly very superior

21   performance.  And, in any event, its fees have been

22   reduced.

23   Q.   What conclusions do you draw, if any, from your

24   review of the Lipper material provided to the board?

25   A.   Well, I think Lipper used a reasonable framework for

1   selecting peers, along with its own judgment.  And the

2   Great-West index and the actively managed funds in this

3   chart are well within the Lipper range, and in many cases

4   cheaper.

5   Q.   If we can show Exhibit 1597.  Do you recognize this

6   document, Mr. Hubbard?

7   A.   Yes.  This is the same kind of comparison, also taken

8   from the Appendix I, but now we are moving to the asset

9   allocation funds, so lifetime funds.

10  Q.   And, again, this was prepared under your direction?

11  A.   Yes.  And so what I am doing is comparing the

12  at-issue fund at these two points in time with the peer

13  mean, as calculated by Lipper and shown to the board.

14  Q.   And what conclusions do you draw about how the

15  lifetime funds' fees compare to their peer funds based on

16  this analysis?

17  A.   Again, focusing on total expense ratio, they happen

18  to be cheaper than their Lipper peer means.

19  Q.   Do you think it makes sense to focus on the total

20  expense ratio for the lifetime funds as opposed to just

21  the top level fee?

22  A.   Absolutely.  The total expense ratio is what you pay.

23  It wouldn't benefit you, as a consumer, if you had a low

24  or zero top level fee but a very expensive underlying fee.

25  So it is really the sum that you care about.

1877

```
 1    Q.   In your experience as a BlackRock board member, is

 2    that the way you view it?

 3    A.   Yes.  Total expense ratio.

 4         MR. MURPHY:  Your Honor, I would move Exhibit 1597

 5    into evidence?

 6         THE COURT:  Any objection?

 7         MR. WOLFF:  Same objection as to 1596.

 8         THE COURT:  Same ruling as before.  1597 is

 9    admitted.

10         (Exhibit No. 1597 is admitted.)

11    Q.   (BY MR. MURPHY)  I believe you said, Mr. Hubbard, you

12    also looked at the management fees?

13    A.   I did.

14    Q.   And what conclusions did you draw about how the

15    management fees of the Great-West funds compared to the

16    Lipper peers?

17    A.   Again, while I don't think that is the comparison one

18    would do from an economic perspective, they are certainly

19    within range.

20    Q.   Well, did you understand that at least for some

21    periods, the funds had a unitary fee?

22    A.   That's correct, which makes the comparison inapt.

23    Q.   Well, if all else is equal, wouldn't you expect the

24    Great-West funds to have higher management fees than their

25    peers?
```

```
 1   A.   Well, yes.

 2           MR. WOLFF:  Objection, leading.

 3           THE COURT:  Sustained.

 4           MR. MURPHY:  I will move on, Your Honor.

 5   Q.  (BY MR. MURPHY)  As part of your analysis in this

 6   case, did you perform an independent analysis of how the

 7   Great-West funds' fees compare to similar mutual funds?

 8   A.   I do.

 9   Q.   Are you offering that opinion here today?

10   A.   No.  As I read the trial transcripts, it seemed that

11   Lipper was not at issue.  And so to economize on the

12   number of conversations for the Court, I am limiting it to

13   Lipper.

14   Q.   What do you mean Lipper is not at issue in your

15   understanding?

16   A.   My understanding from reading the transcript is

17   nobody objected to the Lipper peer group.

18   Q.   You mean Mr. Meyer wasn't challenging the Lipper peer

19   group?

20   A.   He was not.

21           MR. WOLFF:  Objection, relevance.

22           MR. MURPHY:  Your Honor, my understanding is that

23   the Lipper peer groups, we thought Mr. Meyer was going to

24   offer an opinion challenging those.  Mr. Hubbard offered

25   an expert report kind of verifying those peer groups,
```

1    doing his own independent analysis.

2         Mr. Meyer showed up at trial and did not present

3    any challenge to the Lipper peer groups.  In fact, I asked

4    him, are you challenging any of those peers?  Do you

5    challenge that any of them were selected independently?

6    To us, I believe he validated those peer groups.

7         So we didn't see any need to tie up the Court's

8    time by going through a lengthy opinion of Mr. Hubbard's

9    independent peer group analysis, which were designed

10   solely for one reason, to sort of back test Lipper.  So we

11   don't see a need to do it.  I am just kind of bringing

12   that out.  I don't think it is controversial.

13        MR. WOLFF:  What I find controversial, and what I

14   am objecting to, is commenting on the evidence in the

15   trial so far in this case.

16        THE COURT:  Okay.  Let me ask you, does the

17   plaintiff dispute Lipper as a valid peer group?

18        MR. WOLFF:  No.  We haven't alleged it.  It was

19   never part of the report.  All he has to do is ask him

20   what his opinions are, not what his opinions aren't or his

21   commenting on the evidence in the case.

22        THE COURT:  I wanted to make sure that was indeed

23   going to be the case going forward.  So, you may limit it

24   to that.

25   Q.   (BY MR. MURPHY)  Have you reviewed in this case,

1    Mr. Hubbard, any comparison of the Great-West funds to a

2    peer group used by the plaintiffs' expert?

3    A.   Yes.  I did review Mr. Meyer's peer group comparison,

4    and also what he testified to here at trial.

5    Q.   And what do you understand Mr. Meyer to have done?

6    A.   Well, if you are starting with the core funds, what

7    he has done is basically compare the expense ratios --

8    this case, actually expense ratios less intermediary fees,

9    to the fees from the so-called top 10 funds, that I am

10   sure the Court has heard about.  These were so-called

11   best-selling funds in the large market on the Empower

12   platform.

13        So, his damage thesis is that in a but-for world,

14   this mutual fund complex should have charged those fees.

15   So anything above that is excessive.  That is his theory.

16   Q.   And in terms of top 10 best selling funds, what do

17   you think about that as a peer group for comparison

18   purposes for the Great-West Funds?

19        MR. WOLFF:  Objection, outside the scope of his

20   expert report, also relevance, as well as

21   mischaracterizing the evidence.

22        THE COURT:  Well, what I've understood, those were

23   aspirational group; correct.  I will sustain the

24   objection.  I understand what the difference is.

25        MR. MURPHY:  Okay.  Is Your Honor, just so I am

1    clear --

2         THE COURT:  I don't consider it a peer group.  It

3    is an aspirational.

4         MR. MURPHY:  Fair enough.  I will move on, Your

5    Honor.

6    Q.   (BY MR. MURPHY)  You have reviewed Mr. Meyer's damage

7    analysis in this case?

8    A.   Yes.

9    Q.   And starting with the core funds, how do you

10   understand Meyer's damages model to work?

11   A.   For the core funds, the damages would be the

12   difference between the fees charged by Great-West on a

13   given fund and the corresponding average from top 10.

14   There could also be other components of damages relating

15   to admin fees.  But, to start first with that, that is, I

16   guess, the bedrock of his damages model.

17   Q.   Do you have any opinions of his damages model?

18   A.   Well, it is not a damages model, for two reasons,

19   from an economic perspective.  First, it is not a valid

20   peer group, so it is not even a but-for world.  Second, a

21   necessary implication of his model is that many of the top

22   10 funds, themselves, are excessive fees.

23         How do I know that?  I take the average of the

24   group, I went into each of those top 10 categories, and in

25   each case about half of the funds within that very group

1    have above average.

2        So any theory that says above that average is

3    excessive, necessarily indicts the so-called peer group,

4    itself.  It is silly.

5    Q.   Mr. Meyer didn't use Lipper peer groups at all in his

6    damages analysis; correct?

7    A.   No.

8    Q.   And do you think Mr. Meyer's approach is an

9    appropriate measure of the range of arm's-length

10   bargaining of the Great-West funds' fees?

11   A.   No.  It identifies neither a peer group nor a

12   reasonable weighted measure of damages.

13   Q.   What is your understanding of Mr. Meyer's damage

14   model as it relates to the lifetime fund?

15   A.   For the lifetime funds, there are two pieces, one,

16   which we just talked about, which is sort of the excess

17   fees on the underlying funds, themselves.  The other is

18   his claim that the entire top level fee is inappropriate,

19   and so that entire amount would be damages, in his view.

20   Q.   What is his stated rationale, as you understand it,

21   for saying Great-West should be not charging a top level

22   fee?

23   A.   My understanding from his report, and from my reading

24   of his testimony here, is that it is because the

25   underlying funds, themselves, were excessively profitable

1     in his view, therefore, you didn't need to charge a top

2     level fee.  I believe that is his reasoning.

3     Q.   Were you able to identify any criteria for

4     excessiveness other than profitability?

5     A.   He didn't offer any.

6     Q.   As an economist, what do you think about that

7     approach?

8     A.   Well, it's not the way to think about what an

9     excessive fee is to begin with.  From an economic

10    perspective, you are looking at the cost, the total

11    expense ratio all in, and asking, how does that cost

12    compare, and in looking at a number of *Gartenberg* factors.

13         So, it is simply -- the analog, I guess, to draw

14    for the Court is it is an attempt to doing rate regulation

15    or profit regulation.  That is really not typically the

16    exercise that mutual funds are in.

17    Q.   Meaning, if you just said at a certain profit level

18    you can't charge more than a fee above that, it's rate

19    regulation?

20    A.   That would be rate regulation.  It is up to the Court

21    to decide what the law is.  But that is what is being

22    tendered by Mr. Meyer.

23    Q.   Well, can you explain what you mean by "rate

24    regulation"?

25    A.   In other words, that you have a limit based on a

1    profit, as opposed to the value proposition or a price of

2    the product, itself.  So, the right concept to look at is

3    the total expense ratio all together.  The profitability

4    of the underlying funds is not a reason to or not to have

5    a top level fee.

6    Q.   Is it uncommon, in your experience, for an asset

7    allocation fund, like the lifetime funds, to charge a top

8    level fee?

9    A.   It is not only uncommon, it is actually common.

10   Q.   If I can show Exhibit 1607.  Do you recognize this

11   document, Mr. Hubbard?

12   A.   Yes.  It is from an exhibit in my report.

13   Q.   And was this prepared under your direction?

14   A.   It was.

15   Q.   And what does this reflect?

16   A.   This is looking, again, at 2015 and 2016.  You take

17   the rows that say "all asset allocation funds."  So this

18   would be all funds.  Then, 44 percent of them have a gross

19   advisor fee, and 83 percent of them have some direct fee.

20        Not surprisingly for non-internal asset allocation

21   funds, all of them have to have some direct fee.  So, as

22   you can see from these, depending on the year, 83 or 87

23   percent of all asset allocation funds had a direct fee.

24   Q.   And just so I am clear, the word "direct fee," is

25   that the top level fee?

1885

1   A.   Yes.

2   Q.   So, in 2015, 83 percent of asset allocation funds had

3   a top level fee, just as the lifetime funds has?

4   A.   Correct.

5   Q.   That is the fee that Mr. Meyer is saying Great-West

6   shouldn't charge?

7   A.   That's correct.

8        MR. MURPHY:  Your Honor, I would move for the

9   admission of Exhibit 1607 into evidence.

10       THE COURT:  Any objection?

11       MR. WOLFF:  Yes, same as to the prior two exhibits.

12  Counsel is not including any of the headers from the

13  expert report, so it appears that this is not a document

14  or a chart that is in the witness' expert report.  So I

15  object on that basis.

16       THE COURT:  Is this in the expert report?

17       MR. MURPHY:  I believe it is the exact same

18  analysis.  And perhaps Mr. Hubbard can clarify, but I

19  think probably the only thing -- no, I think it is

20  probably in his expert report.  I think the only changes

21  we made to any of these, Your Honor, is if we had to

22  change them because some of the funds are not at issue.

23  So, some of the numbers might change slightly, but I don't

24  think this is one of them.

25       THE WITNESS:  It is definitely there, yes.

 1          THE COURT:  Can you tell me where in your report it

 2     is, sir?

 3          MR. WOLFF:  As these exhibits come up, if you

 4     identify the appendix number, it would make my job a lot

 5     easier, too.

 6          MR. MURPHY:  Your Honor, I apologize.  These have

 7     been on our exhibit list for a full year, since the trial

 8     was postponed.  I didn't know I was going to have to tie

 9     them back to the appendix.  But I will certainly try to do

10     that at the break, to make sure I can do that for

11     Mr. Wolff's convenience.

12          THE COURT:  All right.  Why don't we go ahead and

13     take our break now.  It is 10:15 anyway.  If you can look

14     those over and do those for any of the exhibits you plan

15     to enter into evidence.

16          We will be in recess until 10:30.

17          (A break is taken from 10:15 a.m. to 10:30 a.m.)

18          THE COURT:  You may be seated.

19          All right.  Mr. Murphy, you may proceed.

20          MR. MURPHY:  Thank you, Your Honor.

21          We were on Exhibit 1607.  And during the break,

22     Your Honor, we were able to confirm that the source of

23     that data is Exhibit 21 to the Hubbard report.  Just for

24     the record, the numbers vary slightly, and perhaps I can

25     ask Mr. Hubbard why, or he can explain to the Court.

1     THE COURT:  All right.  You may go ahead and ask

2   him.

3   Q.   (BY MR. MURPHY)  Mr. Hubbard, do you have an

4   understanding of why Exhibit 1607 differs slightly from

5   the numbers in Exhibit 21 of your report?

6   A.   Yes.  The slight difference arises because some of

7   the funds that were in the original report are no longer

8   at issue, so they are removed.

9   Q.   And just so we are clear, for all of the exhibits

10  that we presented so far, they are either right out of

11  your report or they have been changed just to focus on the

12  funds at issue?

13  A.   That's correct.

14     THE COURT:  All right.  So any objection to 1607?

15     MR. WOLFF:  Yes.  If it is meant to be a revision

16  to or supplementation of Exhibit 21, which from my looking

17  at it -- and I am just hearing this right now -- is

18  significantly different from Exhibit 1607.  It was not

19  timely updated under the rules regarding expert witnesses.

20     THE COURT:  The objection is overruled.  1607 is

21  admitted.

22     (Exhibit No. 1607 is admitted.)

23  Q.   (BY MR. MURPHY)  Mr. Hubbard, did you analyze whether

24  it's common for asset allocation funds, such as the

25  lifetime funds, to invest in underlying proprietary funds?

1   A.   I did.

2   Q.   And what did you find?

3   A.   About 61 percent of asset allocation funds generally

4   invest in proprietary funds principally.  By

5   "principally," I mean more than 75 percent of the assets,

6   for most.

7   Q.   If we can show Exhibit 1583.

8   A.   This is what I just said.  It is the exhibit from my

9   report.  For the Court's benefit, the percentage of

10  internally allocated funds and the underlying definition

11  of how I am defining that, is in footnote 2.

12  Q.   So, just a couple things, Mr. Hubbard.  First of all,

13  for Mr. Wolff's benefit, this is Hubbard Exhibit 2 to his

14  report.  And so in 2015, how many asset allocation funds

15  did you look at?

16  A.   In 2015, there were 1193.

17  Q.   And how many of those invested in their own --

18  primarily in their own proprietary fund?

19  A.   Over half; 730.  That is the 61 percent.

20  Q.   And what conclusions did you draw from this analysis?

21  A.   That this behavior is common, and would be an example

22  of one such organizational form that must work well.  It

23  persists.

24       MR. MURPHY:  Your Honor, I move Exhibit 1593 into

25  evidence.

1          THE COURT:  Any objection?

2          MR. WOLFF:  No, Your Honor.

3          THE COURT:  1583 is admitted.

4          (Exhibit No. 1583 is admitted.)

5    Q.   (BY MR. MURPHY)  Mr. Hubbard, did you analyze the

6    damages analysis offered by plaintiffs' expert with

7    respect to the 35 basis point administrative services fee?

8    A.   I did.

9    Q.   What do you understand that opinion to be, his

10   expert -- their expert?

11   A.   My understanding of his opinion, from his report and

12   testimony, is that the damages would be the difference

13   between 35 basis points, which he defines to be the fee at

14   issue here, and 25 basis points, which would be a median

15   fee that has been calculated.  So the difference of 35

16   minus 25, or 10 basis points, would represent damages in

17   Mr. Meyer's view.

18   Q.   Do you agree with that approach to damages in this

19   case?

20   A.   No, for a number of reasons.  First, the 35 basis

21   points isn't the price of recordkeeping.  Recordkeeping

22   deals are negotiated individually.  They can be more or

23   less than 35 basis points and can be paid for in multiple

24   ways.  So, to begin, it is not even a price.

25          Assuming, for the sake of argument, it were the

1   price, what he is doing is calculating damages relative to

2   a median.  Well, as the Court knows, if something is being

3   compared to a median, if something is a median, half must

4   be above it.

5        So, what Mr. Meyer is effectively telling the Court

6   is that half of all of these funds have some damages,

7   which is just preposterous.  So it is not the right price,

8   and the damages methodology leads to a nonsensical

9   conclusion.

10  Q.   What do you mean, Mr. Hubbard, when you say 35 basis

11  points is not the price?

12  A.   35 basis points is the answer to a question, but that

13  question isn't what is the price of recordkeeping, it is

14  the answer to a question of what is the fee paid.  The

15  price of recordkeeping could be paid for out of transfer

16  agency, 12b-1 fees, administrative fees.  It could be

17  completely paid for by a plan sponsor directive.  There

18  are all kinds of ways to do it.  This is just simply one

19  component of it.  It is not the price.  So it is not where

20  you begin the analysis.

21       Even if you wanted to think of it as the price, you

22  can't compare it to a median of the distribution without

23  believing that fully half of everybody in distribution is

24  excessive.

25  Q.   And based on your analysis of Plaintiffs' expert

1891

```
 1    models and report, did he use any criteria for measuring
 2    excessiveness other than median fees?
 3    A.   He did not.
 4    Q.   If I can show you Exhibit 1602.
 5         MR. MURPHY:  For the Court's benefit, this tracks
 6    to Hubbard Exhibit 15 in the Hubbard report.
 7    Q.   (BY MR. MURPHY)  Mr. Hubbard, do you recognize this
 8    document?
 9    A.   I do.  It is an exhibit in my report.
10    Q.   Was this demonstrative prepared under your direction?
11    A.   It was.
12    Q.   Is it an accurate summary of the source materials in
13    your expert report?
14    A.   Yes, it is.
15    Q.   What does this reflect?
16    A.   Well, if you start by looking at the header, the
17    statement being made here is that the intermediary fees
18    for the Great-West funds are consistent with intermediary
19    fees paid by non-Great-West funds.  So what is an
20    intermediary?  I'm taking the definition to be the sum of
21    the admin fee plus 12b-1 fees.  Either could be used to
22    pay intermediaries.
23         So my benchmarking says let me look at all of the
24    Great-West share classes.  That number ranges between 35
25    basis points and 60 basis points.  I then present below
```

1    for each year the summaries statistics, the median/mean,

2    minimum and maximum, and then the quartile range for all

3    of the other funds.

4            So, where does Great-West stack up?  It is between,

5    depending on the share class, the 40th percentile and the

6    75 percentile of all of the other funds.

7    Q.   And why did you look at admin fees and 12b-1 fees

8    combined, as opposed to just admin fees?

9    A.   Well, again, those are both fees that could be paid

10   to intermediaries.  And different organizations will

11   choose different mixes.  So it is the sum that is really

12   relevant.  It is also the sum that is generally presented.

13   Q.   And so the investors for the initial share class

14   charge a 35 basis point admin fee and no 12b-1 fee on the

15   Great-West funds?

16   A.   Correct.  So they would be the 35 basis points.

17   Q.   And then some share classes of the Great-West funds

18   charge a 35 basis point fee plus a 12b-1 fee?

19   A.   Right.  So if the 25 basis point 12b-1 fee is added,

20   it would be 60 basis points.

21   Q.   And that is in terms of -- if you count the

22   Great-West admin fee, plus the share class that uses 12b-1

23   fees, where is that in the range of comparable funds?

24   A.   Well, again, sort of right in the middle.  As I point

25   out for each of the years, it is between the 40th and 75th

1    percentile, depending on the share class.

2    Q.   What do you conclude from this analysis, in terms of

3    your assessment of the 35 basis point fee?

4    A.   That it is certainly well within the range of

5    comparable fees paid by others.  So there would be no need

6    to do the kinds of damages approach that Mr. Meyer

7    tendered for the Court.

8    Q.   Did you review Mr. Meyer's trial testimony in this

9    case?

10   A.   I did.

11   Q.   Do you recall that he offered some testimony about

12   the split of what the adviser paid versus the sub-adviser?

13   Do you recall that?

14   A.   I do.

15   Q.   Do you think that split is economically relevant?

16   A.   It's certainly not for A-head level reasons, and also

17   for this case, the B-head level reason.  The A-head level

18   reason is when you have a subcontracted arrangement, it is

19   still the total price that matters.  If you have a general

20   contractor at a house, you are not always looking at all

21   of the subcontractors, you are looking at total costs.

22   So, it is irrelevant from that perspective.

23          For this case, I would argue that from an economic

24   perspective, it is doubly irrelevant, because a lot of

25   this is looking at internal management.  So, inside

1894

1    Great-West, how they decide to allocate numbers between

2    unit A of the firm and unit B of the firm is an accounting

3    decision, not economic one.  So either way it is not

4    something you would do.

5    Q.   Can we just break that down a little bit,

6    Mr. Hubbard?  When you say it is "internal," what do you

7    mean?

8    A.   Well, in other words, if you have internal

9    sub-advisers to the adviser, now at the level of the

10   adviser, I am trying to decide where do I allocate costs

11   and profits.  I could say that the fee from the

12   sub-adviser is this number or this number.  It really

13   doesn't matter, because it is all me, it is all just

14   components of me.

15        It would be like in my house example, if a general

16   contractor also had family members as the subcontractors,

17   it is an accounting question, but it is not very

18   interesting as an economic sort of finance or damages

19   question.

20   Q.   So, if we can just take the S&P 500 fund for a

21   minute, Mr. Hubbard, I think what you are saying is the

22   sub-adviser is affiliated?

23   A.   Yes.  It is Irish Life, I believe.

24   Q.   Irish Life is owned by GWL&A?

25   A.   Yes.

1895

1    Q.    In fact, most of the core funds are managed by

2    affiliated sub-advisers?

3    A.    That is my recollection, yes.

4    Q.    There are six index funds, I think.

5    A.    Yes.

6    Q.    Then a couple Putnam funds?

7    A.    Yes.  Eight all together.

8    Q.    And could, for example, could Great-West decide

9    tomorrow to change that split and pay Irish Life 10 basis

10   points and have Great-West Capital Management keep

11   whatever is left?

12   A.    Right.  It would be of little import to either

13   Great-West or, more importantly, to the ultimate consumers

14   who pay the same price.

15   Q.    Leaving aside affiliated sub-advisers, Mr. Hubbard,

16   do you think the split is economically relevant if the

17   sub-adviser is unaffiliated, like Franklin Templeton?

18   A.    I don't, for the A-head reason that I suggested for

19   the Court.  But, in general, you are looking at the price

20   of the finished product, whether somebody produced it

21   internally or chose to subcontract part of that

22   externally, that is a decision for the firm.  What the

23   consumer cares about is how much does it cost, and how

24   does it perform?  And those are questions that Mr. Meyer's

25   approach just leaves aside.

1896

```
 1    Q.   I would like to turn to economies of scale,

 2    Mr. Hubbard.  I assume you are familiar with the term.

 3    A.   Yes.

 4    Q.   Can you, in your opinion, try to define economies of

 5    scale?

 6    A.   Sure, economies of scale is a defined term.  It

 7    arises when long-run average total costs fall from a

 8    change in output.  And, to unpack that, long-run average

 9    total costs, you are talking in the long run, you are

10    talking about the total cost per unit of a product

11    falling.  And for that to be an economies of scale, that

12    change has to be driven entirely by a change in output, as

13    opposed to a change in some other costs or rules or for

14    something like that.

15    Q.   Is there sort of an example you can give to

16    illustrate the conflict?

17    A.   Yeah, a standard example would be think of

18    manufacturing something, where I build a large plant, then

19    average total costs in that plant will probably be falling

20    over time as I increase capacity toward the capacity of

21    the plant, if I were a manufacturing firm.

22         The same logic shows you why you have to be

23    careful.  Let's suppose that I were selling milk.  The

24    manufacturing of milk may well have a lot of economies of

25    scale; the bigger the milk plant, and so on.  But milk is
```

1    consumed locally all around the country.  I don't want to

2    make all of the milk in Denver, Colorado, then put it on

3    trucks and drive all over the country.  So we have dairies

4    and manufacturing all over the country.  So you have to be

5    careful what a total cost is.

6    Q.   And why do you have to be careful about total costs

7    versus a subset of costs?

8    A.   Because that is what economies of scale is.

9    Economies of scale says, if I look at the total cost of

10   the finished product; milk, in the example I just gave, is

11   that importantly driven by changes in scale, changes in

12   the volume of output.

13   Q.   And is looking at total costs a standard way to

14   assess economies of scale in the field of economics?

15   A.   It is a defined term.  It is standard.  It would be

16   in any freshman textbook in economics, certainly mine, and

17   any of its competitors.  It is Econ 101.

18   Q.   Can economies of scale be accurately measured by just

19   looking at a subset of costs?

20   A.   It cannot.

21   Q.   With respect to mutual funds specifically, how

22   difficult is it to measure economies of scale?

23   A.   Well, it is complicated.  For the Court's benefit,

24   what is output?  So, you can think of a mutual fund as a

25   multi-dimensional product.  So there is output assets

```
 1    under management.  Is it number of accounts?  What metric

 2    do we even define as output?  Different complexes use

 3    different systems to do this, but that is question one.

 4         Question two, there are so many other costs that

 5    change for reasons other than scale; regulation,

 6    technology, costs of labor, things like that.

 7         And, third, there is the cost allocation problem.

 8    If I have a complex, how do I allocate complex overhead to

 9    individual funds?  There are many ways to do that, and you

10    might get very different answers.

11    Q.   Why is it difficult to estimate the costs?  Why

12    wouldn't you just be able to know exactly what your costs

13    are?

14    A.   Well, if you are talking about the level of the fund,

15    you can estimate costs at the level of the fund, but then

16    you have to allocate overhead costs, because you have to

17    make sure you are looking at total costs if you are trying

18    to look at economies of scale.

19         So, you can look at, in principle, at economies of

20    scale for a fund complex, or you can try to look at it at

21    a fund.  Mr. Meyer did neither one.

22    Q.   At a high level, what is your understanding of the

23    ways in which an adviser can share economies of scale?

24    A.   There are many ways.  One would be investing back in

25    components of the business that benefit shareholders.  So,
```

1   you can think of cybersecurity in the present case

2   example, new technology systems.  Then, anything that

3   changes price; so, fee waivers, fee reductions,

4   breakpoints at a particular level.  And, in some cases,

5   pricing to scale, when you start a fund.

6   Q.   What is pricing to scale?

7   A.   When funds say they price to scale, what they mean is

8   if you were starting a fund and you had a small amount of

9   assets, you have a lot of costs to start a fund, you

10  wouldn't price at the level that would make that fund

11  profitable day one, because it would be hard to attract

12  customers.

13        So, by pricing to scale, you are setting the price

14  at a level that you expect the funds asset to get to, so

15  you would be profitable somewhere out here, but you are

16  losing money today.  Hence, pricing to scale.

17  Q.   You also mentioned fee reductions.

18  A.   Yes.

19  Q.   Do you recall Mr. Meyer suggesting that a fee

20  reduction on the Goldman Sachs Mid Cap Value Fund to a

21  lower price was not sharing for some reason?

22  A.   I do recall seeing that, but it is definitely an

23  example of sharing economies of scale.

24  Q.   Did you understand the point he was trying to make?

25  A.   To be candid, no.

1    Q.   Are you aware of any circumstances where reducing a

2    fee wouldn't be a sharing of economies of scale?

3    A.   I can't.

4    Q.   Did you see any evidence in this case of sharing of

5    economies of scale?

6    A.   I did, both in the deposition testimony I reviewed

7    when I wrote my report, and in some of the trial

8    testimony, the Court has heard about various investments

9    that were made and the dollars associated with those.  And

10   then, of course, the fee reductions and waivers that I was

11   just speaking of.

12   Q.   In terms of the reinvestments in service, plaintiffs

13   have suggested that some of those costs are included in

14   the profitability of the funds.  Does that have any

15   significance, in your opinion, to sharing?

16   A.   I don't think so.  It is really an accounting

17   question.  The way I would think of it is the level of a

18   complex -- I might make investments that benefit lots of

19   components of my business, and that, of course, won't even

20   show up in the fund level accounting but for some

21   allocation.

22   Q.   Did you review plaintiffs' expert report as it

23   relates to economies of scale?

24   A.   Mr. Meyer's report?

25   Q.   Yes.

1    A.    Yes.

2    Q.    And did you review his testimony?  I believe he

3    testified about the S&P 500 fund?

4    A.    Yes.

5    Q.    Do you believe he properly analyzed the economies of

6    scale?

7    A.    I don't.  My reading of his testimony said two

8    things, which I guess are intentioned.  One, that you

9    can't quantify economies of scale.  Second, he purported

10   to try to do that for the S&P 500.  Both his claims are

11   false.  You absolutely can quantify economies of scale.

12         And, second, what he did is no such thing, because

13   it is not looking at average total costs, it was simply

14   profit comparisons at points in time.  So it doesn't rise

15   to the definition of the term.

16   Q.    Did you understand Mr. Meyer to look at total costs?

17   A.    He did not.

18   Q.    Did he look at GWL&A's costs, for example?

19   A.    No.

20   Q.    And in terms of the S&P's costs or profits over time,

21   can those move for reasons other than scale?

22   A.    Of course they can.  I listed several factors earlier

23   in the environment that can shift values.

24   Q.    And did you see any evidence, either in Mr. Meyer's

25   testimony or his report, where he investigated why those

1   costs were moving?

2   A.   He did not, in the testimony transcript that I saw.

3   Q.   Did Mr. Meyer quantify economies of scale?

4   A.   Well, it is an interesting question.  As I said,

5   there is tensions in what he said.  He said you couldn't

6   do it, but he purported to give an example of just that.

7   But the bottom line is, he didn't quantify economies of

8   scale.

9   Q.   And did you see any analysis in Mr. Meyer's report or

10  his testimony of sharing of economies of scale?

11  A.   I did not.

12  Q.   Let's move on to fallout benefits.  What are fallout

13  benefits?

14  A.   A fallout benefit would be the benefit to a provider,

15  the adviser here, that is ancillary to the contract being

16  negotiated.  So, typically fallout benefits are to be

17  identified and discussed.

18  Q.   And did you review Mr. Meyer's testimony as relates

19  to fallout benefits?

20  A.   I did.

21  Q.   Did Mr. Meyer do any analysis of whether any fallout

22  benefits related to any particular fund?

23  A.   I didn't see an analysis of the existence that would

24  have told me -- the existence of a fallout benefit, let

25  alone its allocation to some fund.

1    Q.   He didn't quantify fallout benefits for any

2    particular fund?

3    A.   He did not.

4    Q.   I think you mentioned two fallout benefits; a fixed

5    contract and affiliated sub-advisers.  Do you recall that?

6    A.   I mentioned them in my report, yes.

7    Q.   Did you see anything in his report or Mr. Meyer's

8    testimony where he said how much of the fixed contract was

9    related to the lifetime funds, for example?

10   A.   I did not.

11   Q.   Do you believe the fixed contract is a fallout

12   benefit?

13   A.   It wouldn't meet the definition.  The way I view it,

14   the purported fallout benefit, Your Honor, is the purchase

15   of an insurance contract; that is a transaction with a

16   price, a known price, and the board saw it.  So it doesn't

17   seem like it is a fallout benefit, at all.

18   Q.   In conclusion, Mr. Hubbard, do you believe the fees

19   charged to Great-West Funds are in the range of fees

20   charged by comparable funds?

21   A.   I do, based on the analysis presented to the board.

22   Q.   And based on your review of Mr. Meyer's testimony and

23   his report, has he demonstrated any analysis that

24   indicates to you that the funds' fees are excessive?

25   A.   He has not.

1    MR. MURPHY:  No further questions, Your Honor.

2    THE COURT:  Mr. Wolff?

3                    **CROSS-EXAMINATION**

4    **BY MR. WOLFF:**

5    Q.   So, you ended up, in your summation, with stating the

6    advisory fees on the Great-West mutual funds that are at

7    issue in this lawsuit are in the range of fees charged by

8    comparable funds.  And I just want to be sure that I am

9    clear on what that statement applies to.

10         Does that apply to the advisory fee that Great-West

11   Capital Management charged in 2014 through 2017, or are

12   you referring to the total expense ratios being within the

13   range of what comparable funds charged?

14   A.   Both.

15   Q.   And in your gambit of comparable funds, you are

16   including the mutual funds that were listed in the Lipper

17   fee comparison charts that were provided to the board at

18   their annual reviews?

19   A.   Yes, sir.  The Lipper peer group comparisons.

20   Q.   Those Lipper peer group comparisons, do you know

21   which of the fees for the comparable funds were the result

22   of arm's-length bargaining?

23   A.   That, of course, would be for the Court to decide.

24   From an economic perspective, my reading is that they are

25   all arm's-length bargains.

1905

1    Q.   Do you know specifically whether the fees that were

2    shown in the Lipper comparison charts were the result of

3    arm's-length bargaining between the mutual fund board and

4    the adviser?

5    A.   I see what you are saying.  I am sorry.  No, I

6    haven't analyzed all of those.

7    Q.   You testified earlier, and it is in your CV, that you

8    are an independent director for the board of directors at

9    MetLife.  MetLife, that is the holding company for the

10   MetLife Insurance Company?

11   A.   Yes.

12   Q.   It is not a '40 Act company?

13   A.   That's correct.

14   Q.   So the only 1940 Act company, or I guess what we call

15   colloquially, the mutual fund, is BlackRock?

16   A.   Sorry, I am not sure what the question is.  Are there

17   other mutual funds than BlackRock?

18   Q.   That you served as a director.

19   A.   Oh, that I served as director.  No, just BlackRock.

20   Q.   And just their fixed-income fund?

21   A.   For most of the time it was called the closed-end

22   fund complex.  There has been a re-organization.  It now

23   has some open-end funds, as well.  It is now called the

24   fixed-income fund complex.

25   Q.   So, the closed-end fund complex, were they just

1906

```
 1    fixed-income funds?

 2    A.   No.  There were some equity funds, as well.

 3    Q.   Any index funds?

 4    A.   No.

 5    Q.   In the re-organization, now you are just on the

 6    fixed-income fund complex, so you are not a director for

 7    other BlackRock mutual funds?

 8    A.   There are other BlackRock mutual fund boards.  There

 9    are, for example the ETF board and another equity board.

10    Q.   "And another equity board"?  Is that other equity

11    mutual funds' board?

12    A.   More or less, yes.

13    Q.   So, in the time that you have been working at

14    BlackRock, since I think it was 2004, BlackRock has had

15    different boards for different groups of its mutual funds

16    or 1940 Act products?

17    A.   Yes, sir, that's correct.

18    Q.   For the mutual funds for which you served as a

19    director, did BlackRock use a sub-adviser?

20    A.   A lot of funds over a lot of years.  I don't recall,

21    but it is quite possible.

22    Q.   I know you didn't work on the index funds, but you

23    might have heard while you were on the board, do you know

24    what BlackRock's profit margin was on its index funds?

25    A.   I don't know, because I wasn't on that board.
```

1907

1    Q.   Well, you might know because someone told you, even

2    though you are not on the board.  So, the question is, do

3    you know what the profit margin was on BlackRock's index

4    fund?

5    A.   I don't.  It is not a question I would ask.

6    Q.   You mentioned risks earlier today.  BlackRock faced

7    all of those risks; right?

8    A.   Yes, sir.

9    Q.   All mutual funds face those same risks?

10   A.   I think we are referring to advisers.  Is that what

11   you mean when you say "mutual funds"?  There is a risk to

12   the adviser.  Yes, advisers do face those categories of

13   risk.

14   Q.   You talked earlier about a unified management fee or

15   a unitary fee, and the transition to having the funds pay

16   those in 2017.  Do you know how much, in fees, were at

17   issue in that transfer?

18   A.   I don't.  I am sorry.

19   Q.   No need to apologize.

20        So, you don't know either in dollar amounts or a

21   percentage of assets?

22   A.   I don't.

23   Q.   If we can get Exhibit 1596 up.  For the S&P 500 Index

24   Fund, just to pick an example, do you know what funds are

25   included in your peer mean column?

1    A.   I don't, off the top of my head.  Sorry.

2    Q.   Whoever prepared this information would know that?

3    A.   This information came from Lipper.  These are Lipper

4    data.  I can talk about how they constructed it, but I

5    don't know off the top of my head the underlying funds.

6    Q.   Exhibit 1607.  This information that you have on here

7    about the gross adviser fee, as you call it, that is the

8    fee at the fund of funds level; right?

9    A.   Yes.  If it is an adviser fee, yes.

10   Q.   Did you examine what the profitability was to the

11   adviser of the funds in which those asset allocation funds

12   invested?

13   A.   I am sorry, are you asking me about the split between

14   the sub-advised and top level advisory fee, is that what

15   you are asking?

16   Q.   You're noting here the percentages of the funds that

17   you considered that had a fund of funds' level fee; right?

18   A.   Yes.

19   Q.   In compiling that, did you look at those funds that

20   did have and did not have a fund of funds' level fee, did

21   you examine what the profitability was to the adviser from

22   investing in proprietary underlying funds?

23   A.   I didn't.  I testified that that would be a useless

24   thing to do.

25   Q.   The question is whether you did or didn't.  So, no is

1    fine.

2              Have you ever negotiated a recordkeeping fee on

3    behalf of a sponsor of an employee retirement plan?

4    A.   I have not.

5    Q.   Do you know what, if any, negotiations occurred

6    between the retirement plans in which the plaintiffs are

7    invested and Great-West Life & Annuity?

8    A.   Only the description Mr. Kreider gave in his

9    deposition testimony that I talk about in the report and

10   to which he testified to here.

11   Q.   Is it your understanding that Mr. Kreider

12   participated in those negotiations?

13   A.   I don't recall that one way or another.  He was

14   describing the process.

15   Q.   Did you examine -- you understand that mutual funds

16   that pay 12b-1 fees have to have a 12b-1 plan that's

17   approved by the directors?

18   A.   Yes, sir.

19   Q.   Do you do that at BlackRock?

20   A.   Yes, sir.

21   Q.   Did you examine the 12b-1 plan in this case?

22   A.   I was not asked to do that, no.

23   Q.   Okay.  So the answer is no?

24   A.   No.

25   Q.   Do you recall seeing any document that identifies how

1    much, if any, of the 12b-1 fees that are collected on

2    managed funds in the Empower platform, is paid to GWL&A

3    for the recordkeeping services it provides under the

4    administrative services agreement?

5    A.   I don't recall whether I have seen that or not, to be

6    candid.

7    Q.   Candid is fine.  Candor is what I would like on your

8    answer to every one of my questions.  So, thank you.

9         Exhibit 1602.

10        THE COURT:  Actually, at this point, 1602 was never

11   offered into evidence.

12        MR. MURPHY:  I apologize, Your Honor.  We would

13   offer Exhibit 1602 into evidence.

14        THE COURT:  Any objection?

15        MR. WOLFF:  No, Your Honor.  I believe it is a copy

16   of Exhibit 1524.

17        THE COURT:  All right.  1602 is admitted.

18        (Exhibit No. 1602 is admitted.)

19        THE COURT:  You also did not offer the resume.

20        MR. MURPHY:  We would offer Exhibit 1298 into

21   evidence, Your Honor.

22        THE COURT:  Any objection?

23        MR. MURPHY:  No.

24        THE COURT:  All right.  1298 is also admitted.

25        (Exhibit No. 1298 is admitted.)

1911

1    Q.   (BY MR. WOLFF)  Does BlackRock provide recordkeeping

2    services for retirement plans?

3    A.   Not to my knowledge.  Certainly not in the complex

4    that I have worked with.

5    Q.   The complex that you work with, are any of those

6    mutual funds included in retirement plans?

7    A.   Traditionally, no.  The plans that I -- funds which I

8    work were the closed-end funds.  So I doubt those are

9    retirement plans.

10   Q.   Would you explain to Judge Arguello what the

11   difference is between a closed-end fund and an open-end

12   fund, as you understand it?

13   A.   An open-end fund is a mutual fund that has the

14   possibility of continuous sales and redemptions.  There is

15   an offer, people sign up.  They can liquidate and get net

16   asset value in return.

17        The closed-end fund is like the initial public

18   offering of stocks; money is raised -- a particular amount

19   is raised and invested in a particular way.  There is a

20   net asset value, but the price of that, the share price of

21   the closed-end fund could be higher or lower than its net

22   asset value.  Closed-end funds are often used by people

23   who are seeking a lot of dividend income.

24   Q.   So, a closed-end fund is traded on an exchange like a

25   stock exchange?

1    A.   Yes.

2    Q.   So it is subject to whatever price a buyer is willing

3    to pay for those shares?

4    A.   Correct, which may or may not be the net asset value.

5    Q.   And you don't believe any of the BlackRock funds you

6    work on are on the Empower Retirement platform?

7    A.   I don't know one way or the other, but I don't think

8    so.

9    Q.   Do you know how much of the -- do any of those

10   closed-end funds collect 12b-1 fees?

11   A.   I don't recall.  Some may.  I don't recall.

12   Q.   Of those that may, do you know how much of those

13   12b-1 fees BlackRock pays for retirement plan

14   recordkeepers?

15   A.   I don't recall percentages or dollars on that.

16   Q.   Exhibit 1602.  In terms of your looking at the

17   comparisons on administrative fees, putting aside 12b-1

18   fees for now, do you know what of those administrative

19   fees for non-Great-West funds were the result of

20   arm's-length bargaining?

21   A.   I haven't looked at all of those funds, so I don't

22   have a view.

23   Q.   Columbia University has retirement plans for its

24   employees?

25   A.   Yes.

1   Q.   You are not a fiduciary for any of those retirement

2   plans?

3   A.   I am not.  I am just a participant.

4   Q.   You have not been asked to provide advice to the

5   fiduciaries of any of those retirement funds?

6   A.   I have not.

7   Q.   And do those retirement plans include defined

8   contribution plans?

9   A.   Yes.  I am not a participant in a defined benefit

10  plan.

11  Q.   So the defined contribution plans are similar to the

12  Empower Retirement plans?

13  A.   I don't know what you mean by "similar," but those

14  are both examples of a defined contribution fund.

15  Q.   They are both defined contribution funds, that is

16  what I mean by similar.

17  A.   Yes.

18  Q.   Okay.  You participate in one of the Columbia defined

19  contribution plans; right?

20  A.   Yes.

21  Q.   And does TIAA offer investment products on that plan?

22  A.   Yes, TIAA-CREF and Vanguard.

23  Q.   And you invest in the Vanguard funds; right?

24  A.   Both, actually.  My contributions from Columbia go

25  into the TIAA-CREF.  And I also supplementary invest in

1914

1    Vanguard.

2    Q.   TIAA is one of the largest retirement plan providers

3    for educational institutions; colleges and high schools,

4    is that right?

5    A.   Yes.  That is why it was set up in the first place.

6    Q.   And it provides the recordkeeping services for those

7    plans?

8    A.   I believe -- I am not a hundred percent sure, but I

9    believe so.

10   Q.   Well, you are in the plan and you have money in

11   there.  Have you ever been informed that a third-party

12   administrator is doing the recordkeeping for your plan?

13   A.   I don't recall seeing that one way or another.

14   Q.   So, the only -- of your publications, the only

15   publications that are -- that address specifically

16   management fees charged by an investment adviser to a

17   mutual fund is the Law Review article and then the book;

18   right?

19   A.   That is more or less correct.

20   Q.   Your Law Review article was in Volume 33 of the

21   University of Iowa Law School Journal of Corporation Law,

22   called *Competition in the Mutual Fund Industry*?

23   A.   Yes.  That is the article.  It is internal

24   corporation law.

25   Q.   I have the book.  I got it from the library.

1   A.   I was hoping you bought it.

2   Q.   I don't have that much money, unfortunately.

3        MR. MURPHY:  You would be the third person.

4   Q.   (BY MR. WOLFF)  At least I can refresh your

5   recollection as to what the book you published in 2010 is

6   called.  And we can put the title page up if you want to

7   see the book at any time, so let me know.

8        The title of your book is *The Mutual Fund Industry,*

9   *Competition and Investor Welfare*?

10  A.   Yes.  I think that is what I said.  But yes, that's

11  correct.

12  Q.   That wasn't what you said, but that is okay.

13       Published by your business school, Columbia

14  Business School?

15  A.   It was published by the Columbia Business School

16  Press, which is part of Columbia University Press.

17  Q.   In 2010?

18  A.   Yes.

19  Q.   You have never worked at an investment adviser firm;

20  correct?

21  A.   That's correct.

22  Q.   Outside of litigation, you haven't provided any

23  professional services to an adviser of a mutual fund?

24  A.   That, too, is correct.

25  Q.   At BlackRock, have the directors asked you to provide

1  them charts, similar to what you have showed us in court

2  today?

3  A.   No, they have not.

4  Q.   Okay.  If we can go to the Law Review article.  This

5  is -- I will tell you, it is copied from the University of

6  Iowa Law School Journal of Corporation Law, but do you

7  generally recognize that as a Law Review article that you

8  and Mr. Coats wrote in 2007?

9  A.   Yes, sir.

10  Q.   And, in this article, you argue that contrary to what

11  the Court in *Gartenberg* said, the mutual fund industry is

12  a competitive industry?

13  A.   I don't think that is quite the way we put it.  We

14  argued for a three-legged stool, which one clearly is

15  competition.

16  Q.   If I could, I would just like to highlight the

17  section at the bottom here.  In the credits that you

18  provide, "This article came out of testifying as an expert

19  for a mutual fund advisory company" -- then an action

20  number -- "under Section 36(b) of the *Investment Company*

21  *Act*"?

22  A.   No, but I did do that expert witness work, so I

23  wanted to disclose it.

24  Q.   And the information that you put together and used as

25  an expert witness in that case, you used in this article?

1917

```
 1    A.    There could well have been overlap.  I am not sure

 2    which case or what the time period was.  That could easily

 3    be true.

 4    Q.    And that was the first time you ever testified as an

 5    expert witness on behalf of a mutual fund adviser in a

 6    Section 36(b) case?

 7    A.    If you are referring to American Century, I never

 8    actually testified.  So, I am not sure what the question

 9    is.  Maybe you are asking about something else.

10    Q.    I am just asking a question.  When you wrote this

11    article, you said, down here, "Dean Hubbard has testified

12    as an expert witness in a 36(b) case," right?

13    A.    Well, I certainly offered deposition testimony.

14    Q.    And was that the first case you had done before you

15    wrote this article?

16    A.    I am not sure it was done before I wrote the article.

17    But, yes, that was the first case on which I worked.

18    Q.    It had to have been done before you wrote the

19    article, because when you wrote the article, you said

20    Dr. Hubbard has testified as an expert witness; right?

21    A.    Sure.  By the time it is published, yes.

22    Q.    By the time this was typed up and put into the

23    document; right?

24    A.    Right.  Publications lag in my area a couple years or

25    so.  But, yes, it's not a point I would fight you on.
```

1918

1    Q.   It sure sounds like it.

2         THE COURT:  Mr. Wolff, I don't like how

3    disrespectful you are to the witness.

4         MR. WOLFF:  I am sorry, Your Honor.

5    Q.   (BY MR. WOLFF)  You note that your article "benefited

6    from comments and conversations with Sean Murphy."  That

7    is the Sean Murphy at the table here?

8    A.   The very same.

9    Q.   That is the Sean Murphy who hired you to testify as

10   an expert witness in that 36(b) case?

11   A.   I don't remember if it was Sean who hired me, but I

12   have worked with Sean in that case.

13   Q.   Whether it was Sean or his firm?

14   A.   It was certainly the firm.

15   Q.   Among the others that you thank for their invaluable

16   research, suggestions, comments, and data analysis is

17   Analysis Group.  They also provided you the research and

18   data and the charts that we saw today in this case?

19   A.   Yes.  They assisted me with those charts.

20   Q.   They provided all of the data and charts and exhibits

21   in your expert reports?

22   A.   They assisted me with all of that, yes.

23   Q.   You also note Lee Heavner.  He is right here; right?

24   A.   Yes.

25   Q.   So he helped you also in this case; right?

1    A.   He did.

2    Q.   The Investment Company Institute supported Analysis

3    Group's work; is that correct?

4    A.   Yes.

5    Q.   Did they support it monetarily?

6    A.   That, I don't recall.  It's been a while ago.  I

7    would assume so.

8    Q.   The Investment Company Institute is an organization

9    of mutual fund advisers?

10   A.   Yes.  It is sort of like a trend association of

11   mutual fund advisers, that is a good way to put it.

12   Q.   They have a company called ICI Mutual?

13   A.   Yes.

14   Q.   That is an insurance company?

15   A.   It is.

16   Q.   Provides liability insurance for 36(b) litigation?

17   A.   In part.  They do other things but, yes, it certainly

18   does that.

19   Q.   And so that insurance company for the mutual fund

20   adviser provided financial assistance for the writing of

21   this article?

22   A.   Yes.  That is why I disclosed it.

23   Q.   How much are you being paid to testify in this case?

24   A.   I am being paid my usual hourly rate; $1,500 an hour.

25   Q.   And Analysis Group is also being paid for all of the

1920

1    data analysis work they are doing and the charts, et

2    cetera; right?

3    A.    Yes.

4    Q.    You also get a percentage of Analysis Group's

5    billings; correct?

6    A.    That's correct, insofar as they are supporting me.

7    Q.    In this case, what percentage of their billings do

8    you get paid?

9    A.    I believe it is a standard attribution rate of 20

10   percent.

11   Q.    In all of your engagements -- well, since testifying

12   as an expert witness, that you referred to in this 2007

13   Law Review article, you have been engaged to testify as an

14   expert witness in how many Section 36(b) cases?

15   A.    Gosh, going from memory, I think, counting this one,

16   seven.  It is either six or seven, something like that.

17   Q.    And have you used Analysis Group as your support in

18   all of those engagements?

19   A.    Yes, I have.

20   Q.    And you receive a percentage of Analysis Group's

21   billings on all of those engagements?

22   A.    That's correct.

23   Q.    In those engagements, do you recall that Sean Murphy,

24   or his firm, Milbank, hired you in at least four of them,

25   not including this one?

1921

```
 1    A.   I certainly have worked with that firm on more than
 2    one occasion.  I don't know how many.
 3    Q.   Hartford?
 4    A.   Yes.
 5    Q.   Fidelity?
 6    A.   Yes.
 7    Q.   American Century?
 8    A.   Yes.
 9    Q.   American Funds?
10    A.   Yes.
11    Q.   For this article, ICI Mutual paid you $190,000;
12    correct?
13    A.   I don't recall what it was, but that could well be
14    right for RA support and for me, yes.
15    Q.   $150,000 in direct billings and 40 percent as your
16    percentage from Analysis Group?
17    A.   I don't recall that, but that doesn't sound
18    unreasonable, no.
19    Q.   You recall you were engaged to be an expert witness
20    on behalf of Fidelity Investments in the case of *Tussey v.*
21    *ABB* in the Western District of Missouri?
22    A.   Yes.  That is not a 36(b) case.  But, yes.
23    Q.   "Not a 36(b) case."  But Fidelity Investments is a
24    mutual fund adviser?
25    A.   Yes, sir.
```

1922

1    Q.   Do you recall -- and I have the transcript if you

2    need for me to pull it out.  But, do you recall indicating

3    that you received $150,000 in direct billings and 40

4    thousand dollars in attribution from Analysis Group for

5    this article?

6    A.   I don't recall it, but as I say, it doesn't sound

7    unreasonable.

8    Q.   Now, in the *ABB* case -- and the case number on that

9    is 06-cv-4305 -- you also were supported by Analysis

10   Group?

11   A.   Yes, sir.

12   Q.   And at that time, your billing rate -- this is in --

13   before 2010, was $1,200 an hour?

14   A.   If you say so.  I don't recall what it was.

15   Q.   All right.  If we can have the *ABB* trial transcript.

16   If we can go to page 2108, it is cross-examination,

17   Professor Hubbard, with lines 7 through 10, confirms that

18   your rate was $1,200 an hour then?

19   A.   Yes.  At that time.  It was lower for part of the

20   case, but, yes.

21   Q.   And by the time you testified at trial in that case,

22   you had received $200,000 in direct billings?

23   A.   That is what it says, yes.

24   Q.   All right.  That is what you said.

25   A.   No reason to doubt it.

1923

1   Q.   All right.  Then if we can go to page 2109 of that

2   document 567 from the ECF filing.  At the bottom, starting

3   at page 22 on page 2109, you were asked about the

4   attribution that you collect from Analysis Group in the

5   *ABB* case, and you corrected the examiner and said it was

6   7-and-a-half percent?

7   A.   Yes, at that time.

8   Q.   If we can go to the next page.  And on this next

9   page, 2110, lines 1 through 17, "the 7-and-a-half percent

10  attributions you got from Analysis Group added up to

11  $220,000"?

12  A.   It is not clear from what I said whether that is what

13  the 220- refers to.  But I would get 7-and-a-half percent

14  of their billings, if that is the question.

15  Q.   So $200,000 for your hourly rate, and 220,000 in this

16  case for your percentage of the billings of the Analysis

17  Group?

18  A.   I am not clear that that is what my answer is.  It

19  could be an estimate of what the work was they had done.

20  But I certainly get 7-and-a-half percent of whatever that

21  number was.

22  Q.   You were asked if that added up to $420,000 that you

23  received up to this point in this case.  You said, "Yes,

24  over the past 2 years or so"?

25  A.   Okay.

1    Q.    So that is similar to the arrangement you have in

2    this case?

3    A.    Yes, sir.

4    Q.    And what is the total you have been paid in this case

5    up to today's date of trial?

6    A.    I don't know.   I have billed, probably including this

7    trial, close to 200 hours.

8    Q.    The insurance that ICI Mutual provides to advisers

9    includes defending advisers from Section 36(b) litigation?

10   A.    I believe that's true, yes.

11   Q.    Your 2007 Law Review article was cited by the Seventh

12   Circuit Panel Decision in *Jones v. Harris Associates*, 527

13   F.3d 627?

14   A.    I believe so, yes.

15         MR. WOLFF:   And if we could have that case up,

16   please, and go to page 634 of the case.

17   Q.    (BY MR. WOLFF)   Do you have the case -- in that case,

18   citing your article, Judge Easterbrook and the panel

19   stated, "A recent, careful study concludes that thousands

20   of mutual funds are plenty, that investors can and do

21   protect their interests by shopping, and that regulating

22   advisory fees through litigation is unlikely to do more

23   good than harm."   Do you agree with that statement?

24   A.    Do I agree that Judge Easterbrook said it, yes.

25   Q.    Do you agree with what he said?

1    A.   I certainly agree the competition is important.  What

2    John and I described -- John Coats and I described, was a

3    three-legged stool.  But certainly Judge Easterbrook was

4    taken by the arguments.

5    Q.   Do you agree that "regulating advisory fees through

6    litigation is unlikely to do more good than harm"?

7    A.   I think that Section 36(b), from an economic

8    perspective, is probably not the optimal design of the

9    law.  But that's neither here nor there.  My views on

10   public policies really aren't on issue here.

11   Q.   All I was asking is whether you agreed with the

12   Seventh Circuit Panel's statement?

13   A.   I think the statement, as made, is too broad for me

14   to agree or disagree.  But, I certainly stand behind the

15   paper that informed Judge Easterbrook.

16   Q.   All right.  Now, if we can go back to your book, *The*

17   *Mutual Fund Industry*, and go to page 7, where you describe

18   the purpose of the book.  It begins on page 7.  And if we

19   can go to the next page.  Again, let me know if you want

20   to see the book.

21        So, in the book, you note that, "As of the time of

22   this writing, U.S. Appellate Courts that were addressing

23   mutual fund excessive fees' cases were in conflict over

24   whether price competition prevailed between fund

25   investment advisers.

1926

```
 1          In the leading legal decision from 1982 onward, the
 2   Gartenberg case, the Second Circuit Court of Appeals
 3   concluded that effective price competition between
 4   investment advisers was absent in the mutual fund
 5   industry.
 6          In 2008, the Seventh Circuit Court of Appeals
 7   concluded the opposite; that mutual fund pricing was
 8   guided by price competition.  Our analyses are intended to
 9   help resolve these contrary views of price competition in
10   the mutual fund industry."
11          Now, the Seventh Circuit case is the Jones v.
12   Harris case we were just talking about?
13   A.   Yes, sir.
14   Q.   And your book was advocating for the interpretation
15   of Section 36(b) adopted by the Seventh Circuit, citing
16   your article?
17   A.   I don't think that is -- we are advocating for
18   attention to be paid for competition.
19   Q.   Okay.  If we can go back to the highlights we have up
20   here, and go to the next page.  On page 44 of the book,
21   you have a section on "Subsequent court decisions,
22   following Gartenberg."  And, here again, you refer to the
23   "significant break with the past that came from the
24   Seventh Circuit Panel's decision in Jones v. Harris in
25   2008"?
```

1   A.   If that is a question, yes.

2   Q.   Then you note here that resolving the conflict

3   between *Jones, Gartenberg* and an Eighth Circuit case

4   *Gallus*, at the time you wrote this book, is pending before

5   the Supreme Court?

6   A.   Yes, sir.

7   Q.   Now if we can back up to the preface, the very

8   beginning.  Now, in the preface, you note that "during

9   this last wave of" -- Section 36(b) lawsuits is what you

10   are referring to?

11   A.   Yes, sir.

12   Q.   -- "counsel for various mutual funds invited us to

13   examine price determinations in the mutual fund industry.

14   This book grew out of these initial research efforts."

15   There, you are referring to your engagement as an expert

16   witness in those Section 36(b) cases?

17   A.   Yes, sir.

18   Q.   And if we could go to the next page, please.  I am

19   sorry, if we can go back one.  At the bottom of the

20   preface, you note, "Although there have been numerous

21   government and academic studies on mutual fund fees, an

22   economic model of demand and supply in the mutual fund

23   industry has been largely missing in the controversy over

24   fees, as well as more economic-based study of the relevant

25   empirical evidence.  This book provides an economic model

1    and analysis of advisory firm pricing."

2           And so that information is in reaction to the type

3    of economic information that the decision in *Gartenberg*

4    relied on?

5    A.   If I am understanding your question, no.  We are

6    simply saying it is time for rigorous economics here.  We

7    need to look at supply and demand.  So, it is a motivation

8    for why we wrote the book.

9    Q.   Right.  But *Gartenberg* relied on SEC studies, things

10   like the Wharton study regarding competition in the mutual

11   fund industry.  One of the things you point out in the

12   book is that you said the time is right for a

13   reconsideration of those studies which you consider to be,

14   I guess, obsolete?

15   A.   That is certainly true.  Those studies were written

16   in a very different era of information availability for

17   people.  So we could update.

18   Q.   If we can go to the next page.  For this book also

19   you were provided support by, again, Lee Heavner?

20   A.   Yes.  He certainly provided comments on the book.

21   Q.   Support and research assistance; right?

22   A.   May have.  I think my Analysis Group colleagues who

23   wrote the book did most of that, but he may well have.

24   Q.   You say, "we are especially grateful to those who

25   provided support and research assistance, including Lee

1    Heavner," right?

2    A.   Yes.  Which one of those, I don't know.  But either

3    way is fine.

4    Q.   Also Eric Nguyen, N-G-U-Y-E-N; right?

5    A.   Yes.

6    Q.   He also provided you support in this case on the

7    information that is included in your expert report?

8    A.   That is certainly true.

9    Q.   Those two were your primary contacts at Analysis

10   Group in this case?

11   A.   Yes.

12   Q.   Okay.  If we can go to the next page on "organization

13   of this book," page 8.  Here on page 9 of your book, you

14   note that "Chapter 3 summarizes and discusses the

15   *Gartenberg* decision, a historically major court case

16   addressing excessive mutual fund fees."

17          And in that paragraph, and especially this portion

18   here, is where you are pointing out how the economic

19   information of which *Gartenberg* relies, was obsolete?

20   A.   No.  In fact, the *Gartenberg* factors, which I think

21   correspond more to the district court decision, are pretty

22   much all economic factors.

23   Q.   Right.  But you point out that the *Gartenberg*

24   decision states that investment advisers do not compete on

25   price.  And that is one of the perceived errors that you

1  are addressing in this book, as well as in your article?

2  A.   Right.   That is an empirical error.   There is more

3  recent data that offered that evidence, and that is what

4  this book is about.

5  Q.   It also is what your article is about; right?

6  A.   Well, they are quite different.   But, yes, the same

7  general subject.

8         MR. WOLFF:   Okay.   Now if we can go to the

9  conclusion on page 157.   And then the next page to get to

10  the summation point in your article.   I am sorry, back up.

11  If we can expand the second paragraph of the conclusions.

12  Q.   (BY MR. WOLFF)   You state in your book that "Price

13  competition exists in mutual funds, as our analysis

14  indicates.   The current investment company laws to

15  investigate the charges of excessive fees in mutual funds

16  serve little useful purpose."   Is that correct?

17  A.   Yes.

18  Q.   And "the current investment company laws" you are

19  referring to there includes Section 36(b)?

20  A.   Yes.   Although the book points out that it is still

21  fine to have it as one of three legs of the stool.   The

22  point is the competition has to be another way.

23  Q.   In your opinion, it serves little useful purpose in

24  light of what you perceive to be competition among mutual

25  funds?

1    A.    The thrust of that paragraph is to really talk about

2    empirical evidence.  We now feel like we have empirical

3    evidence on price competition.  So, in that sense, that

4    body of work wasn't available in 1970.

5    Q.    And you read the Supreme Court *Jones v. Harris*

6    Opinion; right?

7    A.    Yes, as a layman can.

8    Q.    Uh-huh.  They vacated the Seventh Circuit's decision

9    in *Jones v. Harris*; correct?

10   A.    That is my understanding, yes.

11   Q.    And they did not rely on the theories, or even

12   mention the theories that you had posited in your Law

13   Review article?

14   A.    That is my recollection of the decision, yes.

15   Q.    So, in your opinion, the Great-West Capital

16   Management S&P 500 Index Fund's 25 basis point advisory

17   fee was reasonable compensation to Great-West Capital

18   Management before 2012, when that fund had under a billion

19   dollars in assets under management?

20   A.    If I am understanding your question -- first of all,

21   I was only asked about this litigation and time period

22   which it covers.  And over that time period, I do, indeed,

23   conclude that the fee is reasonable from an economic

24   perspective.

25   Q.    And just to be specific, that applies even when the

1932

1    fund had less than a billion dollars in assets under

2    management?

3    A.    That's correct.

4    Q.    Do you know how that 25 basis point fee had been

5    arrived at?

6    A.    The deposition testimony indicates just the general

7    competitive process in markets and how those change over

8    time.  Of course, I wasn't a part of those conversations.

9    I can't really know.

10   Q.    Uh-huh.  Do you know when that fee was initially set?

11   A.    I do not, sorry.

12   Q.    In your opinion, the 25 basis point fee was

13   reasonable compensation for the services that Capital

14   Management provided, even when the S&P 500 Index Fund

15   exceeded a billion dollars in assets under management?

16   A.    During the time period that I was asked to look; 2015

17   and 2016, that is my conclusion, yes.

18   Q.    And it also was reasonable compensation after the S&P

19   500 Index Fund exceeded $2 billion assets under

20   management?

21   A.    That is certainly the case.

22   Q.    Competition among mutual funds, as you understand it,

23   has it changed significantly from, say, 2010 through 2014?

24   A.    I think competition gets stronger all of the time in

25   this industry.  But it was high at the beginning and the

1    end of the period.

2    Q.   Would 21 basis points have been reasonable

3    compensation to Great-West Capital Management, in your

4    opinion, for the Great-West S&P 500 Index Fund before it

5    reached a billion dollars in assets under management?

6    A.   I am not sure how to answer that hypothetical.   I

7    would have to go back and look at the time period you are

8    looking at and do the same comparisons that I do.   If my

9    approach led me to that conclusion, I would offer that,

10   yes.

11   Q.   Do you recall that that is the rate that the board

12   set in June of 2017?

13   A.   Yes.

14   Q.   Now, the charts that you have put into evidence

15   today, those charts were not presented to the board;

16   correct?

17   A.   My literal charts were not presented to the board.

18   The underlying 15(c) information, of course, is.

19   Q.   Could I have Exhibit 1006, page 98.   Do you recognize

20   this as one of the Lipper charts on which you based your

21   analysis?

22   A.   It is certainly a Lipper chart.   So it could well be.

23   Q.   Okay.   It is from the 2014 board presentation, just

24   to orient you.

25              So, according to this chart, management fee less

1    estimated intermediary fees, the Great-West S&P 500 Index

2    Fund is 11 out of 13?

3    A.   Yes, I see that.

4    Q.   And that 23 basis point number is taking into account

5    operating expenses that Capital Management is paying on

6    behalf of the fund?

7    A.   If I am understanding your question, yes.

8    Q.   Up here at the top, SSgA, that is State Street Global

9    Advisers?

10   A.   Yes, sir.

11   Q.   A very reputable advisory firm?

12   A.   I would say so, yes.

13   Q.   They face the same risks out there regarding their

14   mutual funds as Capital Management does?

15   A.   They certainly face similar risks.

16   Q.   So, do you know the process by which Nuveen,

17   MassMutual or State Farm got to their advisory fees?

18   Well, let me rephrase that.

19        MassMutual is shown as one that has a management

20   fee less estimated intermediary fees that is higher than

21   Capital Management's.  Do you know anything about the

22   process by which MassMutual got that advisory fees?

23   A.   No, I don't.

24   Q.   J.P. Morgan is up here, one of the funds.  J.P.

25   Morgan has a very good reputation as an advisory firm;

1    right?

2    A.   I would say so, yes.

3    Q.   If the Great-West S&P 500 Index Fund were the most

4    expensive fund on this list, would that cause you to

5    conclude that its advisory fees are excessive?

6    A.   It would cause me to take a harder look at the

7    negotiations surrounding it; whether the constructs being

8    compared are the same.  So, yes, it would certainly be

9    extra analysis.

10   Q.   Because it's the third most expensive of the group,

11   you agree that would require further analysis, maybe not

12   to the extent if it were last, but at least more than if

13   it were at the top of the list; right?

14   A.   Well, the answer to your question is yes, there is

15   always going to be board involvement in this.  It is not

16   the subject of my report, but, yes.

17   Q.   All right.  If we can have Exhibit 1014, this is the

18   data from 2015.  Go to page 101, please.  So, as of 2015,

19   it is now the second most expensive management fee less

20   estimated intermediary fees?

21   A.   Is that a question?  Yes.

22   Q.   I just want to make sure we are on the same page with

23   the chart.  MassMutual is the only one more expensive?

24   A.   Yes.  In this peer group, that is true.

25   Q.   SSgA is charging 6 basis points on its similarly

1    sized S&P 500 Index Fund, just like it did the year

2    before?

3    A.    That's correct.

4    Q.    In your experience, do index fund fees at the adviser

5    level stay fairly consistent from year to year?

6    A.    It would depend on the competitive conditions for the

7    product and issues with that adviser, but they may.

8    Q.    If we can go to Exhibit 1024.  I am sorry, if we can

9    go back to Exhibit 1014, at 101.  Correct me if I am

10   wrong, but I believe what you indicated is that in

11   comparing mutual fund expenses, what you compared for your

12   opinions was the total expense ratio.  Is that in the

13   right column there?

14   A.    Yes.  I do other analyses, but, yes, that is the one

15   I think is best.

16   Q.    And that is because I think, as you put it, it

17   includes all of the expenses in the mutual fund?

18   A.    That's correct.

19   Q.    If an investor were going to buy a mutual fund, that

20   is the total expenses that are going to be taken out of

21   their account day-to-day?

22   A.    Yes.

23   Q.    Now, for the Templeton Global Bond Fund, if Capital

24   Management's charging 95 for it but Templeton is only

25   charging 52, that's relevant to an investor, if they had a

1   choice, which of the Templeton Global bond funds to invest

2   in?

3   A.   It may be, but not likely, because of cost structure

4   differences, their performance differences.  Maybe.

5   Q.   Do you know what the -- the Great-West Templeton

6   Global Bond Fund uses the same adviser as Templeton;

7   right?  It is Franklin Adviser; right?

8   A.   Actually, that changed subsequent to this.  But, yes,

9   even in the period which they do the performance isn't

10  identical.  The portfolio managers are doing something

11  different in the two products.  And, in any event, the

12  cost structure is very different.

13  Q.   I didn't see in your report a comparison on the

14  performance between the two Templeton Global bond funds,

15  but you did that analysis?

16  A.   I brought it to the deposition thinking you might ask

17  me, but you didn't.

18  Q.   That is because it is not in your report, and if it

19  is not in your report, you can't say it.  But it is not in

20  your report; right?

21  A.   No.

22  Q.   Okay.  The total expense ratio, just so we are clear

23  on it, it kind of shows up on this chart and includes

24  things like 12b-1 fees?

25  A.   Right.

1938

1    Q.    12b-1 fees don't have anything to do with the

2    management of the mutual fund portfolio; is that right?

3            THE COURT:  Mr. Murphy?

4            MR. MURPHY:  Your Honor, I believe Mr. Hubbard

5    presented data and did an analysis on data that was in the

6    relevant period.  I think the chart before this was

7    presented in 2014, looking at fees in 2013.  This one, if

8    I look at the report date where the fees are drawn from,

9    it is 2013 and 2014.  I don't think they are relevant to

10   the case, but certainly not the ones that I believe

11   Mr. Hubbard analyzed.  And I am just not sure of the

12   relevance at this point.  We have been on it quite a

13   while.

14           THE COURT:  What is the relevance?

15           MR. WOLFF:  It is to get an understanding of what

16   is included within the total expense ratio that the expert

17   witness is relying on.  This is just an example of fees

18   that are included in the expense ratio.  This is

19   information that was provided in 2015, but it is just an

20   example.

21           THE COURT:  I think the objection is you are using

22   figures not at issue in this case.

23           MR. WOLFF:  But the specific dollar amounts aren't

24   the point I am getting at.  The point is what is included

25   in the total expense ratio as a category.

```
 1          THE COURT:  I will overrule the objection and allow

 2   you to do that, with that caveat; that you are not talking

 3   about the actual numbers here.

 4          MR. WOLFF:  Okay.  Thank you, Your Honor.

 5   Q.   (BY MR. WOLFF)  So, the total expense ratio, when you

 6   are looking at comparison funds, can include 12b-1 fees,

 7   like we see on this one page, at least?

 8   A.   Yes.

 9   Q.   And 12b-1 fees don't have anything to do with the

10   investment of the mutual fund; right?

11   A.   I am not sure what you mean by that.  Do you mean

12   portfolio management when you say the word "investment"?

13   Q.   People give mutual fund money to invest the mutual

14   fund money in stocks and bonds, get performance,

15   dividends, et cetera.  That is what I mean by performance;

16   the investment performance.

17   A.   I am not quite sure how to answer that.  You are

18   asking me about portfolio management.  But it is the total

19   expense ratio that draws people to the fund in the first

20   place.  But, no, it is not paying for portfolio

21   management, per se, if that is what you are asking.

22   Q.   12b-1 fees don't have anything to do with the

23   performance of the mutual fund, do they?

24   A.   If I am understanding the question, no, that is not

25   what they are there for.
```

1  Q.   Shareholder services fee don't have anything to do

2  with performance of the mutual fund?

3  A.   If I am understanding your question, no.

4  Q.   What it does have to do with the performance of the

5  mutual fund is what you are paying to the adviser who

6  either has in-house portfolio management or hires someone

7  else to do your portfolio management; in other words

8  investing of the mutual fund's money; is that right?

9  A.   No.  I don't understand that question, at all.  You

10 seem to be suggesting that somehow the level of the

11 management fees is causing performance.  I don't

12 understand this whole line of inquiry --

13 Q.   Okay.

14 A.   -- and where you are going.

15 Q.   Okay.  I will see if I can clarify for you.

16      The management fee is what is being paid for the

17 investing of the mutual fund, among other things; correct?

18 A.   Yes.  Among other things, yes.

19 Q.   12b-1 fees and general servicing fees are not?

20 A.   Correct.  They are part of the total expense ratio.

21 Q.   Okay.  If we can go to Exhibit 1024, please, page 97.

22 Another fee comparison; TIAA, the one you have in your

23 retirement plan, charges only 4 basis points for the

24 management fee?

25 A.   I actually don't have their S&P 500 Index.  But, yes,

1941

1    I am a customer of TIAA-CREF.

2    Q.   Is it an investment option in your plan?

3    A.   It may well be.

4    Q.   At this point in time, the management fee less

5    estimated intermediary fees is the first of the lot; is

6    that right?

7    A.   Yes.  But this is an example of the inapt comparison

8    of the unitary fee that I talked about in my testimony.

9    Q.   In 2016, how much of the unitary fee are we talking

10   about?  Of the entire management fee, how much of that is

11   expenses that the fund would have been paying instead of

12   Capital Management because of this unitary fee structure?

13   A.   I don't recall.  But you are comparing an apple and

14   an orange.

15   Q.   Uh-huh.  Isn't it 1 basis point?  25 management, less

16   operating expenses, is 24?

17   A.   I really don't recall.  If you look at the total

18   expense ratio, which is the more apt comparison, it is 9

19   out of 12.

20   Q.   But doesn't that column take into account whatever

21   expenses are being paid by Capital Management as part of

22   the unitary management fee?

23   A.   I don't really recall that.  That is an accounting

24   question.

25   Q.   Did you check to see, 2016, 2017, how much, as a

1    percentage of assets, was the operating expenses paid

2    under the unitary management fee?

3    A.   I didn't, because the calculation is the wrong one to

4    do.

5    Q.   You didn't because what?

6    A.   The calculation would be the wrong one to do.  You

7    shouldn't be comparing unitary fees with other firms'

8    management fees.

9    Q.   If it was only one basis point, it doesn't really

10   make much of a difference in terms of the ranking here;

11   right?

12   A.   I don't know, because I haven't gone back to look at

13   those numbers.  As I testified, I don't think you should

14   be looking at the management fee.

15   Q.   You, at least in the charts that you presented here,

16   you did not examine the profitability of the funds at

17   issue.  And let's just focus on the S&P 500 Index Fund as

18   an example.  You did not examine the profitability of the

19   fees to Great-West Capital Management over the time at

20   issue; is that right?

21   A.   That's right.

22   Q.   And in your opinion, looking at the profit margin on

23   the S&P 500 Index Fund advisory fee, it is completely

24   meaningless?

25   A.   If you mean by that the split between the sub-adviser

1943

```
 1    and adviser, yes, that is economically meaningless.
 2    Q.   What I mean by that is the profit margin that Capital
 3    Management is earning on its fee in 2012, let's say was 80
 4    percent, but by 2015, it is closer to 88 percent.  So its
 5    profit margin is increasing even as its assets are
 6    increasing.  That kind of examination, in your opinion,
 7    doesn't serve any economic purpose?
 8    A.   Well, it depends on how you define a profit margin.
 9    Profit margins can be defined in many different ways.  The
10    board is always looking at this.  This is one of the
11    factors they consider.  It is just not something I was
12    asked to do.
13    Q.   All right.  But is it something you considered?
14    A.   I think you asked me, and I said no, I did not.
15    Q.   And is that because you consider it to be of sort of
16    no economic purpose, in your mind?  Not other people's
17    mind, but in your mind?
18    A.   It would definitely serve a purpose as a factor for a
19    board to look at.  But I wasn't asked to look at
20    everything the board was doing, just to look at this
21    piece.
22    Q.   I understand that.  But you serve on a board.  And so
23    how the profit margins at BlackRock varies with the assets
24    is something you don't consider?
25    A.   Well, that's not true.  In the closed-end case it
```

```
 1    almost is, because it is a fixed size of assets; they are
 2    not changing over time.  For open-end funds, boards are
 3    given, and do react, to profitability numbers.
 4    Q.   And in doing your analysis, you didn't compare
 5    Capital Management's profit margin on particular funds to
 6    other adviser's profit margins?
 7    A.   That's correct.  I am not sure how I would have done
 8    so.  But it is certainly correct, I didn't do so.
 9         MR. WOLFF:  Your Honor, I am going to go into a new
10    area of inquiry.  I have a bit more to go.  Do you want to
11    break now or keep going?
12         THE COURT:  How much longer do you have?
13         MR. WOLFF:  Probably at least 45 minutes.
14         THE COURT:  All right.  Then let's go ahead and
15    break for lunch.  All right.  We will be in recess until
16    approximately 12:35.
17         (Lunch is taken from 12:03 p.m. to 12:35 p.m.)
18    lunch.
19         THE COURT:  You may be seated.
20         Mr. Wolff, you may proceed.
21         MR. WOLFF:  Thank you, Your Honor.
22    Q.   (BY MR. WOLFF)  Professor Hubbard, the BlackRock
23    Board on which you are a member, they have nine directors?
24    A.   That's correct, nine independent directors.
25    Q.   Are they directors or trustees?
```

1945

1    A.    Technically we are called trustees.

2    Q.    Trustees.  So nine trustees that are not affiliated

3    with the adviser.  And does it have an affiliated trustee

4    on the board?

5    A.    Yes, there is an affiliated trustee.

6    Q.    So 10 total?

7    A.    Yes, sir.

8    Q.    Has that been the case since 2004?

9    A.    More or less.  It might have been one lower or

10   higher, but in that range.

11   Q.    Right.  So, if somebody left in the interim and you

12   haven't replaced that person yet, there would be nine?

13   A.    Or thinking ahead or changes in skill metrics.  But

14   in that range, yes.

15   Q.    Do you know whether the other BlackRock boards for

16   the other mutual funds in their complexes, do you know

17   whether they also have around 10 trustees?

18   A.    I don't, sorry.

19   Q.    That's all right.

20         Do you agree that in the investment management

21   industry, as fixed costs are spread over a larger asset

22   base, the resulting decrease in fixed costs on a per-unit

23   or assets under management basis, is frequently defined as

24   economies of scale?

25   A.    If I'm understanding your question, the answer would

1946

1    have to be no, because that is not the definition of

2    economies of scale.

3           MR. WOLFF:  If we can have Exhibit 1023, please.

4    This is the 15(c) report that Capital Management delivered

5    to the directors in 2016.  If we can go to page 35,

6    please.  And if we can expand the paragraph on economies

7    of scale.

8    Q.   (BY MR. WOLFF)  So, the statement that Capital

9    Management made to the directors in this document, which I

10   provided to you, that is an incorrect statement on what

11   economies of scale are?

12   A.   It wouldn't have to be if, by that, they meant

13   average total costs.  I just can't tell.  I don't know

14   what is in the conversation or the context around this.

15   It is not literal definition, but business people are

16   often more colloquial than economists.

17   Q.   You are familiar with the SEC's Division of

18   Investment Management's 2000 report on mutual fund fees

19   and expenses?

20   A.   Yes, sir.  I cite to it in the report.

21   Q.   Okay.  If we can have -- that was filed as part of

22   the summary judgment papers.  And so I am going to pull up

23   the excerpts in document 253, pages 113 through 119,

24   focusing for now on Docket 253, at 115.  And just for your

25   reference, if we can go to page 113, please.  This is the

1947

1    online version of that report?

2    A.   I think so, yes.

3    Q.   It has the URL at the bottom.  But, that is what that

4    is.  So, go to 115.  The Division of Investment Management

5    at the SEC states, "Evidence developed above indicates

6    that as mutual fund assets grow larger they're operating

7    expense ratio decline."  Do you agree or disagree with

8    that statement?

9    A.   Well, the evidence they collected, it may well be

10   true.  It is not a definition of economies of scale,

11   because it is component of costs, but it may well be true.

12   Q.   Until May 1st of 2017, the operating expense ratios

13   for the various funds, for example the Great-West S&P 500

14   Index Fund, came out of Capital Management's 25 basis

15   point fee?

16   A.   That is my understanding, yes.

17   Q.   And if you want me to enlarge any of these, please

18   let me know.  The statement here, "Most observers believe

19   that portfolio management is the fund cost with the

20   greatest economies."  Do you agree or disagree with that?

21   A.   I certainly agree that portfolio management, by

22   itself, is likely to have -- again, they are using the

23   word economy colloquially.  But, yes, it is just not

24   average total cost.

25   Q.   All right.  That refers to a footnote 105.  I would

1    like to go to that on page 119.  Footnote 105 is down

2    here.  Referring to the "protecting investors" cite, they

3    state, "An advisory fee that does not scale down as

4    company assets increase consequently may yield enormous

5    profits to the adviser to the detriment of shareholders."

6    Do you agree or disagree with that statement?

7    A.    It is simply a statement about "may."  I suppose

8    anything is possible.  It just means you would need to do

9    the analysis.  There is no conclusion there, at all.

10   Q.    And in terms of the analysis, do you not look at the

11   profit to Capital Management on the S&P 500 Index Fund?

12   A.    I would not do that, no.

13   Q.    Okay.  If we can go to page 164 of document 253 in

14   the record in this case.  I am sorry, if we can go to page

15   120.  This is -- do you recognize this as a press release

16   from the Investment Company Institute on the SEC report on

17   mutual fund fees and expenses?

18   A.    I do.

19         MR. WOLFF:  And it is in the record as document

20   253, page 120.  If we can expand that paragraph.

21   Q.    (BY MR. WOLFF)  The Investment Company Institute

22   stated in their response to that report, "The report makes

23   clear that the combination of" -- can we close that.

24         Sorry, this paragraph, please.  The Investment

25   Company Institute, in their press release, states, "The

1949

 1    SEC fee report confirms that mutual fund shareholders

 2    benefit from economies of scale."

 3         Going to the third sentence, they state, "Expense

 4    ratios for funds that have grown to more than $1 billion

 5    in assets, for example, are nearly 50 percent lower than

 6    expense ratios for smaller funds that have yet to

 7    experience such growth."  Do you agree or disagree with

 8    that statement?

 9    A.   It sounds like something they say they found.  I

10    don't have a basis for agreeing or disagreeing.  It is not

11    a comment about economies of scale, it is about expense

12    ratios.

13    Q.   As you interpret it, that is not a comment about

14    economies of scale for funds that are at a billion dollars

15    of assets?

16    A.   It is about expense ratios, it is not about costs.

17    But whether the statement is true, I don't know.  I

18    haven't seen their study.

19    Q.   One way to share economies of scale is by cutting the

20    advisory fee at certain assets levels, such as

21    breakpoints; correct?

22    A.   Correct.

23    Q.   And when the S&P 500 Index Fund grew to a billion

24    dollars in 2012, Capital Management did not reduce its

25    management fee by 50 percent; right?

1    A.    That is certainly true.

2    Q.    It is your belief that while economies of scale may

3    exist for low levels of assets, they are not a defined

4    feature of the mutual fund industry?

5    A.    Yes.   I think I say almost exactly those words in my

6    report.   So, yes, it is my belief.

7    Q.    What do you mean by "low levels of assets"?

8    A.    I'm simply making a comment about the studies that I

9    looked at that tended to find evidence only for low levels

10   of assets.   The defining feature comment refers to the

11   analysis that I did in the report.

12   Q.    A dollar amount low level of assets.   What is the

13   dollar amount that you consider to be a low level of

14   assets?

15   A.    I don't recall from those studies.   It is difficult

16   because of the pricing-to-scale phenomenon.   But I don't

17   recall one way or another.

18   Q.    All right.   If we can go to your book, and go to page

19   112.   It is the chapter in your book on economies of scale

20   in mutual funds and price competition, and you are

21   responding to -- excuse me, fee critics' arguments in that

22   section.

23         And on page 113, that section of your book, you

24   state, "As indicated, despite the seemingly majority view

25   of large economies of scale in investment advisory

1    services, the extent of such economies, as discussed here

2    in the following section, remains an open question."

3         Now, in your book, when you are talking about that,

4    you are kind of qualifying that with the word "large."

5    What do you mean by "large"?

6    A.   In other words, that it is a defining feature of the

7    industry.  The analysis I present in this book suggests

8    that it is not.  And many of the critics were actually

9    looking at methods that weren't even about average total

10   costs; exactly the same discussion we have been having.

11   Q.   All right.  So is "large" a percentage number or a

12   dollar number?

13   A.   Well, as you know, in the book what I did was look at

14   deciles and looked at survival rates.  We can go through

15   the analysis if you'd like.

16   Q.   Do you recall what the percentage is as to what

17   constitutes a large economies of scale or not?

18   A.   That is an indirect method.  We argue in the book

19   that it is very hard to do a direct method for economies

20   of scale.  The test I did, which was developed by Nobel

21   laureate, George Stigler, S-T-I-G-L-E-R, is simply

22   designed to so show that the economies of scale aren't a

23   defining feature of an industry.

24   Q.   You state in your book that "Economies of scale at

25   the individual fund level are impossible to measure as a

1952

    1   reasonable degree of accuracy due to joint and common
    2   costs."  You are still of that belief?
    3   A.   Yes.  I think any economist would be of that belief.
    4   Cost allocation is an art, as well as a science.  There
    5   are many reasonable cost allocations.
    6        MR. WOLFF:  And if we can go to page 115 of your
    7   book.  This is the section on "prior studies."  If we can
    8   blow up that paragraph.
    9   Q.   (BY MR. WOLFF)  You point out, "most studies find
   10   expense ratios decline with increases in assets under
   11   management up to some level of assets.  Faster growth in
   12   assets than expenses, however, does not necessarily
   13   establish the presence of large economies of scale."
   14        It may establish the presence of economies of
   15   scale, but just not at a level you consider to be large?
   16   A.   It may.  You would have to study it.  The studies you
   17   are referring there didn't look at average total costs, so
   18   they wouldn't know one way or another.
   19   Q.   And the SEC study we just looked at also doesn't look
   20   at what you call "average total costs"?
   21   A.   I don't remember what the SEC did.  It is certainly
   22   not what they said.  I don't remember the underlying
   23   study.
   24   Q.   The approach of examining fund expense relative to
   25   the total amount of assets under management, that is not a

1953

1    proper approach to measuring economies of scale?

2    A.   That's correct.

3    Q.   Reinvestment, as a means of sharing economies of

4    scale, in this case, you did not calculate the total

5    dollar amount of reinvestments that you contend

6    constitutes a sharing of economies of scale?

7    A.   No, sir, I did not.  There was evidence in the

8    witness testimony, but I didn't total up their numbers.

9    Q.   And other than what was said at trial, you didn't do

10   a calculation of the amount of those investments as a

11   percentage of assets for any particular fund?

12   A.   That's correct.  I reviewed the deposition

13   transcripts for the writing of the report, but it wasn't

14   really for me to say.

15   Q.   Any reinvestments that were made -- you are familiar

16   with the Net Income By Fund Charts that were presented to

17   the board in this case?

18   A.   Yes, sir.

19   Q.   Any reinvestments that would constitute sharing of

20   the economies of scale would be in the operations expense

21   column of those charts?

22   A.   I wouldn't think so, no.  Some would.  I would think

23   some might be overall firm level or complex level

24   investments, which would be any number of accounts.  But I

25   am not an accountant, and I wasn't asked to go through

1954

1    that.

2    Q.   Okay.  So it could be at the firm level, like GWL&A,

3    Great-West Life & Annuity, that was allocated as part of

4    the overhead?

5    A.   That is quite possible.

6         MR. WOLFF:  No further questions.

7         THE COURT:  Redirect?

8         MR. MURPHY:  Thank you, Your Honor.

9                    **REDIRECT EXAMINATION**

10   **BY MR. MURPHY:**

11   Q.   Mr. Hubbard, you referred several times in your

12   testimony, when you were being questioned by Mr. Wolff,

13   about a three-legged stool.

14   A.   Yes.

15   Q.   Can you explain to the Court what you mean by a

16   three-legged stool?

17   A.   It was an argument that Professor Coats and I had

18   developed; that there are really three things that

19   constrain pricing in the mutual fund industry.  One leg of

20   the stool is competition and market forces.  The second

21   level of the stool is the board's engagement to

22   restraining advisers.  And the third level is a private

23   right of action, which is why we are here, Section 36(b).

24   We talk about all three of those legs of the stool.

25   Q.   And do you believe 36(b) continues to be one of the

1    legs of the stool; to protect shareholders?

2    A.   It is certainly a leg of the stool.  And from an

3    economic perspective, I think the Supreme Court got it

4    right, that it would kick in if the board process was so

5    flawed and competition were so flawed, then one might need

6    a private right of action.

7    Q.   You were just questioned on an SEC report that talked

8    about economies of scale?

9    A.   Yes.

10   Q.   And you were shown an ICI report that talked about

11   economies of scale?

12   A.   Yes.

13   Q.   In the statements you were shown in those reports, do

14   you understand them to be analyzing economies of scale by

15   looking at fees or expense ratios?

16   A.   That is what they were doing, yes.

17   Q.   And do you think that is the way you analyze

18   economies of scale?

19   A.   No, it is absolutely not.  I think they are using the

20   term colloquially, but it really has nothing to do with

21   economies of scale.

22   Q.   Would any economic textbook tell you to analyze

23   economies of scale by looking at fees, not costs?

24   A.   It would not.

25   Q.   Do you have an understanding why the SEC or the ICI

1956

1    uses fees instead of costs?

2         MR. WOLFF:  Objection, foundation.

3         THE COURT:  Sustained.

4    Q.   (BY MR. MURPHY)  Is cost data -- to do an economies

5    of scales data, you would need cost data, manufacturing

6    cost data from mutual fund advisers; right?

7    A.   That's correct.  Because it is total costs, you would

8    need the advisory costs, all of the operating expenses, a

9    way to allocate overhead, and compare that across

10   complexes.  Outside of government inquiry or litigation,

11   it would be very hard to imagine having that data.

12   Q.   Well, if the SEC had them, do you have an

13   understanding of whether they publish other advisers' cost

14   data?

15        MR. WOLFF:  Objection, foundation.  He never worked

16   at the SEC.

17        THE COURT:  Overruled.

18        THE WITNESS:  I have not seen that, no.

19   Q.   (BY MR. MURPHY)  Have you seen any publicly available

20   study that analyzes a mutual fund adviser's cost data that

21   would be required to do a study of economies of scale?

22   A.   No.  Indeed, my colleagues and I looked when we were

23   writing the book.  That is why we did the indirect method,

24   because we couldn't get the direct data.

25   Q.   You testified about survival rates?

1957

1    A.    Yes.

2    Q.    What was that a reference to?

3    A.    It was a reference to a study that I had done in the

4    book which asked the following question:  If economies of

5    scale are really important, you would expect that the

6    smaller funds or smaller complexes would die off and all

7    assets would go to the largest funds and largest

8    complexes.

9         In fact, when you look at deciles of the size

10   distribution over a decade period, they are more stable

11   than that.  So, small- and mid-sized funds and complexes

12   can persist.  So economies of scale, in the Stigler sense,

13   can't be a defining feature of the industry.  That was the

14   purpose of that analysis.

15   Q.    If we can go to Exhibit 1024, at page 97.  Do you

16   recall being questioned on this document, Mr. Hubbard?

17   A.    Yes.

18   Q.    The entire management fee of the Great-West S&P 500

19   fund is 25 basis points?

20   A.    Yes, sir.

21   Q.    What is the total expense ratios of the Great-West

22   S&P 500 Fund?

23   A.    It is 25 basis points.

24   Q.    So their management fee is the same as the total

25   expense ratio?

1958

1    A.   For an institutional share class, yes.

2    Q.   And does that indicate anything about what the

3    advisory fee for the institutional share class of that

4    fund covers?

5    A.   It certainly is equivalent, if that is what you are

6    asking.

7    Q.   That is my point.  Would that indicate to you that

8    the total expense ratio, which is the same as the

9    management fee, means it essentially covers -- it is an

10   all-in price?

11   A.   Yes.

12   Q.   And the other -- the average of the entire peer

13   group, it looks like the average advisory fee is 16 basis

14   points?

15   A.   That's true.

16   Q.   And it looks like the average total expense ratio is

17   22 basis points?

18   A.   That's true.  That is the number I put in the table I

19   showed this morning.

20   Q.   Does that indicate that, on average, advisers are

21   charging another 6 basis points outside their management

22   fee to get to their total expense ratio?

23   A.   Yes.  That is just the math.

24   Q.   In looking at the management fee of the institutional

25   share class of the Great-West fund, are you essentially

1   looking at the total expense ratio in this scenario?

2   A.   For that fund, yes.

3   Q.   Does that tell you anything about whether you should

4   look to total expense ratio versus management fee in doing

5   comparisons?

6   A.   Well, as I said earlier, to make an apt comparison,

7   the total expense ratio is the only one that is apt;

8   meaning apples-to-apples.

9          MR. MURPHY:  No further questions, Your Honor.

10         THE COURT:  All right.  May this witness be

11  excused?

12         MR. MURPHY:  Yes.

13         MR. WOLFF:  Yes, Your Honor.

14         THE COURT:  All right.  Thank you very much.

15         THE WITNESS:  Thank you, Your Honor.

16         THE COURT:  Dr. Hubbard, you are excused.

17         Defendants may call their next witness.

18         MR. MURPHY:  Defendants call Arthur Laby.

19         COURTROOM DEPUTY:  May I have your attention,

20  please.

21                    **ARTHUR LABY**

22  having been first duly sworn, testified as follows:

23         THE WITNESS:  I do.

24         THE COURT:  Please be seated, sir.

25         Please state your name, and spell your first and

1    last names for the record.

2         THE WITNESS:  Any name is Arthur Laby.  A-R-T-H-U-R

3    L-A-B-Y.

4                        **DIRECT EXAMINATION**

5    **BY MR. MURPHY:**

6    Q.   Mr. Laby, what is your occupation?

7    A.   I am a professor at Rutgers Law School, and

8    co-director of our Center For Corporate Law and

9    Governance.

10   Q.   And how long have you been a professor at Rutgers Law

11   School?

12   A.   Well, let's see.  I started in 2006.  So 14 years.

13   Q.   And were you a full professor that entire 14 years?

14   A.   No.  When I first arrived, I was an associate

15   professor without tenure.  And 5 or 6 years later, I

16   received tenure and became a full professor.

17   Q.   And if we can show Trial Exhibit 1300, please.  Do

18   you recognize this, Mr. Laby?

19   A.   Yes, I do.

20   Q.   What is it?

21   A.   That looks like my own CV.

22   Q.   And do you know that this is current as of what date?

23   A.   This is -- it looks like it is current as of the time

24   that I filed my report in this case, because I see it is

25   indicated as Appendix 1.

1961

```
 1   Q.   Was that around January 2018?

 2   A.   That's correct.

 3   Q.   And does this accurately reflect your education and

 4   employment history as of that time?

 5   A.   Yes, it does.

 6   Q.   What did you do immediately after graduating from law

 7   school?

 8   A.   Right after law school, I clerked for a federal

 9   district court judge in Baltimore, Maryland.

10   Q.   What judge was that?

11   A.   Judge Motz.

12   Q.   How long did you have that clerkship?

13   A.   That was a one-year clerkship.

14   Q.   What did you do after the clerkship?

15   A.   After the clerkship, I went into private practice.  I

16   joined the firm of what was then called Wilmer Cutler and

17   Pickering.  It is now known as WilmerHale.

18   Q.   And can you just briefly walk us through your

19   employment history, from the time you were at, I guess,

20   WilmerHale, to becoming a professor at Rutgers?

21   A.   Sure.  So, I spent 4 to 5 years at the law firm.  I

22   also did a little bit of teaching at that time at George

23   Washington University School of Law.  After spending 4 or

24   5 years at the firm, I left to go overseas on a Fullbright

25   grant.  And I did some teaching and research at two German
```

1    law schools that are indicated here on my CV.

2         I came back to the U.S. and joined the Securities

3    and Exchange Commission staff.  I spent close to 10 years

4    on the SEC staff.  I also did some adjunct teaching during

5    that time at George Mason University Law School.  And then

6    when I left the SEC, and as I was transitioning into

7    academia, I did some additional work in private practice

8    on a part-time basis at two different law firms.

9    Q.   And did you have an opportunity to examine mutual

10   fund governance issues in any of the positions that you've

11   just walked us through?

12   A.   Yes.  Yes.  I had a chance to do that in my time at

13   the SEC.  And, then, to some degree, in my work when I was

14   transitioning into academia, in my work at the firm of

15   Mayer Brown.

16   Q.   Let's start with the Securities and Exchange

17   Commission.  In what capacity or what role at the SEC did

18   you have an opportunity to examine mutual fund governance

19   issues?

20   A.   Sure.  So, the most -- my most recent position at the

21   SEC, before leaving, was assistant general counsel for

22   investment management matters.  And, in that capacity, my

23   team and I, we were required to review every matter that

24   went up to the Commission for approval in the investment

25   management area.  So every rule making, every enforcement

1    case, it had to come through the general counsel's office

2    and through my office and my team, and I would analyze

3    those materials.

4         Many of those materials, especially various rule

5    makings under the *Investment Company Act* and the

6    *Investment Advisers Act* dealt specifically with areas

7    related to mutual fund governance and mutual fund boards.

8    And so that was one opportunity.

9         Before my work --

10   Q.   And before you go on, Mr. Laby, you mentioned you

11   were the assistant general counsel in the Investment

12   Management Division or broadly?

13   A.   No, that is a fair question.  And it can be

14   confusing.  So, I was employed -- at the time I am

15   speaking about right now -- in the Office of the General

16   Counsel.  My position was assistant general counsel, and

17   my portfolio of work in the Office of the General Counsel

18   was in the area of investment management.  That was my

19   primary responsibility.

20   Q.   And just for the Court's benefit, the Investment

21   Management Division of the SEC, is that -- what

22   responsibility does that division have as relates to

23   mutual fund?

24   A.   Sure.  That is the division at the Securities and

25   Exchange Commission that regulates both mutual funds and

1   investment advisers.  So, the Investment Management

2   Division effectively implements the *Investment Company Act*

3   of 1940 and the *Investment Advisers Act* of 1940, and is

4   responsible for the regulation of investment advisers and

5   funds.

6   Q.   And did you have other positions at the SEC where you

7   had occasion to evaluate mutual funds or mutual fund

8   governance issues?

9   A.   Yes.  Yes, I did.  So, before joining the Office of

10  the General Counsel, I spent 3 to 4 years in the Division

11  of Investment Management, itself, the division that I

12  spoke about just a moment ago.  And in my work in that

13  division, I was the head of a task force on investment

14  adviser regulations, including investment advisers to

15  mutual funds.  And that was a rulemaking group.

16       So, we were required to prepare various rules that

17  the Commission would ultimately be asked to propose and

18  adopt.  Some of those rules dealt specifically with

19  investment advisers to mutual funds.  And so we had to

20  think pretty deeply about how our rules would affect

21  investment companies, investment company boards, and

22  investment company governance.

23  Q.   Did some of those potential regulations involve

24  governance of -- mutual fund governance issues?

25  A.   Yes, they did.

1   Q.   During the time -- your time at the Securities and

2   Exchange Commission, did you become familiar with the

3   *Investment Company Act*?

4   A.   Yes.  Yes, I did.

5   Q.   And I think you said you would have -- while you were

6   at the Office of the General Counsel, you would have been

7   involved in enforcement actions against potential mutual

8   fund advisers for boards?

9   A.   Yes.  Just to be clear, during my time in the Office

10  of the General Counsel, we were not the ones who did those

11  investigations.  We did not interview potential witnesses

12  and look at documents.  We were required to analyze the

13  case once it was put together by the enforcement division,

14  but before it went up to the SEC, itself, to the

15  Commission for approval.

16        So, we had to look at each of those enforcement

17  matters, and there were hundreds of those over the years,

18  and determine whether or not they were appropriate and

19  legal and good policy.

20  Q.   How many times, while you were at the SEC, were you

21  asked to provide advice with respect to the *Investment*

22  *Advisers Act* or the *Investment Company Act*?

23  A.   Oh, my goodness, it must be literally hundreds of

24  times for both of those statutes.  Because I spent several

25  years, first in the Division of Investment Management, and

1966

 1    that was our primary work, of course, was focused on

 2    investment advisers and funds.

 3          And, then, as I say, during my time in the office

 4    of the General Counsel, my primary portfolio was working

 5    with the Investment Management Division and the *Investment*

 6    *Company Act* and *Investment Advisers Act*.

 7  Q.   During your time at the SEC, did you also have

 8    interactions with investment advisers or boards of

 9    directors of mutual funds?

10  A.   Yes.  So that happened primarily during my time

11    working in the Division of Investment Management, more

12    than my time working in the Office of the General Counsel.

13    The Division of Investment Management interacts on a

14    fairly regular basis with members of the industry.

15          So, for example, if we are thinking about proposing

16    a rule in a given area, we might want to know early on in

17    the process, informally, how that rule might affect the

18    industry.  And so even before the time when the rule is

19    formally put out for public comment, we would have

20    conversations with members of the industry, including at

21    times some board directors, just to get some anecdotal

22    idea of how the rule might affect the industry.

23  Q.   You also mentioned that you had some experience with

24    mutual funds while you were at Mayer Brown, I believe?

25  A.   Yes, that's correct.

1   Q.   What exposure or experience would you have with fund

2   boards at Mayer Brown?

3   A.   Sure.  After I left the SEC, as I was transitioning

4   to academia, I had some extra time before my teaching

5   schedule began, and I did some part-time work with two law

6   firms.  Mayer Brown was the second of those firms.  And

7   the work I did was primarily in the investment management

8   area.

9        So, they had a need for somebody to come in and

10  help out on some *Investment Adviser Act* matters, and those

11  matters were also related to advisers to mutual funds, to

12  investment companies.  And my work, therefore, was very

13  closely related, not only to investment advisers, but in

14  some cases, to advisers to funds, and looking at the funds

15  and the fund complex and the fund governance.

16  Q.   If I can ask you to scroll down on page 1 of your CV.

17  Perhaps go to the next page.  I thought that was the page

18  with your courses.  Do you need to see your CV to know the

19  courses you taught?

20  A.   I don't need to see my CV to know the course I

21  taught.

22  Q.   Thank goodness.  If you can just generally walk us

23  through, at a high level, what courses you teach at

24  Rutgers?

25  A.   Sure.  Almost every semester I teach the standard

1    course in what we call business organizations, which is

2    often known as corporations.  That class is agency,

3    partnership, and corporations.  I am teaching that class

4    this semester, for example.

5         But I also have taught a classes, the standard

6    class in securities regulation.  And then I have taught

7    other classes, which I see now on the screen, regulation

8    of securities, intermediaries is one of those class, I

9    have taught a class in fiduciary law.  I have taught an

10   introduction to business concepts course, and several

11   others.

12   Q.   Do any of those courses relate to governance issues

13   that impact mutual funds?

14   A.   They do.  They do.  I would say three of the courses

15   relate specifically to governance and specifically to fund

16   governance, which I bring into the curriculum.  Business

17   organization touches on that.  The regulation of

18   securities intermediary course focuses pretty intently on

19   that topic.  And I also cover mutual fund governance in

20   the class on fiduciary law.

21   Q.   And right above that on your CV, Mr. Laby, it says

22   you are the co-director of the Rutgers Center for

23   Corporate Law and Governance.  What is that about?

24   A.   Yes.  So, about 5 years ago, a colleague and I formed

25   our Center for Corporate Law and Governance at the law

1   school.  That is really used as a forum to bring together

2   practitioners and academics, students, alumni, anybody who

3   is interested in issues related to governance -- corporate

4   law and governance.

5        We host a series of programs on that topic.  We

6   regularly bring in speakers to talk about governance

7   issues, and sometimes that includes mutual fund governance

8   issues.

9   Q.   Do you perform any research in your capacity as a

10  professor of law?

11  A.   I do.  I do.  That is a large part of my work as a

12  professor, yes.

13  Q.   And what is the focus of your research?

14  A.   So, the focus of my research is really on the duties

15  and obligations of financial services providers, such as

16  broker/dealers, investment advisers, and mutual funds.  I

17  focus specifically on the fiduciary relationship, the duty

18  of care, the duty of loyalty, and conflicts of interest.

19  Those are broadly my areas of research.

20  Q.   And looking at your CV, towards the bottom there,

21  Mr. Laby, there is some publications?

22  A.   Yes, I see it.

23  Q.   Do any of the publications listed in your CV, that we

24  have marked as Exhibit 1300, relate to mutual funds in any

25  way?

1   A.   Well, there are several that relate to mutual funds,

2   but I would point to two that relate to mutual funds very

3   specifically.   The first is what is listed here as *The*

4   *Regulation of Money Managers:   Mutual Funds and Advisers*.

5   So, I am the co-author of a foregoing treatise on the

6   topic of mutual funds and advisers.

7          So, as you can see by the title, that entire

8   treatise relates very specifically to mutual funds and, of

9   course, to matters related to mutual fund board governance

10  at parts of that treatise.

11         Then there is another publication that appears

12  elsewhere on my CV.   I am the co-author of a publication

13  that is put together by the American Bar Association,

14  which is a guidebook for fund directors.   And that guide

15  book focuses specifically on -- gives guidance to mutual

16  fund board directors who are trying to learn how to

17  operationalize their duties.

18  Q.   If we can go back to page 1 of your CV, please.   The

19  book chapter at the bottom, *Fiduciary Principles in*

20  *Investment Advice* is that related at all to mutual funds?

21  A.   Yes.   So, there are numerous other papers listed on

22  my CV that certainly have to do with mutual funds and

23  mutual fund governance.   I didn't list those specifically

24  a moment ago because those are a bit broader.   They talk

25  broadly about fiduciary principles and investment advice,

1971

1    they don't focus quite specifically on the topic of mutual

2    fund governance.  They certainly touch on it, but it is

3    not the primary focus of that particular book chapter and

4    some other papers listed on the CV.

5    Q.   Okay.  So are there other ones that you would note

6    that might relate to mutual funds?

7    A.   I would have to scan -- if you can show me the second

8    page, I could scan that list.  Yes.  So the *Fiduciary*

9    *Structure of Investment Management Regulation*, that is a

10   book chapter in a published research handbook on mutual

11   funds.  Certainly, that chapter, which is now published,

12   and it is no longer "forthcoming," as indicated on the CV.

13   That chapter also focuses to some degree on board

14   governance.

15        Several of the other articles here also focus on

16   mutual funds and board governance.  There is a paper on a

17   case called *Capital Gains Research Bureau*, toward the

18   bottom of the page.  That is another example of a paper

19   that I believe has some discussion of mutual funds and

20   mutual fund governance, but it is not the primary topic of

21   that particular paper.

22   Q.   Okay.  If you can go to page 9 of your CV, please.

23   Under "Organizations and Activities," did you have an

24   opportunity to examine mutual fund governance issues in

25   connection with any of your organizations and activities

1972

1    that are listed here?

2    A.   Yes.  Yes, I do.  I would highlight a few of those.

3    So, the first is the National Association of Corporate

4    Directors.  So I serve on the Academic Advisory Board of

5    the Philadelphia Chapter of the NACD.  That is an

6    organization that focuses very specifically on board

7    governance.  And we have had some discussions within the

8    NACD of mutual fund governance, as well.

9         I would also point to the very last item listed

10   here, the Philadelphia Compliance Roundtable.  So that is

11   an organization in Philadelphia of representatives from

12   financial services providers, such as broker/dealers,

13   investment advisers, and funds.  It's lawyers, compliance

14   professionals, and other professionals who come together a

15   couple times a year and talk specifically about

16   developments in the investment management industry,

17   including developments with respect to board governance.

18   Q.   And this was a list of organizations and activities

19   as of 2018?

20   A.   Yes.  And just as I am looking at it, I already

21   mentioned the work listed under the American Bar

22   Association, the *Fund Directors' Guidebook*.  So, that

23   particular task force is the task force that prepared the

24   guidebook I mentioned earlier, but I'm mentioning it now

25   because that task force is a bit broader.  Above and

1    beyond working on the *Fund Directors' Guidebook*, that task

2    force, of which I am a member, looks more broadly at

3    issues related to mutual funds and mutual fund governance.

4    Q.    Is there any previous organizational activities that

5    are not listed in your CV that would have touched on

6    mutual funds?

7    A.    Well, I would say there are both previous and

8    subsequent, which are not listed on this CV, which is a

9    snapshot in time.  I didn't include everything that I had

10   done before.

11        So, for example, I served a 4-year term on the CFP,

12   the Certified Financial Planner Board of Standards, the

13   CFP Board.  The CFP Board is the organization that upholds

14   the CFP mark for certified financial planners, and it

15   regulates 80,000 CFPs, those who hold that designation, in

16   the United States.

17        My time on the CFP Board was a time when we

18   debated, quite intensively, many topics related to mutual

19   funds and mutual fund governance, because the CFP

20   professionals are the people who are out selling those

21   fund products to investors.  So, that is one example.

22        Another example that is not listed on the CV is a

23   New York City Bar Association organization.  I served a

24   3-year term on the New York City Bar Association's Mutual

25   Fund Committee, Investment Management Committee, and that

1    is a committee that gathers once a month or so of, again,

2    lawyers and compliance professionals to discuss

3    developments in investment management, mutual funds, and

4    mutual fund governance.

5    Q.   Have you ever been retained in a 36(b) litigation to

6    testify as an expert on mutual fund board processes?

7    A.   Yes, I have been retained in several other of those

8    matters.

9    Q.   And what is the most recent 36(b) litigation in which

10   you were retained?

11   A.   The most recent is *Chill v. Calamos Advisors*.

12   Q.   Were you qualified as an expert in this case?

13   A.   I was, yes.

14   Q.   In connection with your role as an expert in matters,

15   have you had an opportunity to examine 15(c) materials for

16   fund boards?

17   A.   Yes.  Yes.

18   Q.   Have you ever been retained by government agencies to

19   testify as an expert with respect to investment management

20   matters?

21   A.   Yes.  So, I am regularly retained by both the

22   Securities and Exchange Commission and by the U.S.

23   Department of Justice as an expert witness in their

24   matters.  Virtually all of those matters -- almost all of

25   those matters relate to investment management; that is the

 1    *Investment Advisers Act* and the *Investment Company Act*.

 2         And so I have testified numerous times for both the

 3    SEC and the Department of Justice in criminal cases on

 4    behalf of the government in those kinds of matters.

 5         MR. MURPHY:  Your Honor, at this time I would move

 6    to qualify Mr. Laby as an expert on mutual fund

 7    governance.  Again, I think his CV and his testimony here

 8    demonstrate his qualifications and skills in those areas.

 9         THE COURT:  Any objection?

10         MR. STRUCKHOFF:  Yes, Your Honor.  He lacks

11    qualification for purposes of Rule 702.  He has no direct

12    experience with any industry practices.  He has not ever

13    worked for a mutual fund, been on a mutual fund board,

14    never been employed by an investment adviser.  There is no

15    evidence that he has first-hand or direct experience with

16    any practices that are actually employed by directors of a

17    mutual fund board.

18         THE COURT:  The objection is overruled.  He is

19    admitted as an expert in the area that has been

20    identified.

21    Q.   (BY MR. MURPHY)  Mr. Laby, what was your assignment

22    in connection with your engagement in this matter?

23    A.   In this matter, I was asked to do three things.

24    First, I was asked to look at the qualifications and the

25    experience of the board of directors in this case.  And I

 1    was also asked to look at the structures that the board

 2    set up.  That is first.

 3            Second, I was asked to look at the process that the

 4    board used to review and approve contracts in this case,

 5    advisory contracts and administrative services agreements.

 6            And, third, I was asked to look at the board's

 7    independent oversight over the funds, and whether that

 8    oversight was, in fact, independent.

 9    Q.   And, broadly speaking, what standards did you use to

10    assess the board's process?

11    A.   Well, broadly speaking, I used industry standards,

12    industry best practices that have been set forth by

13    various industry groups as best practices for the

14    industry.  But I did not rely solely on those, I also

15    supplemented those through my own judgment, based on my

16    experience working in this area.  And I also relied, to

17    some degree, on case law decided in the mutual fund area,

18    and specifically under Section 36(b).

19    Q.   And did you review the board materials and the

20    minutes in connection with your review of the board?

21    A.   Oh, yes.  I reviewed a great deal of materials,

22    including board materials and minutes.

23    Q.   And you mentioned "best practices."  What are best

24    practices?

25    A.   Sure.  So, there are several industry groups which

1    set forth best practices for mutual fund directors.  The

2    Mutual Fund Directors Forum, the MFDF, is one example of

3    that.  They've provided at least two sets of best

4    practices for mutual fund directors.

5         The Investment Company Institute is another example

6    of an organization that has an educational function and

7    provides best practices and guidelines for mutual fund

8    directors.  A third example is the *Fund Directors'*

9    *Guidebook*, which I, myself, worked on, that we talked

10   about just a few minutes ago, that was prepared by the

11   American Bar Association.

12   Q.   And those best practices that you just identified,

13   those are best practices that relate to governance of

14   mutual funds specifically, or more broadly?

15   A.   Well, they relate to mutual fund governance and the

16   duties and obligations of mutual fund boards and mutual

17   fund directors.  That is the focus.

18   Q.   And how do these best practices come about?

19   A.   Well, in some cases they come about directly through

20   a request by the SEC.  So, I recall at least one, I think

21   two instances, where the Securities and Exchange

22   Commission asked for those materials.  Former Chairman

23   William Donaldson, for example, in one instance sent a

24   letter to the MFDF asking specifically for that

25   organization to formulate best practices for mutual fund

1978

1   directors.

2          So, in some cases, they come from the SEC.  That is

3   the impetus.

4   Q.   And did you review those best practices, or were you

5   generally familiar with them in connection with your

6   review of the Great-West Funds' Board in this case?

7   A.   Yes, yes.  I was familiar with them before my work on

8   this case, and then I reviewed them specifically for my

9   work on this matter.

10  Q.   And your opinion in this matter is based, in part, on

11  those best practices?

12  A.   It is.

13  Q.   Are you generally familiar with the case law under

14  Section 36(b) and *Jones v. Harris*, for example?

15  A.   Yes, I am.

16  Q.   Did you take those cases, like *Jones v. Harris,* into

17  account in forming your opinions in this case?

18  A.   I did.

19  Q.   How so?

20  A.   Sure.  Well, under the case law under 36(b) and under

21  *Jones*, in particular, the cases are quite clear that when

22  a mutual fund board has a good set of policies and

23  procedures that it follows, when it has a good practice

24  and it reviews relevant information, the board is then

25  entitled to some degree of deference with respect to its

1    decision.  How much deference is ultimately left to a

2    court.  But it is decided that it is entitled to some

3    degree of deference.

4        And so during my work on this case, I looked

5    carefully at the board's process and gave an opinion about

6    the process.  I would also add that the cases decided

7    under Section 36(b) also reference some of the best

8    practices that appear in the various guidelines we talked

9    about a moment ago.

10       And so I try to do what the cases do; I took a look

11   at whether those various best practices were followed in

12   this case, and that helped inform my opinion in this case.

13   Q.   Your expert report in this matter uses the phrase

14   "business judgment."  Can you explain what you meant by

15   the phrase "business judgment"?

16   A.   Sure.  So, what I meant by that phrase is really what

17   I referred to a moment ago.  As I say, the courts are

18   fairly clear that to the extent a board has a good

19   process, it's entitled to a degree of deference.  And so I

20   looked at the board's process and gave an opinion about

21   the process.

22   Q.   But you are not offering an opinion on how much

23   deference is due to the board; correct?

24   A.   No, I am not.  That is ultimately up to a court.

25   Q.   Your opinion in this matter isn't that the board's

```
 1   decision on an issue is dispositive, is it?
 2   A.   No, it is not dispositive.  Again, that is up to a
 3   court.
 4   Q.   Are you familiar with the business judgment rule?
 5   A.   Yes, I am.
 6   Q.   What is the business judgment rule?
 7   A.   The business judgment rule is a doctrine that appears
 8   in corporate law.  Again, it has various formulations.
 9   But, broadly speaking, it suggests that when a board has a
10   good process in place, is not conflicted, and had good
11   information, then its decision is entitled to deference by
12   a court.
13   Q.   Did you use the business judgment rule in this case
14   in assessing the Great-West Funds' Board?
15        MR. STRUCKHOFF:  Your Honor, objection, relevance.
16   He has been providing testimony that is legal conclusions
17   for you to make in this court.  And with Jones v. Harris,
18   it does not refer to the business judgment rule.  So it is
19   not relevant to the matters before the Court, Your Honor.
20        MR. MURPHY:  Your Honor, I will move on, as long as
21   they are not going to attempt to suggest that he is
22   applying the wrong standard and using the business
23   judgment rule.  If that is the case, I will move on.
24        THE COURT:  Are you stipulating to that?
25        MR. STRUCKHOFF:  I was only going to point out that
```

1   he does, in fact, refer to the business judgment rule in

2   his report, itself.  So he applied his analysis under that

3   rule.

4          THE COURT:  Well, the objection is overruled.

5   Q.   (BY MR. MURPHY)  Just to start over, Mr. Laby, are

6   you using the business judgment rule to assess Great-West

7   Funds' Board in this case?

8   A.   No, I am not.

9   Q.   What standard did you use in assessing the Great-West

10  Funds' Board?

11  A.   As I tried to say a moment ago, the *Jones* case, and

12  other cases decided under 36(b), are quite clear, and they

13  state that to the extent the board has a good process, the

14  board is entitled to a degree of deference.  And so I

15  reviewed the board's process, and gave an opinion about

16  the process.

17  Q.   Mr. Laby, I would like to talk broadly about what

18  opinions you formed in this case.  As it relates to the

19  independent directors of the Great-West Funds' Board, at a

20  high level, what opinions have you formed?

21  A.   Sure.  So, my first opinion is that the board was

22  qualified, it was independent of Great-West, and it had

23  sound structures in place.  My second opinion is that the

24  board's process for reviewing and approving agreements in

25  this case was a sound process.  And my third opinion is

1    that the board's oversight of the funds here was

2    independent.  The board conducted independent oversight of

3    the funds in this matter.

4    Q.   Let's talk about your first opinion.  If we can go to

5    Exhibit 1569.  Do you recognize this document, Mr. Laby?

6    A.   Yes, I do.  This was an exhibit to my report.

7    Q.   Was this prepared under your direction?

8    A.   Yes, it was.

9    Q.   Where did the 22 items on this list come from?

10   A.   So, these are, as indicated at the top, these are

11   practices that were implemented by the board in this case,

12   that promote independence and foster effective governance.

13   And they were drawn from the best practices documents that

14   I referred to earlier, but they were not based solely on

15   those documents.

16        I also supplemented these, to some degree, based on

17   my own judgment, based on my own experience.  And, again,

18   they were supplemented by my knowledge of mutual fund case

19   law.

20   Q.   Maybe I should back up.  What are we looking at?

21   What is the significance of this chart?

22   A.   Sure.  So, these 22 items are really the items that I

23   used when deciding what my opinions would be when coming

24   to my opinions in this matter.

25        So, items 1 through 22 are kind of a roadmap, as it

1    were, which helped me in my analysis and allowed me to

2    ultimately make my opinions in this matter.

3    Q.   And maybe if we can go to page 2.  Are the source

4    materials listed here the sources on which you identified

5    those practices for purposes of the chart?

6    A.   Yes, that's correct.

7    Q.   If we can go back to page 1.  Is this an accurate

8    summary of the source materials we just looked at?

9    A.   Yes, it is.

10         MR. MURPHY:  Your Honor, I would move for admission

11   of Exhibit 1569 as a summary exhibit under Rule 1006.

12         THE COURT:  Any objection?

13         MR. STRUCKHOFF:  Yes, Your Honor.  He has no

14   personal knowledge of the facts that are identified in

15   this exhibit, so he can't provide specific foundation for

16   its contents.

17         THE COURT:  In what regard?

18         MR. STRUCKHOFF:  There are things on here that are

19   objectionable.  Certainly he is interpreting the evidence.

20   It is not for an expert to testify to what the facts are.

21   And these items are just his own interpretation, applying

22   his own judgment to what he believes the facts are, and

23   that is for Your Honor to decide.

24         THE COURT:  The objection is overruled.  Exhibit

25   1569 is admitted.

1984

1                (Exhibit No. 1569 is admitted.)

2    Q.   (BY MR. MURPHY)  Mr. Laby, if you can look at number

3    one on the list.

4    A.   Yes, I see number one.  The "Board comprises

5    competent business persons."  I see it.

6    Q.   Did you assess the qualifications of the independent

7    directors on the Great-West Funds' Board?

8    A.   Yes, I did.

9    Q.   How did you do that?

10   A.   Well, I looked at their background.  I looked at

11   their experience.  And, of course, I looked at the work

12   that they did on this very board, in coming to my

13   opinions.

14   Q.   If we can show Exhibit 1568, please.  What is

15   reflected here, Mr. Laby?

16   A.   Yes.  So, as you can see from this document, this is

17   some summary information with respect to the

18   qualifications and experience of the independent directors

19   that served on the funds' board during the relevant

20   period.

21   Q.   Did you prepare this chart?

22   A.   I did.  This was another appendix to my report.

23   Q.   And where did the information come from?

24   A.   So, this information came from various publicly

25   available sources.  So, for example, there are certain SEC

1985

1    filings, which are referenced on the bottom of the page.

2    Those SEC filings contain biographical information with

3    respect to the board directors.  It also came from other

4    publicly available sources that were provided by some of

5    the organizations that are listed on this page, where the

6    board members were affiliated.  So various publicly

7    available sources.

8            MR. MURPHY:  Your Honor, I move Exhibit 1568 into

9    evidence.

10           THE COURT:  Any objection?

11           MR. STRUCKHOFF:  No objection, Your Honor.

12           THE COURT:  1568 is admitted.

13           (Exhibit No. 1568 is admitted.)

14   Q.   (BY MR. MURPHY)  Mr. Laby, I think the Court has had

15   quite a bit of testimony about the directors'

16   qualifications, so I don't want to go through it again.

17           But, the plaintiffs sort of singled out Gail

18   Klapper as unqualified.  Do you agree that she is not

19   qualified to serve as an independent director on the

20   board?

21   A.   No, I do not agree with that.  Based on her

22   background and experience, I thought that Ms. Klapper was

23   qualified, and is qualified, to serve on the board.

24   Q.   Do you believe directors need to have experience in

25   the 15(c) process before joining the board to be

1    qualified?

2    A.   No, I don't think that is a prerequisite.  It is

3    certainly not a harmful thing.  But, I don't think it is a

4    prerequisite to serving on a mutual fund board.

5    Q.   Do you think there are benefits to having a diversity

6    of experience on a board?

7    A.   I do.  I do.  So, in my view, a board is well served

8    by having members that come from diverse backgrounds and

9    have diverse opinions and diverse critiques and diverse

10   approaches with respect to problems that are faced by the

11   board, as opposed to everybody coming from the same

12   background and having the same general viewpoints with

13   respect to how to attack any given problem.

14   Q.   Again, do you think the Great-West Funds' Board, in

15   your experience, had the expertise and qualifications to

16   serve as an independent director to the board?

17   A.   Yes, absolutely, I do.

18   Q.   Let's talk about the size of the board.  How many

19   independent directors were on the Great-West Funds' Board?

20   A.   Well, it depends on what period you are talking

21   about.  That number varied from three to five, depending

22   on the time period.

23   Q.   And let's focus on the smallest of three.  Do you

24   view that size as unusual?

25   A.   I am sorry, you asked about when the board had three

1    independent directors?

2    Q.   Yeah, I believe you testified it differed over a

3    period of time, but it ranged from three to five.

4    A.   Yes, that's correct.  And the answer is no, I don't

5    think that three directors is too small.  In fact, there

6    is some literature which suggests that a three-member

7    board is quite common.  A very large percentage of mutual

8    fund boards have from three to four independent directors.

9    So, a three-person board is not uncommon and does not

10   surprise me.

11   Q.   The plaintiffs have criticized three as too small of

12   a fund board.  Do you agree with that criticism?

13   A.   No, I don't.  In fact, I think there can be benefits

14   to having a smaller board.

15   Q.   Such as?

16   A.   Well, a smaller board can lead to efficiencies, where

17   a smaller number of individuals can work together closely,

18   get things done maybe a little bit quicker, and it leads

19   to kind of an intimacy in the communications between and

20   among the board members, where they can have a series of

21   frank discussions among three people that might be much

22   more difficult if you have eight, nine, twelve people

23   sitting on the board.

24   Q.   Can there be benefits to a larger board, like eight

25   or nine?

1988

1    A.    Absolutely.  Absolutely.  There are instances where a

2    given complex might be quite large or very complicated,

3    and could certainly benefit from a larger board, with

4    various experts from given areas, that you might not be

5    able to achieve on a smaller board.

6    Q.    So how do you determine what's the Goldilocks

7    approach to board size?

8    A.    I think there is no silver bullet there.  It is

9    really up to each and every board to think about its own

10   circumstances, what its needs are, whether they have any

11   gaps they need to fill, and to assess on a regular basis

12   whether and when they should be changing the size of the

13   board.

14   Q.    Do the best practices that you have talked about here

15   today, do they talk about board size, at all?

16   A.    I think they do.  And they don't suggest that any one

17   given size is the right size or the wrong size.

18   Q.    Can we call up Exhibit 1354, please.  Do you

19   recognize this document, Mr. Laby?

20   A.    I do.  This is one of the best practices' documents I

21   spoke about earlier.  This is authored by the Mutual Fund

22   Director Forum.

23   Q.    Is this widely used in the industry?

24   A.    It is.

25   Q.    If we can turn to page 8.  There is a bullet at the

1    top talking about board size.  Take a second to review

2    that, and tell me when you have.

3    A.   Sure.  Just one second, please.

4    Q.   Mr. Laby, you and I both probably need to speak

5    slower.  It is getting late in the day.

6    A.   Apologies.  I have taken a look at this paragraph,

7    and I see what the Mutual Fund Directors Forum says here

8    with respect to board size, which is that "It is a

9    balancing act between having enough to represent a broad

10   range of expertise and small enough to allow the

11   independent directors to work together efficiently."  That

12   is exactly what I tried to say a moment ago with respect

13   to board size and how it is up to each board.

14        Then I note that the MFDF also says, on the bottom

15   of this paragraph, that "Periodically re-evaluating the

16   board size will help directors maintain an optimal size."

17   That is exactly what I saw with respect to the Great-West

18   Funds' Board; they did periodically evaluate their own

19   size.  They had a process in place to enlarge the board

20   when they thought that was necessary.  They performed that

21   evaluation on a regular basis and, in fact, made a change

22   at one point in time.

23   Q.   And are you aware of any of the best practices that

24   are out there that suggest a minimum number of a certain

25   size board that has to be a certain number?

1990

1   A.   No, I am not.

2   Q.   Do you know if the SEC has ever commented on board

3   size?

4   A.   Yes, I am aware of that.  There was one instance

5   where the SEC did comment on board size.

6   Q.   And when was that?

7   A.   Sure.  So, that was back in 2004, at the time when I

8   was working at the SEC.  So, the SEC passed a rule, which

9   was ultimately vacated by the courts for reasons that I

10  won't explain in detail, but the gist of the rule was to

11  require 75 percent of a mutual fund board to be

12  independent directors.  It was the so-called "75 percent

13  rule."

14        As part of that rule, the SEC thought a bit about

15  what do you do in a case where you only have a total of

16  three people on the board; let's say two independent

17  directors, and one non-independent director, because, of

18  course, in that case, you would not have a 75 percent

19  threshold.

20        The SEC then specifically wrote about that in this

21  release, and it said, look, we understand that some boards

22  are quite small; two independent directors, one

23  non-independent director, for a total of three, and yet we

24  have this new 75 percent rule.  And we are deciding not to

25  apply the 75 percent rule to a board that is composed of

```
 1    two independent directors and one non-independent

 2    director, because that would require all of those boards

 3    to go out and somehow change their board size or have no

 4    non-independent director.  It would just be not

 5    appropriate to apply that 75 percent rule in that case.

 6            And so there is a paragraph or two in the release

 7    where the SEC simply says, we recognize that, and we won't

 8    apply the 75 percent rule to that particular board

 9    structure.

10    Q.   And do you recall there was a period in this case

11    when Donna Lynne resigned from the board and there was a

12    period where there was only two directors?

13    A.   I do recall that time, although I also remember that

14    during that time, two of the new directors who were about

15    to formally come onto the board, did attend some of those

16    meetings and participated in discussions.  But, yes, as a

17    formal matter, yes, I recall that there were only two

18    independent directors for a period.

19    Q.   Is it relevant at all to your opinion that those

20    potential new directors or director candidates started

21    participating in meetings right away?

22    A.   Well, I think it is helpful.  I think it is helpful.

23    Because what that means is although the board did not have

24    the benefit of those independent directors being able to

25    vote formally on matters, they certainly could participate
```

1992

1    in discussions, ask questions, and effectively act as

2    board members during that time period.  So although there

3    were only two formal independent directors, there were

4    effectively four during that period.

5    Q.   In your opinion, at all points in time, was the

6    Great-West Funds' Board of a sufficient size to provide

7    oversight to the funds?

8    A.   Yes, it was.

9    Q.   If we can go back to Exhibit 1569, please.

10        THE COURT:  Let me clean up the record.  You didn't

11   offer 1354.

12        MR. MURPHY:  I will offer 1354, Your Honor.

13        THE COURT:  1354 is stipulated.  It is admitted.

14        (Exhibit No. 1354 is admitted.)

15        THE COURT:  You did not offer 1300.

16        MR. MURPHY:  Let me check, 1300 is a CV.  I

17   apologize, Your Honor.  I would offer 1300 into evidence.

18        THE COURT:  All right.  Any objection?

19        MR. STRUCKHOFF:  No, Your Honor.

20        THE COURT:  1300 is also admitted.

21        (Exhibit No. 1300 is admitted.)

22   Q.   (BY MR. MURPHY)  Looking at Exhibit 1569, Mr. Laby,

23   if we can go to No. 2 and No. 6.

24   A.   Yes, I see those.

25   Q.   Did you evaluate whether the members of the

1   Great-West Funds' Board were independent?

2   A.   Yes, I did do that evaluation.

3   Q.   And how did you do that?

4   A.   Well, I looked at the independent directors.  I

5   looked at their background.  I looked at their experience.

6   I looked at any ties that they might have to Great-West.

7   And, of course, in the process of doing that, I was also

8   mindful of the standard of what it means to be legally

9   independent, which appears in the *Investment Company Act*,

10  itself.

11  Q.   What does the *Investment Company Act*, itself, say

12  about independence?

13       MR. STRUCKHOFF:  Objection, Your Honor, legal

14  conclusions.

15       THE COURT:  About what the *Investment Company Act*

16  says?

17       MR. STRUCKHOFF:  Yes.

18       THE COURT:  Well, isn't he interpreting it?

19       MR. MURPHY:  No, I think he is just going to say

20  what it says, and he used it as a standard.

21       THE COURT:  Lay more foundation.

22  Q.   (BY MR. MURPHY)  Are you familiar with the statutory

23  guidance of the statute, in terms of how it defines

24  independence?

25  A.   Generally, yes.

1    Q.   What do you understand the statute to say?

2    A.   The statute generally has a standard in Section 2 for

3    what is called a "disinterested director."  And it has a

4    series of criteria that a director has to meet in order to

5    be considered disinterested.

6    Q.   And based on those criteria, do you understand the

7    Great-West Funds to be statutorily independent?

8    A.   Yes, that is my understanding.

9    Q.   Are you aware that some board members knew each other

10   outside of their board service?

11   A.   Yes, I am aware of that.

12   Q.   I think we heard some testimony about belonging to

13   the same golf club or belonging to the Colorado Forum.

14   A.   Yes, I am aware of some of those ties.

15   Q.   Does that impact their independence, in your opinion?

16        MR. STRUCKHOFF:  Objection, relevance.

17        THE COURT:  Overruled.

18        THE WITNESS:  No, that does not affect my view of

19   their independence.  In fact, to the contrary.  In my

20   opinion, the fact that the directors may have known each

21   other in advance of board service is potentially a good

22   thing; that means that the directors could feel

23   comfortable with one another.  And when they begin board

24   service, they might be willing to share views, exchange

25   information in a way that they might not be willing to do

1995

 1   if they were dealing with a total stranger.

 2   Q.   (BY MR. MURPHY)  Are you aware that Ms. Klapper had

 3   served on the board of Orchard Trust before joining the

 4   Great-West Funds' Board?

 5   A.   Yes, I am aware of that.

 6   Q.   And she also, earlier in her career, had done some

 7   legal work for Great-West Life & Annuity?

 8   A.   I am also aware of that.

 9   Q.   Does that have an impact on your opinion of her

10   independence?

11   A.   No.  My understanding is that happened long before

12   her board service, and that does not affect my opinion.

13   Q.   Looking at No. 6 on the screen, "Independent

14   directors complete an annual independence questionnaire."

15   What is that?

16   A.   Yes.  So, each year, the independent directors, as

17   indicated here, complete an annual independence

18   questionnaire, where they are asked to go back and look at

19   whether anything has changed over the past year with

20   respect to their independence from Great-West.

21        So, there is a questionnaire which asks a series of

22   questions about their various affiliations, litigation,

23   other questions about their activities.  And this is quite

24   important, because it essentially verifies, on an annual

25   basis, that the independent directors continue to be

1    independent of Great-West.

2    Q.   If we can show Exhibit 1313, please.  Do you

3    recognize this document, Mr. Laby?

4    A.   Yes, I do.  This looks to -- it appears to be a cover

5    letter for the questionnaire we have been talking about.

6    Q.   And did you review this as part of your engagement in

7    this matter?

8    A.   Yes.

9    Q.   How does this help you address independence, in

10   forming your opinion?  How does this help you form your

11   opinion in terms of the independence in this matter?

12   A.   Sure.  It helped me formulate my opinion because it

13   demonstrated the directors here were very much committed

14   to their independence.  This is not something they thought

15   about on a one-time basis and never reflected on again.

16   They thought about their independence each year.  They

17   completed this questionnaire, and they sent it off to

18   their own independent counsel.  I believe the information

19   also went to the chief compliance officer of the funds.

20        And so they took their independence very seriously.

21   That is what this document demonstrates to me.

22        MR. STRUCKHOFF:  Your Honor, I am just going to

23   object to this.  His testimony, he is actually providing

24   his own interpretation of the directors' mental state,

25   their actual process, when he has no personal knowledge of

1    the process they did or did not follow.  So he is invading

2    the province of the court and testifying to what the facts

3    are and his interpretation of those facts.

4         THE COURT:  Well, I think he has given me his

5    opinion as to what the facts state, which is what an

6    expert does, then I take it for whether I want it or not.

7    So, overruled.

8         MR. STRUCKHOFF:  Thank you, Your Honor.

9         MR. MURPHY:  Your Honor, I move Exhibit 1313 into

10   evidence.  It is a stipulated exhibit.

11        THE COURT:  1313 is admitted.

12        (Exhibit No. 1313 is admitted.)

13   Q.   (BY MR. MURPHY)  If we can go back to Exhibit 1569.

14   Looking at No. 3, Mr. Laby, "Board and committee chairs

15   are independent"?

16   A.   Yes.

17   Q.   Who is the chairperson of the Great-West Funds' Board

18   currently?

19   A.   The chair is Gail Klapper.

20   Q.   And did the board always have an independent chair?

21   A.   No.  I believe that that process changed in 2016.

22   Before that time, the board had what is called an

23   independent lead director.

24   Q.   And is that relevant at all to your opinions?

25   A.   Well, it is relevant in the sense that both, I think,

1998

1    are useful and helpful.  They can both play an important

2    role.  And so I found it to be a positive thing; that the

3    board had a lead independent director at one point and

4    then an independent chair subsequent to that.

5    Q.   Did the best practices that we have spoken about, did

6    those address the use of lead independence versus lead

7    independent chair?

8    A.   Yes.  The best practices that I have seen indicate

9    that both of those structures are acceptable structures

10   for a mutual fund board.

11   Q.   Is the use of a lead independent as opposed to a lead

12   chairperson, is that a common practice in the industry?

13   A.   It is fairly common.  I don't have the exact

14   statistics on the percentage of boards that have a lead

15   independent director as opposed to an independent board

16   chair, but anecdotally I can tell you some of the very

17   large mutual fund firms, like Vanguard and Fidelity, they

18   use a lead independent director, and they do not have an

19   independent chair.

20   Q.   If we can highlight 4 and 5 on Exhibit 1569.

21   Mr. Laby, what was the process used by the Great-West

22   Funds' Board to identify and select new directors?

23   A.   Sure.  So the process that was followed by this

24   board, when nominating and selecting new board members,

25   was that the independent directors, themselves, were

1   essentially responsible for choosing new independent

2   directors for the board.

3         So, that was indicated in the IDC Charter, the

4   Independent Director Committee Charter.  And it was a

5   process that was followed by this board.

6         The independent directors would solicit names from

7   a variety of sources.  They would look carefully at those

8   individuals.  They would ask them to complete some

9   information, to ensure that, if selected, they have the

10  time to put in to being a director.  They would then

11  interview potential names to serve on the board.  And

12  ultimately they would then select new board members

13  themselves.  The process was driven by the independent

14  directors.

15  Q.   Why is that indicia of good governance?

16  A.   That is indicia of good governance to me, because you

17  want the independent directors, themselves, deciding who

18  should be sitting on the board of directors with the other

19  independent directors.  You don't want somebody else

20  stepping in and deciding for the independent directors who

21  would be a good independent director.

22        It is the independent directors, themselves, who

23  know their board.  They understand what their needs are.

24  They understand where their gaps are.  And they can best

25  decide who can best serve on this board.

1    Q.   No. 5 references training.  What is the relevance of

2    training to your opinions?

3    A.   Yes.  So, training is also relevant, because at such

4    time that a new independent director is casting a vote on

5    behalf of the fund or fund shareholders, I want to see

6    that director fully up to speed and trained.

7         And so what happened here with the Great-West Board

8    was, I thought, quite good.  When the new directors were

9    selected, but before the time that the shareholders voted

10   and they were formally serving, the independent directors

11   would actually sit in on board meetings and on committee

12   meetings, and they would participate in conversations and

13   discussions over a period of time, so they would be able

14   to come up to speed and learn about the funds and the

15   adviser and the board, itself.  And, that way, when they

16   first cast their vote, again, as a formal board member on

17   behalf of the shareholders for the funds, by that time

18   they were trained.  They were up to speed, if you will.

19   Q.   And is that training also a best practice?

20   A.   It is.  That is another one of the best practices

21   that is reflected in the documents that we referred to

22   earlier.

23   Q.   And looking at No. 7, "Board meets regularly

24   throughout the year," how often did the board meet?

25   A.   In this case, the board met five times a year.  The

2001

 1    board had quarterly meetings in, I believe it was

 2    February, June, September, and December.  And then the

 3    board had a fifth meeting in April, which was the annual

 4    meeting, when it decided whether to approve the

 5    agreements.

 6          So, the board, itself, had five meetings per year.

 7    In addition, the IDC, the Independent Directors Committee,

 8    they also met five times a year.  The IDC met on the event

 9    of each of the quarterly board meetings that I just

10    referred to.  And then the IDC had a fifth meeting, which

11    took place in March of each year, one full month before

12    the April board meeting, when the board decided whether to

13    approve the advisory and other agreements.

14          I thought that meeting was a very helpful addition

15    to the board's processes.

16    Q.   In terms of the frequency of meetings, how does the

17    Great-West Funds' Board compare to the custom and practice

18    in the industry, in your experience?

19    A.   I would say it is at least as good or better than

20    most boards I have seen.  And I would point, in

21    particular, to that March IDC meeting.  That made a bit of

22    a difference for me.

23    Q.   How does the board's meeting schedule support your

24    opinions in this case?

25    A.   Sure.  So, the meeting schedule supports my opinion,

1    not only because the board had quarterly meetings and then

2    the fifth meeting, which I addressed a moment ago, but

3    that additional March meeting by the IDC allowed the

4    independent directors to gather one month before the vote

5    on any agreement, take a look at the 15(c) materials,

6    think carefully about those, and then ask for additional

7    information that it wanted to see -- that the independent

8    directors wanted to see before they came to the April

9    meeting, when they finally had to decide whether to

10   approve the contracts.

11   Q.   And No. 9 talks about "strong attendance of the

12   board."  Did you evaluate the board's independent

13   directors' attendance at meetings?

14   A.   I did.  I looked at that from the years 2013 through

15   2017.  I was able to get a sense of that by looking at

16   board minutes, and the attendance was very strong.  And

17   most of the attendants, almost all of it was in person.

18   Q.   Did you also examine the board's engagement at the

19   meetings based on the minutes?

20   A.   I did.  I did.  So in addition to simply looking at

21   attendance; that is who came to the meeting, I would say

22   it was just as important, or more important for me to look

23   at the board's engagement when they came to those

24   meetings.  Were they asking questions?  Were they

25   following up with respect to matters that were discussed

2003

1    at the meetings?

2         I wanted to ensure myself that the board was not

3    passively receiving information, but that the board

4    members were active participants at the meetings.

5    Q.   You did that by reviewing the minutes?

6    A.   I did.  I did.  I was able to glean that information

7    from the minutes, because the minutes reflect when a given

8    independent director poses a question and what the

9    response might be.

10   Q.   And, in your experience, would you expect board

11   minutes of a meeting to reflect every question that is

12   asked?

13        MR. STRUCKHOFF:  Objection, foundation.

14        THE COURT:  Overruled.

15        THE WITNESS:  No, I would not expect that.  That

16   was not my intent when I answered your question a moment

17   ago.  I don't think that minutes are a transcript.  They

18   cannot reflect every single question.  I was simply struck

19   here by the level of activity I saw with respect to the

20   independent directors asking questions at board meetings.

21   Q.   (BY MR. MURPHY)  And if I can just go back one,

22   Mr. Laby to No. 8, "Independent directors meet outside the

23   presence of management and with independent legal

24   counsel."  What is the relevance of that to your opinion?

25   A.   Sure.  So, it was very important to me that the

1    independent directors had an opportunity to meet among

2    themselves outside of the presence of Great-West Capital

3    Management, and that they had the opportunity to do that

4    in several respects.

5         First of all, I have already explained that the

6    IDC, the Independent Directors Committee, met five times a

7    year.  So that was an opportunity for the independent

8    directors to come together and meet, in many instances,

9    with their independent legal counsel.  She was present

10   during those meetings.

11        In addition, the independent directors met in what

12   is called executive sessions.  So, that is a phrase to

13   describe a meeting where the independent directors meet

14   among themselves outside of the presence of management.

15   Those meetings also took place sometimes on the event of

16   the quarterly board meetings that we have already

17   discussed.

18        So, there were multiple opportunities for the

19   independent directors to meet and exchange information,

20   air their views outside of the presence of Great-West

21   Capital Management.  And, as I say, in most cases,

22   independent -- their independent legal counsel would be

23   present, as well.

24   Q.   Is that also a best practice?

25   A.   Yes, absolutely.

1    Q.   Was that important to you in assessing the board's

2    independence?

3    A.   It is important to me.  I wanted to see an

4    opportunity where the independent directors could gather

5    among themselves, outside of the presence of management,

6    and discuss any issues that they wanted to bring up.  And,

7    as I say, I saw multiple opportunities for this board to

8    do that.

9    Q.   No. 11 on Exhibit 1569 is "Independent directors

10   retain knowledgeable and experienced independent legal

11   counsel."  What is the relevance of that to your opinions

12   in this case?

13   A.   Yes.  So, that is another best practice indicated in

14   the MFDF and ICI materials, as well as the *Fund Directors'*

15   *Guidebook*.  And it is a best practice, because it is quite

16   important that the independent directors have legal

17   counsel who is advising the independent directors separate

18   and apart from legal counsel who advises the adviser,

19   GWCM.

20        It is important for a number of reasons.

21   Typically, the independent legal counsel will have a great

22   deal of experience, or often has a great deal of

23   experience, and can certainly fill in any gaps that might

24   be present with respect to the independent directors.  And

25   the legal counsel can act as an advocate for the

1    independent directors, in particular, with their

2    interactions with the adviser or with other consultants or

3    other service providers.

4         So, it is important for me, when I look at a mutual

5    fund board, to know whether the board has independent

6    counsel and who that independent counsel might be.

7    Q.   Who is the independent directors' counsel in this

8    case?

9    A.   Yes.  The independent directors' counsel was the firm

10   of Vedder Price.  And the particular lawyer at Vedder

11   Price acting for the independent directors was Renee

12   Hardt.  I am familiar with both Vedder Price and Renee

13   Hardt.  Vedder Price is a large, well-known, international

14   law firm.  I think they have over 300 lawyers.  They have

15   a large practice in the financial services area.

16        And I am familiar with Renee Hardt.  She is a

17   partner at the firm.  She has over 20 years of experience

18   at the firm.  And she -- she has over 20 years of

19   experience as a lawyer.  And she has got a robust practice

20   representing financial services providers, such as the

21   broker/dealer, investment adviser, mutual fund, and mutual

22   fund boards.

23   Q.   Is that helpful, or is that relevant to your opinion,

24   in terms of the board's independence?

25   A.   Absolutely.  A strong independent legal counsel very

2007

1    much enhances a board's independence.

2    Q.   Who is counsel to the Great-West funds in this case?

3    A.   Counsel to the funds was also Vedder Price and Renee

4    Hardt.  I want to be clear, we are talking about the

5    funds, not Great-West Capital Management.

6    Q.   Correct.  But Vedder served as counsel to the

7    independent directors and the funds?

8    A.   And the funds, themselves, that's correct.

9    Q.   Does that alter your opinions in any way in this

10   case?

11   A.   No.  No, it doesn't.  There is not really a conflict

12   between the funds, on the one hand, and the independent

13   directors on the other.  It is also a widely accepted

14   practice for one counsel to serve as both counsel to the

15   independent directors and counsel to the funds.

16          And, again, here I saw Renee Hardt acting in a

17   robust way representing the interest of the independent

18   directors.

19   Q.   If we can see Exhibit 1351, please.  Do you recognize

20   this, Mr. Laby?

21   A.   I do.  This is one of the best practices I have

22   referred to earlier.  This is authored by the Investment

23   Company Institute.

24   Q.   If we can go to page 29.  At the bottom there, it

25   says, "Counsel to the independent directors must be

```
 1    independent from the adviser and other fund service
 2    providers in order to render objective advice on areas of
 3    potential conflict between the fund and its service
 4    providers.  Courts frequently consider whether the
 5    directors have used independent counsel in evaluating
 6    whether the directors acted independently of the fund
 7    manager in fulfilling their responsibilities to fund
 8    shareholders.  The advisory group believes that counsel
 9    for the independent directors also may serve as fund
10    counsel because, in virtually every situation, except
11    possibly litigation, the interests of the fund and its
12    directors are aligned."  Do you see that?
13    A.   Yes, I do see that.
14    Q.   What do you understand that to be saying?
15    A.   Here, the ICI is basically making crystal clear that
16    in the ICI's view, there is really no conflict between the
17    same individual serving as counsel to the independent
18    directors and as counsel to the funds, because as it is
19    indicated here, in virtually every situation, except
20    potentially some litigation context, the interests of the
21    two are aligned.
22    Q.   And in your review of this case, did you observe any
23    instances where Vedder's advice, as fund counsel, was
24    conflicted in any way?
25    A.   No, not at all.
```

1          MR. MURPHY:  Your Honor, I move Exhibit 1351 into

2     evidence.  I believe it is stipulated.

3          THE COURT:  It is.  Exhibit 1351 is admitted.

4          (Exhibit No. 1351 is admitted.)

5     Q.   (BY MR. MURPHY)  Mr. Laby, did the board consider

6     Vedder Price's independence on a regular basis?

7     A.   Yes.  The board, on an annual basis, reviewed the

8     independence of Vedder Price as its independent counsel.

9     Q.   If we can see Exhibit 1011, which is already in

10    evidence.  Do you recognize this document, Mr. Laby?

11    A.   I do.

12    Q.   What is it?

13    A.   So, again, this is consistent with another of the

14    best practices that we talked about earlier.  This is a

15    memorandum from Vedder Price to the independent directors,

16    and it is an opportunity where Vedder Price, on an annual

17    basis, essentially reviews their own independence and

18    whether they still qualify as an independent counsel to

19    the independent directors.

20    Q.   And is this relevant at all in forming your opinions

21    on the independence of the directors?

22    A.   Yes, it is.  This also enhances my view of the

23    board's independence, because not only did they have

24    independent counsel, which, as I testified, I considered

25    to be quite important.  Not only that, they were quite

2010

1    serious about the independence of their counsel.  And

2    they, each year, examined the memorandum from Vedder

3    essentially verifying Vedder Price's independence on an

4    annual basis.

5    Q.   If we can go to page 12.  At the bottom there is a

6    paragraph starting "Although."  I think there has been

7    some testimony on this already.  But, as I understand it,

8    the "Commission" there is the Securities and Exchange

9    Commission, and there has been some guidance from them as

10   serving as fund counsel and trustees' counsel is

11   acceptable.  Are you familiar with that?

12   A.   I am familiar with this.  In fact, the very release

13   that this comes from is one of the matters that I worked

14   on during my time as the SEC.

15   Q.   And is that consistent with your understanding of the

16   ability of fund counsel to also serve as trustees'

17   counsel?

18   A.   Yes.  That is exactly what this document is laying

19   out.  She is quoting a document from the SEC.  And that is

20   precisely what the SEC is stating in that quoted passage.

21   Q.   In your review of the record in this matter,

22   Mr. Laby, did you observe any instances of Ms. Hardt, or

23   others at Vedder Price, advocating on behalf of the

24   independent directors?

25   A.   Sure.  There were many, many instances that I

1    reviewed where Renee Hardt was advocating on behalf of the

2    directors.  So, for example, after each of the March IDC

3    meetings that we spoke about earlier, Renee Hardt would

4    prepare a memorandum on behalf of the independent

5    directors, where she would seek additional information on

6    a variety of matters and send that over to GWCM,

7    Great-West Capital Management, seeking more information.

8           I remember in 2015, for example, her memo requested

9    additional information with respect to performance, fees,

10   and expenses.  Later in 2015, I recall that Renee Hardt

11   was following up on a request that the board had to review

12   some marketing materials.  The board did not receive those

13   marketing materials, and so Renee Hardt was advocating on

14   their behalf to make sure they, in fact, got those

15   materials from Great-West Capital Management.  So,

16   numerous examples like that.

17   Q.   Did you see instances of Great-West Capital

18   Management personnel sending draft board materials to

19   Ms. Hardt?

20   A.   Sure.  There were many occasions where draft

21   materials that would be meant for the board would first be

22   sent to Renee Hardt.  As their counsel, she would take a

23   look at those materials -- she was quite active -- and she

24   would get a pen and mark them up, have questions,

25   concerns, and then relay those concerns back to Great-West

1    Capital Management.  They would then make changes, the

2    documents would then be revised based on her comments, and

3    those final documents were ultimately sent to the

4    directors, after Great-West Capital Management took her

5    comments into consideration.

6    Q.   Is that review of draft form material by Ms. Hardt,

7    is that indicia of good governance or bad governance?

8    A.   That is indicia of good governance, in my review.  I

9    want to see an independent counsel acting on behalf of the

10   independent directors who is an active counsel, who is

11   participating in the process, looking at materials meant

12   for the board, using her experience to say, wait, I want

13   to see some additional materials, or I think you ought to

14   be changing the materials to make them better in one

15   respect or another.  I see that as an indicia of good

16   governance.

17   Q.   Is that a pretty standard practice in the industry,

18   in your experience?

19   A.   I would say it is a best practice.  And it is fairly

20   standard.  Here, I thought it was -- it stood out as

21   particularly robust.

22   Q.   If we can go back to Exhibit 1569, please.  Highlight

23   No. 12, "The board receives advice and materials from

24   outside consultants."

25   A.   Yes, I see it.

1   Q.   What consultants did the independent directors use?

2   A.   The independent directors used Lipper.  They used

3   JDL.  And they used Deloitte.

4   Q.   And is the use of independent consultants also a best

5   practice?

6   A.   It is.  It is another of the best practices

7   recommended by the MFDF, the ICI, and the *Fund Directors'*

8   *Guidebook*.

9   Q.   Did the board, the Great-West Funds' Board, expand

10   its use of consultants over time?

11   A.   It did expand its use of consultants over time.

12   There were a couple of respects in which the board

13   expanded the use of consultants, yes.

14   Q.   And how is that relevant to your opinions in this

15   case?

16   A.   Well, it is relevant to my opinions, because I like

17   to see a board that is trying to improve its process over

18   years.  The board's process might be fine at any given

19   point in time, but I'm always a little weary when I see a

20   process that is completely stagnant, when there are no

21   changes, at all.

22        So, I like to see a board that is actively trying

23   to improve itself and make changes and improve its

24   process.  And that is what I saw here.

25   Q.   And if we can look at 13 through 17, and highlight

2014

1   those.  What is that group there that I have highlighted?

2   A.   Sure.  So, now you are grouping together several of

3   the items here, which are all best practices recommended

4   by the MFDF or the ICI.  These are practices that I

5   thought were particularly meaningful with respect to the

6   board's process.  And so I included them on this list of

7   practices implemented by the Great-West Board.

8   Q.   What is your understanding of why a -- what is a

9   self-assessment?

10  A.   A self-assessment is what the name implies.  This is

11  an opportunity each year for the board to step back and

12  take a look at its own processes, and think about whether

13  or not any changes can be made.

14       So, the board reviews what it has done over the

15  past year and really analyzes whether it has done a good

16  job.  And, here, this board did that on an annual basis.

17  It did take stock of its own process.  And, in fact, it

18  noted -- I recall evidence in the record where it noted

19  some areas where improvement could be made, and then, in

20  fact, they did make some changes with respect to

21  improvements that they thought they could make to improve

22  themselves.

23  Q.   Do you recall any specific examples of that?

24  A.   I think one of the areas was in the length of board

25  meetings.  They enhanced the length of the board meetings

2015

```
 1    in some respect.  Another area was in the use of their own
 2    education and training, and how they could be better
 3    educated and trained for board service.
 4         Those are two examples where I believe the board,
 5    in its own self-assessment, identified those as areas
 6    where some improvements could be made, and they made some
 7    changes.
 8    Q.   And No. 15 is "Continuing education."  What is that?
 9    A.   Yes.  So that is reflective of what I mentioned a
10    moment ago with respect to the board's self-assessment.
11    So, independent directors often do pursue opportunities
12    for continuing education and training on matters that are
13    related to their oversight.
14         And this is, of course, very important in the
15    mutual fund world, because things are changing so much.
16    The industry is dynamic.  New rules and regulations are
17    often being adopted and implemented by the SEC and other
18    regulators.
19         So, it is really quite important for the directors
20    to stay current and be educated.  And this was another
21    best practice followed by this board.
22    Q.   Did you see any specific instances of continuing
23    education?
24    A.   Sure.  So, there were instances where the individual
25    independent directors would attend a seminar or some
```

1    program put on by an organization, the Mutual Fund

2    Directors Forum.

3          Renee Hardt, the independent counsel, she prepared

4    a quarterly memorandum for the independent directors to

5    update them on developments in the industry and any legal

6    developments.  There was a constant flow of educational

7    materials coming, not only from Vedder Price, but also

8    from Great-West Capital Management to the independent

9    directors, which they would review.

10         So, yes, several examples of their own education

11   and training.

12   Q.   And you have been discussing, Mr. Laby, the board's

13   qualifications, independence, and structure.  What is the

14   significance of these to your overall opinions in this

15   case?

16   A.   Well, we have been talking about the significance to

17   those structures, I think, in a number of respects.  But I

18   would say that their independence and their structures are

19   particularly important with regard to the 15(c) process,

20   the contract review process.  That's really an instance

21   where many of the best practices that we have been talking

22   about are essentially brought into motion, where the best

23   practices can be used.

24         So, when I see a board conducting the 15(c)

25   process, I want to see a board that is high quality, that

```
 1   is independent, and has the sound structures we have been
 2   talking about.
 3   Q.   We heard some evidence, and I think you testified
 4   today, about the fact that the board continued to get
 5   better and improve.  Am I correct?
 6   A.   Yes, that's correct.
 7   Q.   Did you review the board process between 2013 and
 8   2015?
 9   A.   I did review the board process during that time, and
10   it was good.
11   Q.   Your opinion of the process, both before and after
12   2015, is that it was good?
13   A.   Yes.  Yes, it was.  They made some changes, and the
14   board process was quite good after that period, as well.
15   Q.   And, again, does the fact that the board made
16   improvements or changes to the process concern you in any
17   way?
18   A.   No.  As I have tried to say earlier, I consider that
19   to be a positive development.
20   Q.   In terms of the 15(c) process -- and, again, maybe
21   just for clarity, people keep using 15(c) process.  What
22   does that mean?
23   A.   Sure.  So, the 15(c) process simply refers to the
24   contract review process.  That is the process by which the
25   funds' board of directors reviews and then asks to approve
```

 1   various contracts.  In this case, we have talked about the

 2   investment advisory contract and the administrative

 3   services agreement.

 4        The 15(c) process is simply that process; reviewing

 5   and then deciding whether to approve those agreements.

 6   Q.   And did the board follow recommended best practices

 7   in this case when going through that 15(c) process?

 8   A.   Yes.  Yes, it did.  And some of those best practices

 9   that are related specifically to the 15(c) process appear

10   in the higher numbers on the document that is on the

11   screen.

12        So, items 18 through 22, for example, are various

13   practices that refer a bit more particularly to the 15(c)

14   process, the contract review process.  And, yes, the board

15   did follow those best practices with respect to the 15(c)

16   process.

17   Q.   Just at a very high level, can you explain why items

18   18 to 22 are relevant to your opinion with respect to the

19   15(c) process?

20   A.   Sure.  So, at a high level, these items are referring

21   to receiving certain information from independent legal

22   counsel, the directors receiving information throughout

23   the year with regard to considering the various agreements

24   that they might be approving at the April meeting.  There

25   is information here or notations here with respect to how

      1    the independent directors deliberate.

      2          And, then, ultimately there is a reference here to

      3    the process I referred to earlier, where the IDC meets in

      4    March, and then the board meets one month later in April,

      5    and the benefit to those two meetings taking place as part

      6    of the 15(c) process.

      7          MR. MURPHY:  Your Honor, I was going to move on to

      8    a new subject.  It is probably a good place for a stopping

      9    point.  And I thought maybe we could spend a minute on

     10    scheduling, if you would indulge us.

     11          THE COURT:  How much longer do you have with this

     12    witness?

     13          MR. MURPHY:  About six pages, Your Honor.  I would

     14    say half an hour, maybe.

     15          THE COURT:  All right.  Let's go ahead and stop for

     16    the day then.

     17          And, scheduling?

     18          MR. MURPHY:  So, we have 18 more witnesses coming

     19    in.

     20          THE COURT:  18?  Wait a minute.

     21          MR. MURPHY:  Mr. Laby is actually our last witness.

     22    I don't know if the plaintiffs have any rebuttal

     23    witnesses.  So, again, I have a half hour.  I think we do,

     24    just in terms of using tomorrow morning, again, I will be

     25    done very early.  I think we will, as plaintiffs did, I

     1    think we would try to quickly and efficiently move in our

     2    deposition designations and some exhibits, and then I

     3    think we would be done.

     4         I am not sure if the plaintiffs are going to call a

     5    rebuttal witness.

     6         THE COURT:  Mr. Wolff, are you planning on calling

     7    a rebuttal witness?

     8         MR. WOLFF:  No, Your Honor.

     9         THE COURT:  So then we would be at the end?

    10         MR. MURPHY:  Then I am assuming no closing, since

    11    we had long arguments on Friday, but I just wanted to

    12    clarify that you are not expecting that.

    13         THE COURT:  We had long arguments, but I think it

    14    would be helpful for me to get a consolidated closing.  It

    15    was very helpful to hear from both sides, to help me start

    16    to structure this thing.  So, if you want to do closings,

    17    I will give you closings.

    18         How long do you think you will need for that?

    19         MR. MURPHY:  Obviously, we will follow your orders.

    20    I would say 30 minutes, but it is up to you.

    21         THE COURT:  I would say 30 minutes, no longer than

    22    45.

    23         MR. WOLFF:  I would prefer 45, since there is a lot

    24    of material to cover.

    25         THE COURT:  All right.  45 minutes for closing.

1      All right.  Very good.

2              MR. MURPHY:  Thank you, Your Honor.

3              THE COURT:  Then we will be in recess until 8:30

4      tomorrow morning.

5              (Proceedings conclude at 2:26 p.m.)

6

7

8

9              **R E P O R T E R ' S   C E R T I F I C A T E**

10

11              I, Darlene M. Martinez, Official Certified

12      Shorthand Reporter for the United States District Court,

13      District of Colorado, do hereby certify that the foregoing

14      is a true and accurate transcript of the proceedings had

15      as taken stenographically by me at the time and place

16      aforementioned.

17

18              Dated this 11th day of March, 2020.

19

20              _____

21              s/Darlene M. Martinez

22              RMR, CRR

23

24

25

*DARLENE M. MARTINEZ, RMR, CRR*
*United States District Court*
*For the District of Colorado*